1  JOHN P. REITMAN, SBN 80579
   jreitman@lgbfirm.com
2  ALEKSANDRA ZIMONJIC, SBN 210252
   azimonjic@lgbfirm.com
3  LANDAU GOTTFRIED & BERGER LLP
   1801 Century Park East, Suite 700
4  Los Angeles, CA 90067
   Telephone: (310) 557-0050
5  Facsimile: (310) 557-0056

6  Attorneys for Plaintiff Peter J. Mastan,
   Chapter 7 Trustee

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11 | In re | Case No. 2:14-bk-27656-WB |

12 | CARLO BONDANELLI, | Chapter 7 |

13 | Debtor . | Adv. No. 2:17-ap-01547-WB |

14 |

15 | PETER J. MASTAN, Chapter 7 Trustee, | **SUMMONS SERVICE EXECUTED RE SERVICE OF:** |

16 | Plaintiff, |

17 | v. | **1) COMPLAINT;** |

18 | CARLO BONDANELLI, in his individual capacity and as the trustee of ST. | **2) SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]; AND** |

19 | JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN; |

20 | ST. JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN, a | **3) PLAINTIFF'S NOTICE OF REQUIRED COMPLIANCE WITH FRBP 7026 AND LBR 7026-1** |

21 | pension plan; ST. JOSEPH'S INVESTMENTS, INC. in its capacity as |

22 | plan sponsor; and DOES 1-10, Inclusive, | **Status Conference Date and Time:** |

23 | Defendants. | Date:  January 30, 2018 |

24 | Time:  2:00 p.m. |

25 | Place:  Courtroom 1375 |

26 |           255 E. Temple St. |

27 |           Los Angeles, CA 90012 |

28

*(left margin, vertical text)* LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Plaintiff Peter J. Mastan, Chapter 7 trustee, submits the Declaration of Erik Meza reflecting

2  the Plaintiff's service of:

3    1.    Complaint;

4    2.    Summons and Notice of Status Conference; and

5    3.    Notice of Required Compliance with Federal Rule of Bankruptcy Procedure 7026

6  and Local Bankruptcy Rule 7026-1.

7

8

9

10  Dated: November 22, 2017                    LANDAU GOTTFRIED & BERGER LLP

11

12                                    By _____

13                                         Aleksandra Zimonjic
                                       Attorneys for Plaintiff Peter J. Mastan, Chapter 7
14                                     Trustee

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

# DECLARATION OF ERIK MEZA

I, Erik Meza, hereby declare as follows:

    1.    I am over 18 years of age, and I am not a party to the above-captioned bankruptcy case or adversary proceeding. My business address is 1801 Century Park East, Suite 700, Los Angeles, CA 90067.

    2.    On November 22, 2017 as shown by the attached Proof of Service, I served *Chapter 7 Trustee's Complaint to Set Aside and Recover Fraudulent Transfers* [Docket No. 1]; the *Summons and Notice of Status Conference in Adversary Proceeding [LBR 7004-1]* issued by the Clerk of the Court [Docket No. 2]; and *Plaintiff's Notice of Required Compliance with FRBP 7026 and LBR 7026-1* on the defendants listed on the attached Proof of Service. I did so by placing true and correct copies of those documents in an envelope with first class postage thereon fully prepaid, addressed to each of the defendants at the addresses shown on the attached Proof of Service. On the same day correspondence is placed for collection and mailing in that outgoing mail box, such correspondence is deposited in the ordinary course of business in a United States Postal Service mailbox by an LGB employee.

    I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed this 22nd day of November, 2017, at Los Angeles, California.

                        Erik Meza

LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT 1

1  JOHN P. REITMAN (State Bar No. 80579)
   jreitman@lgbfirm.com
2  ALEKSANDRA ZIMONJIC (State Bar No. 210252)
   azimonjic@lgbfirm.com
3  LANDAU GOTTFRIED & BERGER LLP
   1801 Century Park East, Suite 700
4  Los Angeles, California 90067
   Telephone: (310) 557-0050
5  Facsimile: (310) 557-0056

6  Attorneys for Peter J. Mastan, Chapter 7 Trustee

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12 | In re                          | Case No. 2:14-bk-27656-WB

13 | CARLO BONDANELLI,              | Chapter 7

14 |                    Debtor.     |

15 |────────────────────────────────| ADV. NO. _____

16 | PETER J. MASTAN, Chapter 7 Trustee, |

17 |                    Plaintiff,  | **CHAPTER 7 TRUSTEE'S COMPLAINT**
   |      vs.                       | **TO SET ASIDE AND RECOVER**
18 | CARLO BONDANELLI, in his individual | **FRAUDULENT TRANSFERS**
   | capacity and as the trustee of ST.
19 | JOSEPH'S INVESTMENTS, INC.
   | DEFINED BENEFIT PENSION PLAN;
20 | ST. JOSEPH'S INVESTMENTS, INC.
   | DEFINED BENEFIT PENSION PLAN, a
21 | pension plan; ST. JOSEPH'S
   | INVESTMENTS, INC. in its capacity as
22 | plan sponsor; and DOES 1-10, Inclusive,
   |                    Defendants.
23

24

25

26

27

28

EXHIBIT 1
3

1    Plaintiff Peter J. Mastan, the trustee (the "Trustee" or the "Plaintiff") of the chapter 7

2    bankruptcy estate (the "Estate") of Carlo Bondanelli ("Bondanelli"), alleges:

3                    **REQUIRED PLEADING DISCLOSURE**

4    1.    In accordance with the requirements of Local Bankruptcy Rule 7008-1, the

5    Trustee hereby alleges that the Claim for Relief in this Complaint constitutes core proceedings

6    under 28 U.S.C. § 157(b) or is related to this bankruptcy case (the "Bankruptcy Case") because the

7    outcome of that claim could have a significant effect on the Estate as it will impact property of the

8    Estate and the amount of money available for distribution to creditors. Regardless of the core or

9    non-core nature of the Claim for Relief asserted herein, the Trustee consents to the entry of final

10    orders and judgment by the Bankruptcy Court to the maximum extent permitted by applicable law.

11    Defendants are hereby notified that Fed. R. Bankr. P. 7008(a) requires each defendant to plead

12    whether the claims for relief alleged against such defendant are core or non-core and, if non-core,

13    whether consent is given to the entry of final orders and judgment by the Bankruptcy Court.

14                    **JURISDICTION AND VENUE**

15    2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

16    §§ 157 and 1334 because the Claim for Relief in this Complaint arises in or is related to *In re*

17    *Carlo Bondanelli*, the above-captioned Bankruptcy Case pending in this Court.

18    3.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because

19    the Bankruptcy Case is pending in this district and division. Pursuant to 28 U.S.C. § 1391, venue

20    is also appropriate in this district and division because a substantial part of the events, acts or

21    omissions giving rise to the claims asserted in this Complaint took place within this district.

22                    **THE PARTIES**

23    4.    Plaintiff Trustee is the duly appointed trustee of the Estate. Because the Trustee

24    was appointed after the occurrence of the majority of the facts alleged in this Complaint, he has no

25    personal knowledge of such facts. Accordingly, the Trustee alleges all such facts on information

26    and belief based on the testimony at the Debtor's first meeting of creditors, a review of documents

27    and pleadings filed in this Bankruptcy Case and related state and federal court proceedings, as well

28    as a review of the Debtor's books and records that were made available to the Trustee to date.

1

EXHIBIT 1
4

1      5.     Defendant Carlo Bondanelli is a debtor in the above-captioned bankruptcy case and

2  an individual residing in Los Angeles.

3      6.     Defendant St. Joseph's Investments, Inc. Defined Benefit Pension Plan (the "Plan")

4  is a pension plan of which Bondanelli is the trustee and a beneficiary. A copy of the Plan is

5  attached as **Exhibit 1.**

6      7.     Defendant St. Joseph's Investments, Inc. ("St. Joseph") is a California corporation

7  with a principal place of business in Los Angeles, California. At all relevant times, St. Joseph was

8  the sponsor of the Plan.

9      8.     The Trustee is not aware of the true names and capacities (whether individual,

10  associate, corporate, or otherwise) of defendants Does 1 through 10, or any of them, and therefore

11  sues said defendants, and each of them, by such fictitious names and will amend this Complaint to

12  include their true names and capacities, when ascertained, together with appropriate charging

13  allegations.

14      9.     Each of the Doe defendants is an immediate or mediate transferee of the avoidable

15  transfers alleged in this Complaint, or of the proceeds of such transfers, and did not take such

16  transferred property for value, in good faith, and without knowledge of the avoidability of such

17  transfers.

18                  **GENERAL ALLEGATIONS**

19      10.    On September 16, 2014 (the "Petition Date"), Bondanelli filed a voluntary petition

20  for relief under chapter 7 of title 11 of the United States Code and Mr. Mastan was subsequently

21  appointed as the Trustee.

22      11.    Prior to his bankruptcy, Bondanelli worked in the business of real estate

23  management, development and investment. As of the Petition Date, Bondanelli was employed by

24  St. Joseph, which is in the business of making real estate investments on behalf of third parties and

25  managing real estate development projects. Bondanelli previously was an owner of St. Joseph,

26  has worked for it for more than 30 years, and still works for it as a consultant. Prior to his

27  bankruptcy, Bondanelli transferred his ownership in St. Joseph's to his adult children, Bruno

28  Bondanelli and Alessandra Pisani.

<div align="center">2</div>

EXHIBIT 1

5

1  12. On or about January 1, 2003, St. Joseph established a Defined Benefit Plan (*i.e.*, the

2 Plan). At all relevant times, Bondanelli has been, and continues to be, the Plan's trustee and the

3 only person in control of the Plan. The Plan's only beneficiaries are Bondanelli and his daughter,

4 Alessandra Pisani.

5  13. Bondanelli used the Plan's assets as he saw fit, including to finance his business

6 operations. At his Section 341a meeting of creditors, Bondanelli testified: "The company used the

7 money in the Defined Benefit Plan to carry on business. As trustee, I am the only one that can

8 draw the money from the account and then I would – with that money I can do whatever I want.

9 So when the funds in the … Defined Benefit Plan were used from Branca and other things, the

10 benefit plan wrote a check to me, put the money in my account, and from there I put the money in

11 the businesses where it was needed." Transcript of Bondanelli's testimony at the Section 341(a)

12 meeting of creditors on April 2, 2015 (the "341a Transcript"), 43: 1-9.

13  14. Prior to the Petition Date, Bondanelli caused the Plan to make several loans (the

14 "Loans") to himself and/or entities under his ownership and control. Prior to the Petition Date,

15 Bondanelli repaid each of these loans. At his Section 341a meeting of creditors, Bondanelli

16 testified: "I was getting money from St. Joseph's and basically I emptied, completely, my

17 retirement account, which is the – they call it the Defined Benefit Plan, you know, and I have to

18 pay back and I did. There are several loans." Bondanelli's testimony at the Section 341(a)

19 meeting of creditors on April 2, 2015. The 341a Transcript, 25:15-20.

20  15. One of Bondanelli's projects was a 2004 joint venture with certain Italian investors,

21 including Francesco Tieni and Ocean Park SRL (the "Tieni Parties"), for acquisition and

22 development of two real properties (the "Property") in Santa Monica, California. The parties

23 agreed that Bondanelli would serve as the manager of the newly formed LLC without

24 compensation and be responsible for all aspects of the Property development, while the Italian

25 investors would loan funds necessary for acquisition and development of the Property. As part of

26 the joint venture, the Italian investors provided approximately $1.1 million (the "Loaned Funds")

27 to fund the project, while Bondanelli formed New West TC, LLC ("New West"), obtained

28 financing and acquired the Property on behalf of New West. Bondanelli used part of the Loaned

<div align="center">3</div>

EXHIBIT 1

6

1  Funds for a down payment on the Property and he personally guaranteed repayment of the balance

2  of the purchase price for the Property.

3       16.    Under the Joint Venture, the Italian investors agreed to provide additional funds to

4  pay off the loans on the Property, so the Property would be suitable for a construction loan

5  necessary for its development. The investors and Bondanelli disagreed about the amount of

6  additional financial contributions needed to develop the Property.

7       17.    In or about May 2012, Bondanelli entered into an agreement with a Pierluigi

8  Biasiolo ("Biasiolo") pursuant to which the two agreed to sue the Tieni Parties, take over the

9  Property, lease the residential units on the Property, sell the Property and divide the sale proceeds.

10  As part of the agreement, Bondanelli obtained financing from Biasiolo on behalf of New West so

11  it could continue servicing the mortgage and managing the Property.

12       18.    In June 2012, Bondanelli commenced litigation (the "Tieni Litigation") against the

13  Tieni Parties. In November 2012, Bondanelli and Biasiolo leased half of the rental units and began

14  collecting rent.

15       19.    On May 30, 2013, without informing the Italian investors, Bondanelli caused New

16  West to enter into a purchase agreement with Bruce Schwartz and Linda Johns for sale of the

17  Property for $3.3 million.

18       20.    On August 20, 2013, the escrow for the sale of the Property closed and New West

19  received approximately $1.7 million in sale proceeds. Bondanelli caused New West to transfer a

20  portion of the sale proceeds to Bondanelli's personal accounts and make other transfers to third

21  parties, including Biasiolo.

22       21.    On August 28, 2013, the Tieni Litigation was resolved through mediation during

23  which the parties entered into a settlement agreement. Pursuant to that settlement agreement,

24  Bondanelli agreed to make a $800,000 settlement payment to the Tieni Parties in exchange for

25  New West and its assets. After Bondanelli failed to make the settlement payment, the Tieni

26  Parties obtained a judgment in the amount of $804,000 against Bondanelli on March 25, 2014.

27  Bondanelli did not pay any part of Tieni Parties' judgment.

28

4

EXHIBIT 1
7

1   22.   Following his May 2012 agreement with Biasiolo, Bondanelli made transfers (the

2   "Transfers"), listed on the attached **Exhibit 2,** from his personal accounts to the Plan as purported

3   repayment of the Loans, including loans owed by Branca West, LLC ("Branca"). While

4   Bondanelli was the majority owner of Branca and controlled its operations, he had no personal

5   obligation to repay Branca's indebtedness to the Plan. Following the making of the Transfers,

6   Bondanelli retained control of the transferred funds as the sole trustee of the Plan. The Transfers

7   were made by Bondanelli for the sole benefit of Bondanelli. Bondanelli made the Transfers in an

8   effort to place his assets beyond the reach of his creditors and avoid making the Settlement

9   Payment to the Tieni Parties.

10   23.   Bondanelli claims that the Plan's assets are exempt assets, not available to his

11   creditors.

12   <u>**FIRST CLAIM FOR RELIEF**</u>

13   **(Against All Defendants, To Avoid Intentionally Fraudulent Transfers of Money and Other**

14   **Property under 11 U.S.C. §§ 548(a)(1)(A) and 550(a))**

15   24.   The Trustee incorporates by reference and realleges paragraphs 1-23 of this

16   Complaint.

17   25.   During the two-year period immediately preceding the Petition Date, Bondanelli

18   made transfers of his property, including money, to or for the benefit of the defendants (*i.e.,* the

19   "Transfers") in an effort to place his assets beyond the reach of creditors, including the Tieni

20   Parties. **Exhibit 2** identifies all such currently known transfers. At this time, the Trustee lacks

21   sufficient information to specify the total amount of money and other property that comprise all of

22   the Transfers. The Trustee will seek leave to amend this Complaint when he has additional

23   information concerning the money and other property that Bondanelli transferred to or for the

24   benefit of the defendants.

25   26.   When he made the Transfers, Bondanelli had actual intent to hinder, delay, or

26   defraud his creditors, including the Tieni Parties, and none of the Transfers were taken in good

27   faith. Bondanelli had control of the funds prior to making the Transfers, and he retained control of

28   the transferred funds following the Transfers as the Plan's sole trustee. Bondanelli made the

5

EXHIBIT 1
8

1  transfers for his own benefit and to the detriment of his creditors, including the Tieni Parties.

2  Bondanelli now contends that the Transfers are exempt assets, unavailable to his creditors.

3      **WHEREFORE**, the Trustee prays for judgment against the defendants, and each of them,

4  as follows:

5      1.    On the first claim for relief, for a judgment against the defendants that (i) avoids

6  the Transfers from Bondanelli to or for the benefit of the defendants, and (ii) requires the

7  defendants to return those transfers and their proceeds, or their value, to the Trustee, for the

8  benefit of the Estate;

9      2.    For interest at the legal rate on all damages and sums awarded to the Trustee, for

10  the benefit of the Estate; and

11      3.    For such other relief as the Court deems just and proper.

12

13

14  Dated: November 21, 2017           LANDAU GOTTFRIED & BERGER LLP

15

16                 By: _____

17                       Aleksandra Zimonjic
                 Attorneys for Peter J. Mastan, Chapter 7 Trustee

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

EXHIBIT 1

ST. JOSEPH'S INVESTMENTS, INC.
DEFINED BENEFIT PENSION PLAN

AND ALL SUPPORTING FORMS HAVE BEEN PRODUCED FOR

THE KAGAN COMPANY

Copyright 2012 SunGard
All Rights Reserved

EXHIBIT 1
7

EXHIBIT 1
11

ST. JOSEPH'S INVESTMENTS, INC.
DEFINED BENEFIT PENSION PLAN

EXHIBIT 1
8
EXHIBIT 1
12

TABLE OF CONTENTS

ARTICLE I
DEFINITIONS

ARTICLE II
ADMINISTRATION

| | | |
|---|---|---|
| 2.1 | POWERS AND RESPONSIBILITIES OF THE EMPLOYER | 9 |
| 2.2 | DESIGNATION OF ADMINISTRATIVE AUTHORITY | 9 |
| 2.3 | POWERS AND DUTIES OF THE ADMINISTRATOR | 9 |
| 2.4 | RECORDS AND REPORTS | 10 |
| 2.5 | APPOINTMENT OF ADVISERS | 10 |
| 2.6 | PAYMENT OF EXPENSES | 10 |
| 2.7 | CLAIMS PROCEDURE | 11 |
| 2.8 | CLAIMS REVIEW PROCEDURE | 11 |

ARTICLE III
ELIGIBILITY

| | | |
|---|---|---|
| 3.1 | CONDITIONS OF ELIGIBILITY | 11 |
| 3.2 | EFFECTIVE DATE OF PARTICIPATION | 11 |
| 3.3 | DETERMINATION OF ELIGIBILITY | 12 |
| 3.4 | CESSATION OF ELIGIBILITY | 12 |
| 3.5 | REHIRED EMPLOYEES AND BREAKS IN SERVICE | 12 |
| 3.6 | ELECTION NOT TO PARTICIPATE | 13 |
| 3.7 | OMISSION OF ELIGIBLE EMPLOYEE; INCLUSION OF INELIGIBLE EMPLOYEE | 13 |

ARTICLE IV
CONTRIBUTION AND VALUATION

| | | |
|---|---|---|
| 4.1 | PAYMENT OF CONTRIBUTIONS | 13 |
| 4.2 | ACTUARIAL METHODS | 13 |
| 4.3 | ROLLOVERS | 13 |
| 4.4 | QUALIFIED MILITARY SERVICE | 14 |

ARTICLE V
BENEFITS

| | | |
|---|---|---|
| 5.1 | RETIREMENT BENEFITS | 14 |
| 5.2 | MINIMUM BENEFIT REQUIREMENT FOR TOP HEAVY PLAN | 16 |
| 5.3 | PAYMENT OF RETIREMENT BENEFITS | 17 |
| 5.4 | DISABILITY RETIREMENT BENEFITS | 17 |
| 5.5 | DEATH BENEFITS | 17 |
| 5.6 | TERMINATION OF EMPLOYMENT BEFORE RETIREMENT | 18 |
| 5.7 | DISTRIBUTION OF BENEFITS | 19 |
| 5.8 | DISTRIBUTION OF BENEFITS UPON DEATH | 22 |
| 5.9 | MINIMUM DISTRIBUTION REQUIREMENTS | 24 |
| 5.10 | TIME OF SEGREGATION OR DISTRIBUTION | 29 |
| 5.11 | DISTRIBUTION FOR MINOR OR INCOMPETENT BENEFICIARY | 29 |

EXHIBIT 1
9
EXHIBIT 1
13

5.12    LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN ................................................ 29
5.13    EFFECT OF SOCIAL SECURITY ACT ................................................................................. 29
5.14    QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION ............................................ 29
5.15    LIMITATION OF BENEFITS ON TERMINATION ................................................................. 29
5.16    DIRECT ROLLOVER ......................................................................................................... 30
5.17    RETROACTIVE ANNUITY STARTING DATES ..................................................................... 31

**ARTICLE VI**
**CODE SECTION 415 LIMITATIONS**

6.1    ANNUAL BENEFIT ........................................................................................................... 32
6.2    MAXIMUM ANNUAL BENEFIT ........................................................................................... 33
6.3    ADJUSTMENTS TO ANNUAL BENEFIT AND LIMITATIONS .................................................. 33
6.4    ANNUAL BENEFIT NOT IN EXCESS OF $10,000 .............................................................. 35
6.5    OTHER RULES ................................................................................................................. 35

**ARTICLE VII**
**PLAN AMENDMENT**

7.1    AMENDMENT .................................................................................................................... 36

**ARTICLE VIII**
**PLAN TERMINATION**

8.1    TERMINATION OF PLAN WHILE COVERED BY PBGC ......................................................... 37
8.2    TERMINATION OF PLAN IF NOT COVERED BY PBGC ........................................................ 39
8.3    LIMITATION OF BENEFITS ON PLAN TERMINATION ......................................................... 39

**ARTICLE IX**
**MERGER, CONSOLIDATION OR TRANSFER OF ASSETS**

9.1    MERGER, CONSOLIDATION, AND TRANSFER REQUIREMENTS ........................................... 39

**ARTICLE X**
**TOP-HEAVY**

10.1    TOP HEAVY PLAN REQUIREMENTS .................................................................................. 40
10.2    DETERMINATION OF TOP HEAVY STATUS ....................................................................... 40

**ARTICLE XI**
**MISCELLANEOUS**

11.1    PARTICIPANT'S RIGHTS .................................................................................................. 41
11.2    ALIENATION ................................................................................................................... 42
11.3    CONSTRUCTION OF PLAN ............................................................................................... 42
11.4    GENDER AND NUMBER .................................................................................................... 42
11.5    LEGAL ACTION ............................................................................................................... 42
11.6    PROHIBITION AGAINST DIVERSION OF FUNDS ............................................................... 42
11.7    EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE ....................................................... 43
11.8    INSURER'S PROTECTIVE CLAUSE ................................................................................... 43
11.9    RECEIPT AND RELEASE FOR PAYMENTS ......................................................................... 43
11.10    ACTION BY THE EMPLOYER ........................................................................................... 43
11.11    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY ....................................... 43

EXHIBIT 1
10
EXHIBIT 1
14

11.12    HEADINGS .................................................................... 43
11.13    APPROVAL BY INTERNAL REVENUE SERVICE ............................... 43
11.14    UNIFORMITY ................................................................. 44
11.15    INTERPRETATION OF AGREEMENT WHEN PLAN FROZEN ............... 44
11.16    ELECTRONIC MEDIA ........................................................ 44
11.17    PLAN CORRECTION .......................................................... 44

### ARTICLE XII
### PARTICIPATING EMPLOYERS

12.1     ADOPTION BY OTHER EMPLOYERS ........................................ 44
12.2     REQUIREMENTS OF PARTICIPATING EMPLOYERS ....................... 44
12.3     DESIGNATION OF AGENT .................................................. 45
12.4     EMPLOYEE TRANSFERS .................................................... 45
12.5     AMENDMENT ................................................................ 45
12.6     DISCONTINUANCE OF PARTICIPATION .................................. 45
12.7     PROVISIONS APPLIED SEPARATELY (OR JOINTLY) FOR PARTICIPATING NON-AFFILIATED
         EMPLOYERS ................................................................. 45
12.8     TOP-HEAVY APPLIED SEPARATELY FOR PARTICIPATING NON-AFFILIATED EMPLOYERS ... 45
12.9     SERVICE ..................................................................... 46
12.10    REQUIRED BEGINNING DATE .............................................. 46
12.11    ADMINISTRATOR'S AUTHORITY ........................................... 46

EXHIBIT 1
11

EXHIBIT 1
15

### ST. JOSEPH'S INVESTMENTS, INC.
### DEFINED BENEFIT PENSION PLAN

THIS PLAN, hereby adopted this 27th day of April 2012, by St. Joseph's Investments, Inc. (herein referred to as the "Employer").

#### W I T N E S S E T H :

WHEREAS, the Employer heretofore established a Pension Plan effective January 1, 2003, (hereinafter called the "Effective Date") known as St. Joseph's Investments, Inc. Defined Benefit Plan and which plan shall hereinafter be known as St. Joseph's Investments, Inc. Defined Benefit Pension Plan (herein referred to as the "Plan") in recognition of the contribution made to its successful operation by its employees and for the exclusive benefit of its eligible employees; and

WHEREAS, under the terms of the Plan, the Employer has the ability to amend the Plan; and

WHEREAS, as of June 1, 2009, all benefit accruals under the Plan were frozen; and

WHEREAS, as of June 1, 2009, any Eligible Employee who has not become a Participant as of June 1, 2009 shall not enter and shall not become a Participant in the Plan on or after June 1, 2009; and

WHEREAS, the Employer now desires to maintain this frozen Plan so that distribution of benefits may be made at such time and in such manner as provided under the terms of the Plan;

NOW, THEREFORE, effective January 1, 2012, except as otherwise provided, the Employer in accordance with the provisions of the Plan pertaining to amendments thereof, hereby amends the Plan in its entirety and restates the Plan to provide as follows:

#### ARTICLE 1
#### DEFINITIONS

1.1   "Accrued Benefit" means the retirement benefit a Participant would receive at Normal Retirement Date based on the retirement benefit formula set forth in Section 5.1 of the Plan, multiplied by a fraction, not greater than one, the numerator of which is the Participant's total number of Years of Service and the denominator of which is the aggregate number of Years of Service the Participant would have accumulated if the Participant continued employment until Normal Retirement Age.

When determining a Participant's Accrued Benefit, the retirement benefit projected to be provided pursuant to the retirement benefit formula in Section 5.1 is the monthly benefit to which the Participant would be entitled if the Participant continued to earn until Normal Retirement Age the same rate of Average Monthly Compensation upon which the Participant's retirement benefit formula is based. This rate of Average Monthly Compensation is computed on the basis of Average Monthly Compensation taken into account under the Plan (but not to exceed the ten years of service immediately preceding the determination).

For Plan Years beginning before Code Section 411 is applicable hereto, a Participant's Accrued Benefit shall be the greater of that provided by the Plan, or 1/2 of the benefit which would have accrued had the provisions of this Section been in effect. In the event the Accrued Benefit as of the effective date of Code Section 411 is less than that provided by this Section, such difference shall be accrued pursuant to this Section.

Notwithstanding anything herein to the contrary, a Participant's Accrued Benefit attributable to the retirement benefit formula at the close of any Plan Year coinciding with or next following the Participant's attainment of Normal Retirement Age shall be equal to the monthly retirement benefit formula determined pursuant to Section 5.1(d) based upon service and Average Monthly Compensation determined at the close of any such Plan Year.

Notwithstanding the above, a Participant's Accrued Benefit derived from Employer contributions shall not be less than the minimum Accrued Benefit, if any, provided pursuant to Section 5.2.

Furthermore, pursuant to the freezing of benefit accruals under the Plan on June 1, 2009, no additional benefits shall accrue after such date.

1.2   "Act" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.

1.3   "Actuarial Equivalent" means a form of benefit differing in time, period, or manner of payment from a specific benefit provided under the Plan but having the same value when computed using Pre-Retirement Table: None; Post-Retirement Table: Applicable Mortality Table prescribed in Revenue Ruling 2007-67, Pre-Retirement Interest: 5.0%; and Post-Retirement Interest: 5.0%.

Notwithstanding the foregoing, the mortality table and the interest rate for the purposes of determining an Actuarial Equivalent amount (other than nondecreasing life annuities payable for a period not less than the life of a Participant or, in the case of a Pre-Retirement Survivor Annuity, the life of the surviving spouse) shall be the mortality table and the interest rates specified above or the "Applicable Mortality Table" and the "Applicable Interest Rate" described below, whichever produces the greater benefit:

1

EXHIBIT 1
12
EXHIBIT 1
16

(a) The "Applicable Mortality Table" means the mortality table prescribed by Code Section 417(e)(3). For any distribution with an Annuity Starting Date on or after the effective date of these Subsections and before the adoption date of these Subsections, if application of the amendment as of the Annuity Starting Date would have caused a reduction in the amount of any distribution, such reduction is not reflected in any payments made before the adoption date of these Subsections. However, the amount of any such reduction that is required under Code Section 415(b)(2)(B) must be reflected actuarially over any remaining payments to the Participant.

(b) The "Applicable Interest Rate" means the annual rate of interest on 30-year Treasury securities determined as of the first calendar month preceding the first day of the Plan Year during which the Annuity Starting Date occurs. However, except as provided in Regulations, if a Plan amendment (including this amendment and restatement) changes the time for which the "Applicable Interest Rate" (including an indirect change as a result of a change in the Plan Year), any distribution for which the Annuity Starting Date occurs in the one-year period commencing at the time the Plan amendment is effective (if the amendment is effective on or after the adoption date) must use the interest rate as provided under the terms of the Plan after the effective date of the amendment, determined at either the date for determining the interest rate before the amendment or the date for determining the interest rate after the amendment, whichever results in the larger distribution. If the Plan amendment is adopted retroactively (that is, the amendment is effective prior to the adoption date), the Plan must use the interest rate determination date resulting in the larger distribution for the period beginning with the effective date and ending one year after the adoption date.

In the event this Section is amended, the Actuarial Equivalent of a Participant's Accrued Benefit on or after the date of change shall be determined (unless otherwise permitted by law or Regulation) as the greater of (1) the Actuarial Equivalent of the Accrued Benefit as of the date of change computed on the old basis, or (2) the Actuarial Equivalent of the total Accrued Benefit computed on the new basis.

A Participant's Accrued Benefit shall not be considered to be reduced in violation of Code Section 411(d)(6) because the Participant's Accrued Benefit is determined using the "applicable mortality table" and the "applicable interest rate."

1.4    "Administrator" means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer. "Administrator" also includes any Qualified Termination Administrator (QTA) that has assumed the responsibilities of the Administrator in accordance with guidelines set forth by the Department of Labor.

1.5    "Affiliated Employer" means any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Regulations under Code Section 414(o).

1.6    "Aggregate Account" means, with respect to each Participant, the value of all accounts maintained on behalf of a Participant, whether attributable to Employer or Employee contributions, used to determine Top-Heavy Plan status under the provisions of a defined contribution plan included in any Aggregation Group (as defined in Section 10.2).

1.7    "Anniversary Date" means December 31.

1.8    "Annuity Starting Date" means, with respect to any Participant, the first day of the first period for which an amount is paid as an annuity, or, in the case of a benefit not payable in the form of an annuity, the first day on which all events have occurred which entitles the Participant to such benefit.

1.9    "Average Monthly Compensation" means the monthly Compensation of a Participant averaged over the 3 consecutive Plan Years from date of employment, including periods prior to the Effective Date of the Plan, which produce the highest monthly average. If a Participant has less than 3 consecutive Plan Years of service from date of employment to date of termination, the Participant's Average Monthly Compensation will be based on the Participant's monthly Compensation during the Participant's months of service from date of employment to date of termination. Compensation subsequent to cessation of participation pursuant to Section 3.4 shall not be recognized.

1.10    "Beneficiary" means the person (or entity) to whom the share of a deceased Participant's interest in the Plan is payable. Section 5.5 contains a definition of "designated Beneficiary" for purposes of that Section.

1.11    "Code" means the Internal Revenue Code of 1986, as amended or replaced from time to time.

1.12    "Compensation" with respect to any Participant means such Participant's wages as defined in Code Section 3401(a) and all other payments of compensation by the Employer (in the course of the Employer's trade or business) for a Plan Year (the "determination period") for which the Employer is required to furnish the Participant a written statement under Code Sections 6041(d), 6051(a)(3) and 6052. Compensation must be determined without regard to any rules under Code Section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)). Compensation for any Self-Employed Individual shall be equal to such individual's Earned Income. Furthermore, the benefits accrued on behalf of any Owner-Employee shall be made only with respect to the Earned Income for such Owner-Employee which is derived from the trade or business with respect to which such Plan is established. Notwithstanding the foregoing, if compensation for any prior determination period is taken into account in determining a Participant's benefits for the current Plan Year, Compensation means compensation determined pursuant to the terms of the Plan then in effect.

2

EXHIBIT 1
13
EXHIBIT 1
17

**Compensation Adjustments.** For purposes of this Section, the determination of Compensation shall be made by:

(a)   including amounts which are contributed by the Employer pursuant to a salary reduction agreement and which are not includible in the gross income of the Participant under Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and Employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions.

(b)   effective for Plan Years beginning on and after July 1, 2007, making the following adjustments for amounts that are paid after a Participant's severance from employment with the Employer and by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer. Any other payment of compensation paid after severance of employment that is not described in the following types of compensation is not considered Compensation, even if payment is made within the time period specified above.

(1)   **Regular pay.** Compensation shall include regular pay after severance of employment if:

(i)   The payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments; and

(ii)   The payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Employer.

(2)   **Leave cashouts.** Leave cash-outs shall be included in Compensation if those amounts would have been included in the definition of Compensation if they were paid prior to the Participant's severance from employment with the Employer, and the amounts are for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued;

(3)   **Deferred Compensation.** Deferred compensation shall be included in Compensation if those amounts would have been included in the definition of Compensation if they were paid prior to the Participant's severance from employment with the Employer maintaining the Plan, and the amounts are received pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid to the Participant had the Participant continued in employment with the Employer and only to the extent that the payment is includible in the Participant's gross income.

(4)   **Salary continuation payments for military service Participants.** Payments to an individual who does not currently perform services for the Employer by reason of qualified military service (as that term is used in Code Section 414(u)(1)) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer rather than entering qualified military service shall be excluded from Compensation.

(5)   **Salary continuation payments for disabled Participants.** Compensation excludes compensation paid to a Participant who is permanently and totally disabled (as defined in Code Section 22(e)(3)).

**Compensation Limit.** The Compensation of each Participant taken into account in determining benefit accruals in any Plan Year beginning after December 31, 2001, shall not exceed $200,000 (or such other amount provided in the Code). Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the determination period beginning with or within such calendar year. For any short determination period, the Compensation limit shall be an amount equal to the Compensation limit for the calendar year in which the determination period begins multiplied by the ratio obtained by dividing the number of full months in the short determination period by twelve (12). For purposes of determining benefit accruals in a Plan Year beginning after December 31, 2001, Compensation for any prior Plan Year shall be limited to $200,000.

1.13   **"Contract"** or **"Policy"** means any life insurance policy, retirement income policy or annuity contract (group or individual) issued pursuant to the terms of the Plan. In the event of any conflict between the terms of this Plan and the terms of any contract purchased hereunder, the Plan provisions shall control.

1.14   **"Earliest Retirement Age"** means the earliest date on which, under the Plan, the Participant could elect to receive retirement benefits.

1.15   **"Early Retirement Date."** This Plan does not provide for a retirement date prior to Normal Retirement Date.

1.16   **"Earned Income"** means with respect to a Self-Employed Individual, the net earnings from self-employment in the trade or business with respect to which the Plan is established, for which the personal services of the individual are a material income-producing factor. Net earnings will be determined without regard to items not included in gross income and the deductions allocable to such items. Net earnings are reduced by contributions made by the Self-Employed Individual to a qualified Plan to the extent deductible under Code Section 404. In addition, net earnings shall be determined with regard to the deduction allowed to the Self-Employed Individual by Code Section 164(f).

EXHIBIT 1
14
EXHIBIT 1
18

If any combination of bonuses, commissions, tips, overtime, moving expenses, fringe benefits, or any other element of compensation is excluded from Compensation for the purpose of determining any contribution, then for the purpose of determining the amount of such contribution on behalf of any Self-Employed Individual, such person's Earned Income will be reduced in the same proportion that the "includible compensation" of "common law participants" bears to the "total compensation" of all "common law participants."

For purposes of the preceding paragraph, "common law participant" means a Participant who is neither a Highly Compensated Employee nor a Self-Employed Individual, "includible compensation" means the amount of Compensation taken into account in determining the amount of such contribution for "common law participants," and "total compensation" means the amount of Compensation that would have been taken into account in determining such contribution for "common law participants" if (1) no element of Compensation had been excluded in determining such contribution, and (2) all of the following are included in Compensation: any amount which is contributed by the Employer at the election of the Participant pursuant to a salary reduction agreement and which is not includible in the gross income of the Participant by reason of Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions.

However, to the extent that the amount of "includible compensation" for "common law participants" includes any amount which is contributed by the Employer at the election of the Participant pursuant to a salary reduction agreement and which is not includible in the gross income of the Participant by reason of Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions, then those amounts shall be added back to Earned Income after making the adjustment described in the preceding paragraph.

1.17  **"Eligible Employee"** means any Employee, except as provided below, and except as provided in any other particular provision for the limited purposes of that provision. The following Employees shall not be eligible to participate in this Plan:

(a)  Employees of Affiliated Employers, unless such Affiliated Employers have specifically adopted this Plan in writing.

(b)  An individual shall not be an Eligible Employee if such individual is not reported on the payroll records of the Employer as a common law employee. In particular, it is expressly intended that individuals not treated as common law employees by the Employer on its payroll records and out-sourced workers, are neither Employees nor Eligible Employees, and are excluded from Plan participation even if a court or administrative agency determines that such individuals are common law employees and not independent contractors. However, this paragraph shall not apply to partners or other Self-Employed Individuals unless the Employer treats them as independent contractors.

(c)  Unless or until otherwise provided, Employees who became Employees as the result of a "Code Section 410(b)(6)(C) transaction" will not be Eligible Employees until the expiration of the transition period beginning on the date of the transaction and ending on the last day of the first Plan Year beginning after the date of the transaction. A Code Section 410(b)(6)(C) transaction is an asset or stock acquisition, merger, or similar transaction involving a change in the Employer of the Employees of a trade or business that is subject to the special rules set forth in Code Section 410(b)(6)(C).

(d)  Employees who are Leased Employees.

(e)  Employees whose employment is governed by the terms of a collective bargaining agreement between Employer representatives (within the meaning of Code Section 7701(a)(46)) and the Employer under which retirement benefits were the subject of good faith bargaining between the parties, unless such agreement expressly provides for coverage in this Plan.

(f)  Employees who are nonresident aliens (within the meaning of Code Section 7701(b)(1)(B)) and who receive no earned income (within the meaning of Code Section 911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)). In addition, this paragraph shall also apply to exclude from participation in the Plan an Employee who is a nonresident alien (within the meaning of Code Section 7701(b)(1)(B)) but who receives earned income (within the meaning of Code Section 911(d)(2)) from the Employer that constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)), if all of the Employee's earned income from the Employer from sources within the United States is exempt from United States income tax under an applicable income tax convention. The preceding sentence will apply only if all Employees described in the preceding sentence are excluded from the Plan.

1.18  **"Employee"** means any common law employee, Self-Employed Individual, Leased Employee or other person to the extent that the Code treats such an individual as an employee of the Employer for purposes of the Plan, such as (for certain purposes) any person who is employed by an Affiliated Employer.

1.19  **"Employer"** means St. Joseph's Investments, Inc. and any successor which shall maintain this Plan, and any predecessor which has maintained this Plan. The Employer is a corporation, with principal offices in the State of California. In addition, where appropriate, the term Employer shall include any Participating Employer which shall adopt this Plan.

1.20  **"Fiduciary"** means any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

4

EXHIBIT 1
15
EXHIBIT 1
19

1.21    "**415 Compensation**" with respect to any Participant means such Participant's wages as defined in Code Section 3401(a) and all other payments of compensation by the Employer (in the course of the Employer's trade or business) for a Plan Year for which the Employer is required to furnish the Participant a written statement under Code Sections 6041(d), 6051(a)(3) and 6052. "415 Compensation" must be determined without regard to any rules under Code Section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)). "415 Compensation" for any Self-Employed Individual shall be equal to such individual's Earned Income which is derived from the trade or business with respect to which such Plan is established.

Notwithstanding the above, the determination of 415 Compensation shall be made by:

(a)    including any elective deferral (as defined in Code Section 402(g)(3)), and any amount which is contributed by the Employer at the election of the Participant pursuant to a salary reduction agreement and which is not includible in the gross income of the Participant by reason of Code Sections 125 , 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and Employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions.

(b)    effective for Limitation Years beginning on and after July 1, 2007, making the following adjustments for amounts that are paid after a Participant's severance from employment with the Employer and by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer. Any other payment of compensation paid after severance of employment that is not described in the following types of compensation is not considered compensation within the meaning of Code Section 415(c)(3), even if payment is made within the time period specified above.

(1)    415 Compensation shall include regular pay after severance of employment if:

(i)    The payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments; and

(ii)    The payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Employer.

(2)    Leave cash-outs shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment with the Employer and the amounts are for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued.

(3)    Deferred compensation shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment with the Employer maintaining the Plan and the amounts are received pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid if the Participant had continued in employment with the Employer and only to the extent that the payment is includible in the Participant's gross income.

(4)    Payments to an individual who does not currently perform services for the Employer by reason of qualified military service (as that term is used in Code Section 414(u)(1)) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer rather than entering qualified military service shall be excluded in 415 Compensation.

(5)    415 Compensation excludes compensation paid to a Participant who is permanently and totally disabled (as defined in Code Section 22(e)(3)).

Back pay, within the meaning of Regulations Section 1.415(c)-2(g)(8), shall be treated as compensation for the Limitation Year to which the back pay relates to the extent the back pay represents wages and compensation that would otherwise be included under this definition.

Except as otherwise provided herein, if, in connection with the adoption of any amendment, the definition of 415 Compensation has been modified, then for Plan Years prior to the Plan Year which includes the adoption date of such amendment, 415 Compensation means compensation determined pursuant to the terms of the Plan then in effect.

415 Compensation shall not include amounts paid as compensation to a nonresident alien, as defined in Code Section 7701(b)(1)(B), who is not a Participant in the Plan to the extent the compensation is excludable from gross income and is not effectively connected with the conduct of a trade or business within the United States.

1.22    "**Highly Compensated Employee**" means an Employee described in Code Section 414(q) and the Regulations thereunder, and generally means any Employee who:

(a)    was a "five percent owner" as defined in Section 1.26(b) at any time during the "determination year" or "look-back year"; or

5

EXHIBIT 1
16
EXHIBIT 1
20

(b)    for the "look-back year" had "415 Compensation" from the Employer in excess of $80,000. The $80,000 amount is adjusted at the same time and in the same manner as under Code Section 415(d), except that the base period is the calendar quarter ending September 30, 1996.

The "determination year" means the Plan Year for which testing is being performed, and the "look-back year" means the immediately preceding twelve (12) month period.

A highly compensated former Employee is based on the rules applicable to determining Highly Compensated Employee status as in effect for the "determination year," in accordance with Regulation 1.414(q)-1T, A-4 and IRS Notice 97-45 (or any superseding guidance).

In determining who is a Highly Compensated Employee, Employees who are non-resident aliens and who received no earned income (within the meaning of Code Section 911(d)(2)) from the Employer constituting United States source income within the meaning of Code Section 861(a)(3) shall not be treated as Employees. If an Employee who is a nonresident alien has U.S. source income, that Employee is treated as satisfying this definition if all of such Employee's U.S. source income from the Employer is exempt from U.S. income tax under an applicable income tax treaty. Additionally, all Affiliated Employers shall be taken into account as a single employer and Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) shall be considered Employees unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and are not covered in any qualified plan maintained by the Employer. The exclusion of Leased Employees for this purpose shall be applied on a uniform and consistent basis for all of the Employer's retirement plans. Highly Compensated former Employees shall be treated as Highly Compensated Employees without regard to whether they performed services during the "determination year."

1.23    **"Highly Compensated Participant"** means, for a particular Plan Year, a Participant who meets the definition of a Highly Compensated Employee in effect for that Plan Year.

1.24    **"Hour of Service"** means (1) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer for the performance of duties (these hours shall be credited to the Employee for the computation period in which the duties are performed); (2) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer (irrespective of whether the employment relationship has terminated) for reasons other than performance of duties (such as vacation, holidays, sickness, jury duty, disability, lay-off, military duty or leave of absence) during the applicable computation period (these hours will be calculated and credited pursuant to Department of Labor regulation Section 2530.200b-2 which is incorporated herein by reference); (3) each hour for which back pay is awarded or agreed to by the Employer without regard to mitigation of damages (these hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made). The same Hours of Service shall not be credited both under (1) or (2), as the case may be, and under (3).

Notwithstanding (2) above, (i) no more than 501 Hours of Service are required to be credited to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (ii) an hour for which an Employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, or unemployment compensation or disability insurance laws; and (iii) Hours of Service are not required to be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee.

For purposes of (2) above, a payment shall be deemed to be made by or due from the Employer regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund, or insurer, to which the Employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer, or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

For purposes of this Section, Hours of Service will be credited for employment with other Affiliated Employers. The provisions of Department of Labor regulations Section 2530.200b-2(b) and (c) are incorporated herein by reference.

1.25    **"Investment Manager"** means an entity that (a) has the power to manage, acquire, or dispose of Plan assets and (b) acknowledges fiduciary responsibility to the Plan in writing. Such entity must be a person, firm, or corporation registered as an investment adviser under the Investment Advisers Act of 1940, a bank, or an insurance company.

1.26    **"Key Employee"** means, for Plan Years beginning after December 31, 2001, an Employee as defined in Code Section 416(i) and the Regulations thereunder. Generally, any Employee or former Employee (as well as each of the Employee's or former Employee's Beneficiaries) is considered a Key Employee if the Employee, at any time during the Plan Year that contains the "determination date" (as defined in Plan Section 10.2), has been included in one of the following categories:

(a)    an officer of the Employer (as that term is defined within the meaning of the Regulations under Code Section 416) having annual "415 Compensation" greater than $130,000 (as adjusted under Code Section 416(i)(1) for Plan Years beginning after December 31, 2002).

(b)    a "five percent owner" of the Employer. "Five percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent (5%) of the outstanding stock of the Employer or stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business,

6

EXHIBIT 1
17
EXHIBIT 1
21

any person who owns more than five percent (5%) of the capital or profits interest in the Employer. In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers.

(e)    a "one percent owner" of the Employer having an annual 415 Compensation from the Employer of more than $150,000. "One percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than one percent (1%) of the outstanding stock of the Employer or stock possessing more than one percent (1%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than one percent (1%) of the capital or profits interest in the Employer. In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers. However, in determining whether an individual has "415 Compensation" of more than $150,000, "415 Compensation" from each employer required to be aggregated under Code Sections 414(b), (c), (m) and (o) shall be taken into account.

In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers. In determining whether an individual has 415 Compensation of more than $150,000, 415 Compensation from each employer required to be aggregated under Code Sections 414(b), (c), (m) and (o) shall be taken into account.

1.27    "**Late Retirement Date**" means the first day of the month coinciding with or next following a Participant's actual Retirement Date after having reached Normal Retirement Date.

1.28    "**Leased Employee**" means any person (other than an Employee of the recipient Employer) who pursuant to an agreement between the recipient Employer and any other person or entity ("leasing organization") has performed services for the recipient (or for the recipient and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full time basis for a period of at least one year, and such services are performed under primary direction or control by the recipient Employer. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the recipient Employer shall be treated as provided by the recipient Employer. Furthermore, Compensation for a Leased Employee shall only include Compensation from the leasing organization that is attributable to services performed for the recipient Employer. A Leased Employee shall not be considered an Employee of the recipient Employer:

(a)    if such employee is covered by a money purchase pension plan providing:

(1)    a nonintegrated employer contribution rate of at least 10% of compensation, as defined in Code Section 415(c)(3);

(2)    immediate participation;

(3)    full and immediate vesting; and

(b)    if leased employees do not constitute more than 20% of the recipient Employer's nonhighly compensated work force.

1.29    "**Non-Highly Compensated Employee/Participant**" means any Employee who is not a Highly Compensated Employee.

A Participant is a Nonhighly Compensated Participant for a particular Plan Year if such Participant does not meet the definition of a Highly Compensated Employee in effect for that Plan Year.

1.30    "**Non-Key Employer**" means any Employee or former Employee (and such Employee's or former Employee's Beneficiaries) who is not a Key Employee.

1.31    "**Normal Retirement Age**" means the Participant's 65th birthday, or the Participant's 5th anniversary of joining the Plan, if later. A Participant shall become fully Vested in the Participant's Normal Retirement Benefit upon attaining Normal Retirement Age.

1.32    "**Normal Retirement Date**" means the first day of the month coinciding with or next following the Participant's Normal Retirement Age.

1.33    "**1-Year Break in Service**" means the applicable computation period during which an Employee has not completed more than 500 Hours of Service with the Employer. Further, solely for the purpose of determining whether a Participant has incurred a 1-Year Break in Service, Hours of Service shall be recognized for "authorized leaves of absence" and "maternity and paternity leaves of absence." Years of Service and 1-Year Breaks in Service shall be measured on the same computation period.

"Authorized leave of absence" means an unpaid, temporary cessation from active employment with the Employer pursuant to an established nondiscriminatory policy, whether occasioned by illness, military service, or any other reason.

A "maternity or paternity leave of absence" means, for Plan Years beginning after December 31, 1984, an absence from work for any period by reason of the Employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or any absence for the purpose of caring for such child for a period immediately following such birth or placement. For this purpose, Hours of Service shall be credited for the computation period in which the absence from work begins, only if credit therefore is necessary to prevent the Employee from incurring a 1-Year Break in Service, or, in any other case, in the immediately following computation period. The Hours of Service credited for a "maternity or paternity leave of absence" shall be those which would

7

EXHIBIT 1
18
EXHIBIT 1
22

normally have been credited but for such absence, or, in any case in which the Administrator is unable to determine such hours normally credited, eight (8) Hours of Service per day. The total Hours of Service required to be credited for a "maternity or paternity leave of absence" shall not exceed the number of Hours of Service needed to prevent the Employee from incurring a 1-Year Break in Service.

1.34    "Owner-Employee" means a sole proprietor who owns the entire interest in the Employer or a partner who owns more than 10% of either the capital interest or the profits interest in the Employer and who receives income for personal services from the Employer.

1.35    "Participant" means any Employee or former Employee who has satisfied the requirements of Sections 3.1 and 3.2 and entered the Plan and is eligible to accrue benefits under the Plan. In addition, the term "Participant" also includes any individual who was a Participant (as defined in the preceding sentence) and who must continue to be taken into account under a particular provision of the Plan (e.g., because the Participant has an Accrued Benefit under the Plan).

1.36    "Participant's Rollover Account" means the account maintained by the Administrator for each Participant with respect to the total interest in the Plan resulting from amounts rolled over from another qualified plan or Individual Retirement Account in accordance with Section 4.3.

1.37    "Plan" means this instrument, including all amendments thereto.

1.38    "Plan Year" means the Plan's accounting year of twelve (12) months commencing on January 1 of each year and ending the following December 31.

1.39    "Plan Year of Service" means a Plan Year during which an Employee is a Participant and completes 1,000 Hours of Service. However, in determining whether a Participant has completed a Plan Year of Service in a short Plan Year, the number of the Hours of Service required shall be proportionately reduced based on the number of full months in the short Plan Year.

1.40    "Pre-Retirement Survivor Annuity" means an immediate annuity for the life of the surviving spouse of a Participant who dies prior to the Participant's Annuity Starting Date.

1.41    "Present Value of Accrued Benefit" means the Actuarial Equivalent lump-sum amount of a Participant's Accrued Benefit at date of valuation. Notwithstanding the foregoing, the Present Value of Accrued Benefit for the determination of Top Heavy Plan status shall be made exclusively pursuant to the provisions of Section 10.2.

1.42    "Regulation" means the Income Tax Regulations as promulgated by the Secretary of the Treasury or a delegate of the Secretary of the Treasury, and as amended from time to time.

1.43    "Retired Participant" means a person who has been a Participant, but who has become entitled to retirement benefits under the Plan.

1.44    "Retirement Date" means the date as of which a Participant retires for reasons other than Total and Permanent Disability, whether such retirement occurs on a Participant's Normal Retirement Date or Late Retirement Date (see Section 5.1).

1.45    "Self-Employed Individual" means an individual who has Earned Income for the taxable year from the trade or business for which the Plan is established, and, also, an individual who would have had Earned Income but for the fact that the trade or business had no net profits for the taxable year. A Self-Employed Individual shall be treated as an Employee.

1.46    "Shareholder-Employee" means a Participant who owns more than five percent (5%) of the Employer's outstanding capital stock during any year in which the Employer elected to be taxed as a Small Business Corporation under the applicable Code Section.

1.47    "Social Security Retirement Age" means the age used as the retirement age under Section 216(l) of the Social Security Act, except that such Section shall be applied without regard to the age increase factor and as if the early retirement age under Section 216(l)(2) of such Act were 62.

1.48    "Terminated Participant" means a Participant who is no longer employed by any Participating Employer.

1.49    "Top Heavy Plan" means a plan described in Section 10.2(a).

1.50    "Top Heavy Plan Year" means a Plan Year during which the Plan is a Top Heavy Plan.

1.51    "Total and Permanent Disability" means a physical or mental condition of a Participant resulting from bodily injury, disease, or mental disorder which renders such Participant incapable of continuing usual and customary employment with the Employer. The disability of a Participant shall be determined by a licensed physician. The determination shall be applied uniformly to all Participants.

1.52    "Trustee" means the person or entity named as trustee herein or in any separate trust forming a part of this Plan, and any successors.

1.53    "Trust Fund" means the assets of the Plan and Trust as the same shall exist from time to time.

8

EXHIBIT 1
19
EXHIBIT 1
23

1.54   "Vested" means the portion of a Participant's benefits under the Plan that are nonforfeitable.

1.55   "Year of Service" means the computation period of twelve (12) consecutive months, herein set forth, during which an Employee has at least 1,000 Hours of Service.

For purposes of eligibility for participation, the initial computation period shall begin with the date on which the Employee first performs an Hour of Service. The participation computation period shall shift to the Plan Year which includes the anniversary of the date on which the Employee first performed an Hour of Service. An Employee who is credited with the required Hours of Service in both the initial computation period and the Plan Year which includes the anniversary of the date on which the Employee first performed an Hour of Service, shall be credited with two (2) Years of Service for purposes of eligibility to participate. The participation computation period beginning after a 5-Year Break in Service shall be measured from the date on which an Employee again performs an Hour of Service.

For vesting purposes, the computation periods shall be the Plan Year, excluding periods prior to the Effective Date of the Plan.

The computation period shall be the Plan Year if not otherwise set forth herein.

Notwithstanding the foregoing, for any short Plan Year, the determination of whether an Employee has completed a Year of Service shall be made in accordance with Department of Labor regulation Section 2530.203-2(c). However, in determining whether an Employee has completed a Year of Service for benefit accrual purposes or for purposes of Section 5.1(a) in the short Plan Year, the number of the Hours of Service required shall be proportionately reduced based on the number of full months in the short Plan Year.

Years of Service with any Affiliated Employer shall be recognized. Furthermore, Years of Service with any predecessor employer that maintained this Plan shall be recognized.

## ARTICLE II
## ADMINISTRATION

### 2.1   POWERS AND RESPONSIBILITIES OF THE EMPLOYER

(a)   **Appointment of Trustee (or Insurer) and Administrator.** In addition to the general powers and responsibilities otherwise provided for in this Plan, the Employer shall be empowered to appoint and remove the Trustee and the Administrator from time to time as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms of the Act, the Plan and the Code. The Employer may appoint counsel, specialists, advisers, agents (including any nonfiduciary agent) and other persons as the Employer deems necessary or desirable in connection with the exercise of its fiduciary duties under this Plan. The Employer may compensate such agents or advisers from the assets of the Plan as fiduciary expenses (but not including any business (settlor) expenses of the Employer), to the extent not paid by the Employer.

(b)   **Appointment of Investment Manager.** The Employer may, by written agreement or designation, appoint at its option an Investment Manager (qualified under the Investment Company Act of 1940 as amended), investment adviser, or other agent to provide investment direction to the Trustee with respect to any or all of the Plan assets. Such appointment shall be given by the Employer in writing in a form acceptable to the Trustee and shall specifically identify the Plan assets with respect to which the Investment Manager or other agent shall have authority to direct the investment.

(c)   **Funding policy and method.** The Employer shall establish a "funding policy and method," i.e., it shall determine whether the Plan has a short run need for liquidity (e.g., to pay benefits) or whether liquidity is a long run goal and investment growth (and stability of same) is a more current need, or shall appoint a qualified person to do so. The Employer or its delegate shall communicate such needs and goals to the Trustee, who shall coordinate such Plan needs with its investment policy. The communication of such a "funding policy and method" shall not, however, constitute a directive to the Trustee as to the investment of the Trust Funds. Such "funding policy and method" shall be consistent with the objectives of this Plan and with the requirements of Title I of the Act.

(d)   **Review of fiduciary performance.** The Employer shall periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedures established hereunder. This requirement may be satisfied by formal periodic review by the Employer or by a qualified person specifically designated by the Employer, through day-to-day conduct and evaluation, or through other appropriate ways.

### 2.2   DESIGNATION OF ADMINISTRATIVE AUTHORITY

The Employer shall be the Administrator. The Employer may appoint any person, including, but not limited to, the Employees of the Employer, to perform the duties of the Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. Upon the resignation or removal of any individual performing the duties of the Administrator, the Employer may designate a successor.

### 2.3   POWERS AND DUTIES OF THE ADMINISTRATOR

The primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan. The Administrator shall administer the Plan in accordance with its terms and shall

9

EXHIBIT 1
20
EXHIBIT 1
24

have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan. Benefits under this Plan will be paid only if the Administrator decides in its discretion that the applicant is entitled to them. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan shall continue to be deemed a qualified plan under the terms of Code Section 401(a), and shall comply with the terms of the Act and all regulations issued pursuant thereto. The Administrator shall have all powers necessary or appropriate to accomplish the Administrator's duties under the Plan.

The Administrator shall be charged with the duties of the general administration of the Plan as set forth under the terms of the Plan, including, but not limited to, the following:

(a)    the discretion to determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder and to receive benefits under the Plan;

(b)    the authority to review and settle all claims against the Plan, including claims where the settlement amount cannot be calculated or is not calculated in accordance with the Plan's benefit formula. This authority specifically permits the Administrator to settle disputed claims for benefits and any other disputed claims made against the Plan;

(c)    to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder;

(d)    to authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust;

(e)    to maintain all necessary records for the administration of the Plan;

(f)    to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with the terms hereof;

(g)    to determine the size and type of any Contract to be purchased from any insurer and to designate the insurer from which such Contract shall be purchased. All Policies shall be issued on a uniform basis as of each Anniversary Date with respect to all Participants under similar circumstances;

(h)    to compute and certify to the Employer and to the Trustee from time to time the sums of money necessary or desirable to be contributed to the Plan;

(i)    to consult with the Employer and the Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee can exercise any investment discretion (if the Trustee has such discretion) in a manner designed to accomplish specific objectives;

(j)    to prepare and implement a procedure for notifying Participants and Beneficiaries of their rights to elect qualified joint and survivor annuities and qualified pre-retirement survivor annuities as required by the Code and regulations thereunder;

(k)    to determine the validity of, and take appropriate action with respect to, any qualified domestic relations order received by it; and

(l)    to assist any Participant regarding the Participant's rights, benefits, or elections available under the Plan.

## 2.4    RECORDS AND REPORTS

The Administrator shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law.

## 2.5    APPOINTMENT OF ADVISERS

The Administrator, or the Trustee with the consent of the Administrator, may appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator or the Trustee deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries.

## 2.6    PAYMENT OF EXPENSES

All reasonable expenses of administration may be paid out of the Plan assets unless paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any named Fiduciary incident to the exercise of their duties under the Plan, including, but not limited to, fees of accountants, counsel, Investment Managers, and

10.

EXHIBIT 1
21
EXHIBIT 1
25

other specialists and their agents, the costs of any bonds required pursuant to Act Section 412, and other costs of administering the Plan. Until paid, the expenses shall constitute a liability of the Trust Fund.

## 2.7    CLAIMS PROCEDURE

Claims for benefits under the Plan may be filed in writing with the Administrator. Written notice of the disposition of a claim shall be furnished to the claimant within ninety (90) days (45 days if the claim involves disability benefits) after the application is filed, or such period as is required by applicable law or Department of Labor regulation. In the event the claim is denied, the reasons for the denial shall be specifically set forth in the notice in language calculated to be understood by the claimant, pertinent provisions of the Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claim will be provided. In addition, the claimant shall be furnished with an explanation of the Plan's claims review procedure.

## 2.8    CLAIMS REVIEW PROCEDURE

Any Employee, former Employee, or Beneficiary of either, who has been denied a benefit by a decision of the Administrator pursuant to Section 2.7 shall be entitled to request the Administrator to give further consideration to a claim by filing with the Administrator a written request for a hearing. Such request, together with a written statement of the reasons why the claimant believes the claim should be allowed, shall be filed with the Administrator no later than sixty (60) days (45 days if the claim involves disability benefits) after receipt of the written notification provided for in Section 2.7. The Administrator shall then conduct a hearing within the next sixty (60) days (45 days if the claim involves disability benefits), at which the claimant may be represented by an attorney or any other representative of such claimant's choosing and expense and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claim. At the hearing (or prior thereto upon five (5) business days written notice to the Administrator) the claimant or the claimant's representative shall have an opportunity to review all documents in the possession of the Administrator which are pertinent to the claim at issue and its disallowance. The full expense of any such court reporter and such transcripts shall be borne by the party causing the court reporter to attend the hearing. A final decision as to the allowance of the claim shall be made by the Administrator within sixty (60) days (45 days if the claim involves disability benefits) of receipt of the appeal (unless there has been an extension of sixty (60) days (45 days if the claim involves disability benefits) due to special circumstances, provided the delay and the special circumstances occasioning it are communicated to the claimant within the sixty (60) day period (45 days if the claim involves disability benefits). Such communication shall be written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based. Notwithstanding the preceding, to the extent any of the time periods specified in this Section are amended by law or Department of Labor regulation, then the time frames specified herein shall automatically be changed in accordance with such law or regulation.

If the Administrator, pursuant to the claims review procedure, makes a final written determination denying a Participant's or Beneficiary's benefit claim, then in order to preserve the claim, the Participant or Beneficiary must file an action with respect to the denied claim not later than one hundred eighty (180) days following the date of the Administrator's final determination.

### ARTICLE III
### ELIGIBILITY

## 3.1    CONDITIONS OF ELIGIBILITY

(a)    **Eligibility.** For all Plan purposes, any Eligible Employee who has completed one (1) Year of Service and has attained age 21 shall be eligible to participate hereunder as of the date such Employee has satisfied such requirements. However, any Employee who was a Participant in the Plan prior to the effective date of this amendment and restatement shall continue to participate in the Plan.

## 3.2    EFFECTIVE DATE OF PARTICIPATION

(a)    **Effective date of participation.** An Eligible Employee shall become a Participant effective as of the earlier of the first day of the Plan Year or the first day of the seventh month of such Plan Year coinciding with or next following the date such Employee met the eligibility requirements of Section 3.1, provided said Employee was still employed as of such date (or if not employed on such date, as of the date of rehire if a 1-Year Break in Service has not occurred or, if later, the date that the Employee would have otherwise entered the Plan had the Employee not terminated employment).

(b)    **Ineligible to eligible classification.** If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise have become a Participant in the Plan, shall go from a classification of an ineligible Employee to an Eligible Employee, such Employee shall become a Participant in the Plan on the date such Employee becomes an Eligible Employee or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee.

(c)    **Eligible to ineligible classification.** If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise become a Participant in the Plan, shall go from a classification of an Eligible Employee to an ineligible class of Employees, such Employee shall become a Participant in the Plan on the date such Employee again becomes an Eligible Employee, or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee. However, if such Employee incurs five (5) consecutive 1-Year Breaks in Service, eligibility will be determined under the Break in Service rules set forth in Section 3.5.

11

EXHIBIT 1
22
EXHIBIT 1
26

3.3    DETERMINATION OF ELIGIBILITY

The Administrator shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to the Plan and the Act. Such determination shall be subject to review pursuant to Section 2.7.

3.4    CESSATION OF ELIGIBILITY

In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee with respect to the Plan, then such Participant shall continue to Vest in the Plan for each Year of Service completed while an ineligible Employee.

3.5    REHIRED EMPLOYEES AND BREAKS IN SERVICE

(a)    **Reemployed before five (5) consecutive 1-Year Breaks in Service.** If any Employee becomes a former Employee due to severance from employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service occur, then the former Employee's prior service shall count in the same manner as if severance from employment with the Employer had not occurred. If any Participant ceases to be a Participant due to severance from employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service occur, then the Participant shall resume participation (in the same manner as if severance from employment with the Employer had not occurred) as of the reemployment date.

(b)    **Reemployed after five (5) consecutive 1-Year Breaks in Service ("rule of parity" provisions).** If any Employee becomes a former Employee due to severance from employment with the Employer and is reemployed after a 5-Year Break in Service has occurred, Years of Service shall include Years of Service prior to the 5-year break in service subject to the following rules:

(1)    Rule of parity. In the case of a Participant who under the Plan does not have a nonforfeitable right to any interest in the Plan resulting from Employer contributions, Years of Service before a period of consecutive 1-Year Breaks in Service will not be taken into account if the number of consecutive 1-Year Breaks in Service equal or exceed the greater of (A) five (5) or (B) the aggregate number of pre-break Years of Service. Such aggregate number of Years of Service will not include any Years of Service disregarded under the preceding sentence by reason of prior period of five (5) consecutive 1-Year Breaks in Service.

(2)    Participation in Plan. If any Participant becomes a former Employee due to severance from employment with the Employer and is reemployed by the Employer before a 5-Year Break in Service occurs, the Former Employee shall become a Participant as of the reemployment date (provided the Employee is an Eligible Employee as of such date).

(c)    **Non-duplication of benefits and buybacks.** If any Participant becomes a former Employee due to severance of employment with the Employer and again becomes a Participant, such renewed participation shall not result in duplication of benefits. Accordingly, unless a repayment is made pursuant to the following provisions of this subsection, if such Participant has received a distribution of all or a portion of his or her Accrued Benefit, then the Participant's "Normal Retirement Benefit" and Accrued Benefit shall be actuarially reduced by the amount of such distribution.

If a Participant was not fully Vested at the time of a total distribution of his or her Vested Accrued Benefit, then the Participant may repay the amount of such distribution in order to restore the non-Vested portion of the Accrued Benefit. The Participant must make the repayment, with interest, within a period of the earlier of five (5) years after the first date on which the Participant is subsequently reemployed by the Employer or the close of the first period of five (5) consecutive 1-Year Breaks in Service commencing after the distribution. Any repayment by a Participant shall be equal to the total of:

(1)    the amount of the distribution,

(2)    interest on such distribution compounded annually at the rate of five percent (5%) per annum from the date of distribution to the date of repayment or to the last day of the first Plan Year ending on or after December 31, 1987, if earlier, and

(3)    interest on the sum of (1) and (2) above compounded annually at the rate of one-hundred twenty percent (120%) of the federal mid-term rate (as in effect under Code Section 1274 for the first month of a Plan Year) from the beginning of the first Plan Year beginning after December 31, 1987, or the date of distribution, whichever is later, to the date of repayment.

If a Participant terminates service with a vested Accrued Benefit equal to zero, the Participant shall be deemed to have received a distribution such Accrued Benefit, and if such Terminated Participant is reemployed by the Employer before incurring five (5) consecutive 1-Year Breaks in Service, then such reemployed Participant shall be deemed to have repaid the deemed distribution plus interest as of the date of reemployment. If a Participant is deemed to receive a distribution pursuant to this paragraph, and the Participant resumes employment covered under this Plan before the date the Participant incurs five (5) consecutive 1-year Breaks in Service, upon the reemployment of such Participant, the Employer-provided Accrued Benefit will be restored to the amount of such Accrued Benefit on the date of the deemed distribution.

(d)    **Frozen participation.** Notwithstanding anything in the Plan to the contrary, any Eligible Employee who has not become a Participant as of June 1, 2009 shall not enter and shall not become a Participant in the Plan on or after June 1, 2009. Furthermore, if any Employee becomes a former Employee due to severance from employment and is reemployed by the Employer on or after June 1, 2009, then such Employee shall not enter and shall not become a Participant in the Plan on or after June 1, 2009. Lastly, if any

12

EXHIBIT 1
23
EXHIBIT 1
27

Employee either is or becomes ineligible to participate in the Plan and the status of the Employee subsequently changes to an Eligible Employee on or after June 1, 2009, then such Employee shall not enter and shall not become a Participant in the Plan on or after June 1, 2009.

### 3.6    ELECTION NOT TO PARTICIPATE

(a)    **Irrevocable election not to participate.** An Employee may, subject to the approval of the Employer, elect voluntarily not to participate in every Qualified Plan maintained by the Employer. Such election must be made prior to the time the Employee first becomes eligible to participate under any Qualified Plan maintained by the Employer. The election not to participate must be irrevocable and communicated to the Employer, in writing, within a reasonable period of time before the date the Employee would have otherwise entered any Qualified Plan. "Qualified Plan" means, for purposes of this Section, a plan intended to be tax-qualified under Code Section 401(a).

(b)    **Prior Plan document provision.** Notwithstanding anything in this Section to the contrary, if any prior Plan document of this Plan contained a provision permitting an Employee to make a revocable election not to participate and an Employee made such revocable election not to participate while that prior Plan document was in effect, then such Employee may irrevocably revoke such election at any time and participate in the Plan.

(c)    **Effect on coverage tests.** An Employee who elected not to participate under the Plan is treated as a nonbenefiting Employee for purposes of the minimum coverage requirements under Code Section 410(b).

### 3.7    OMISSION OF ELIGIBLE EMPLOYEE; INCLUSION OF INELIGIBLE EMPLOYEE

If, in any Plan Year, any Employee who should be included as a Participant in the Plan is erroneously omitted and discovery of such omission is not made until after a contribution by the Employer for the year has been made and allocated, or any person who should not have been included as a Participant in the Plan is erroneously included, then the Employer shall apply the principles described by, and take corrective actions consistent with, the IRS Employee Plans Compliance Resolution System (as described in IRS Revenue Procedure 2008-50 and any superseding Revenue Procedure).

### ARTICLE IV
### CONTRIBUTION AND VALUATION

### 4.1    PAYMENT OF CONTRIBUTIONS

No contribution shall be required under the Plan from any Participant. The Employer shall pay to the Trustee from time to time such amounts in cash as the Administrator and Employer shall determine to be necessary to provide the benefits under the Plan determined by the application of accepted actuarial methods and assumptions. The method of funding shall be consistent with Plan objectives.

### 4.2    ACTUARIAL METHODS

In establishing the liabilities under the Plan and contributions thereto, the enrolled actuary will use such methods and assumptions as will reasonably reflect the cost of the benefits. The Plan assets are to be valued on the last day of the Plan Year (or on any other date determined by the Administrator) using any reasonable method of valuation that takes into account fair market value pursuant to Regulations. There must be an actuarial valuation of the Plan at least once every year.

### 4.3    ROLLOVERS

(a)    **Acceptance of "rollovers" into the Plan.** Effective for rollovers from an eligible retirement plan into this Plan made on or after January 1, 2002, with the consent of the Administrator (such consent must be exercised in a nondiscriminatory manner and applied uniformly to all Participants), the Plan may accept a rollover by Participants excluding Participants who are no longer employed as an Employee, provided the rollover will not jeopardize the tax exempt status of the Plan or create adverse tax consequences for the Employer. The rollover amounts shall be allocated to the Participant's Rollover Account. The Participant's Rollover Account shall be 100% Vested at all times and shall not be subject to Forfeiture for any reason.

(b)    **Definitions.** For purposes of this Section, the following definitions shall apply on and after January 1, 2002:

(1)    A "Rollover" means: (i) amounts transferred to this Plan directly from another "eligible retirement plan;" (ii) distributions received by an Employee from other "eligible retirement plans" which are eligible for tax-free rollover to an "eligible retirement plan" and which are transferred by the Employee to this Plan within sixty (60) days following receipt thereof; and (iii) any other amounts which are eligible to be rolled over to this Plan pursuant to the Code.

(2)    An "Eligible Retirement Plan" means an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b) (other than an endowment contract), a qualified trust (an employees' trust described in Code Section 401(a) which is exempt from tax under Code Section 501(a)), an annuity plan described in Code Section 403(a), an eligible deferred compensation plan described in Code Section 457(b) which is maintained by an eligible employer described in Code Section 457(e)(1)(A), and an annuity contract described in Code Section 403(b).

13

EXHIBIT 1
24
EXHIBIT 1
28

(c)  **Limits on accepting rollovers.** This Subsection applies to a Rollover from an Eligible Retirement Plan into this Plan made on or after January 1, 2002. The Employer, operationally and on a nondiscriminatory basis, may limit the source of "rollovers" that may be accepted by the Plan.

(d)  **Accounting.** Amounts in a Participant's Rollover Account shall be held by the Trustee pursuant to the provisions of this Plan and may not be withdrawn by, or distributed to the Participant, in whole or in part, except as provided below. The Trustee shall have no duty or responsibility to inquire as to the propriety of the amount, value or type of assets transferred, nor to conduct any due diligence with respect to such assets; provided, however, that such assets are otherwise eligible to be held by the Trustee under the terms of this Plan.

(e)  **Distribution of rollovers.** The Administrator, at the election of the Participant, shall direct the Trustee to distribute all or a portion of the amount credited to the Participant's Rollover Account at any time. Furthermore, amounts in the Participant's Rollover Account, with respect to shall not be considered as part of a Participant's benefit in determining whether the $5,000 threshold has been exceeded for purposes of the timing or form of payments under the Plan. Notwithstanding the foregoing, amounts in the Participant's Rollover Account shall be considered in determining whether a mandatory involuntary cash-out distribution of benefits of $1,000 or less may be made without Participant consent. Any distributions of amounts that are held in the Participant's Rollover Account shall be made in a manner which is consistent with and satisfies the provisions of Section 5.7, including, but not limited to, all notice and consent requirements of Code Sections 417 and 411(a)(11) and the Regulations thereunder.

### 4.4    QUALIFIED MILITARY SERVICE

Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service will be provided in accordance with Code Section 414(u).

### ARTICLE V
### BENEFITS

### 5.1    RETIREMENT BENEFITS

(a)  **Normal retirement benefit.** The amount of monthly retirement benefit to be provided for each Participant who retires on the Participant's Normal Retirement Date shall be equal to the Participant's Accrued Benefit (herein called the Participant's Normal Retirement Benefit). A Participant's Accrued Benefit is based on a retirement benefit formula equal to 0% of such Participant's Average Monthly Compensation multiplied by the Participant's total number of Plan Years of Service (up to a maximum of 25 years), computed to the nearest dollar.

Plan Years of Service prior to January 1, 1998 shall not be recognized for determining the monthly retirement benefit.

The "Normal Retirement Benefit" of each Participant shall not be less than the largest periodic benefit that would have been payable to the Participant upon separation from service at or prior to Normal Retirement Age under the Plan exclusive of social security supplements, premiums on disability or term insurance, and the value of disability benefits not in excess of the "Normal Retirement Benefit." For purposes of comparing periodic benefits in the same form, commencing prior to and at Normal Retirement Age, the greater benefit is determined by converting the benefit payable prior to Normal Retirement Age into the same form of annuity benefit payable at Normal Retirement Age and comparing the amount of such annuity payments. In the case of a Top Heavy Plan, the "Normal Retirement Benefit" shall not be smaller than the minimum benefit to which the Employee is entitled under Section 6.2.

The Employer must ensure that the benefit formula described by this subsection continues to provide meaningful benefits within the meaning of Code Section 401(a)(26).

(b)  **Early retirement.** This Plan does not provide for a retirement date prior to Normal Retirement Date. In the event a Participant retires prior to the Participant's Normal Retirement Date, the Participant's benefit shall be the benefit payable per Section 5.6(a).

(c)  **Normal form of distribution.** The Normal Retirement Benefit payable to a Participant pursuant to this Section 5.1 shall be a monthly pension commencing on the Participant's Retirement Date and continuing for life. However, the form of distribution of such benefit shall be determined pursuant to the provisions of Section 5.7.

(d)  **Delayed retirement.** A Participant may be continued in employment beyond Normal Retirement Date. In such event, the Participant may elect one of the following:

(1)  To postpone receiving the payment of monthly retirement benefits until actual retirement, subject, however to any required minimum distributions pursuant to Section 5.9. At the close of each Plan Year prior to actual Retirement Date, a Participant shall be entitled to a retirement benefit equal to the greater of (i) the Actuarial Equivalent of the monthly retirement benefit such Participant was entitled to at the close of the prior Plan Year, or (ii) the Participant's Accrued Benefit determined at the close of the Plan Year. The monthly retirement benefit calculated pursuant to this Section 5.1(d)(1) shall be offset by the actuarial value (determined pursuant to Section 1.3) of the total benefit distributions (pursuant to Section 5.9) made by the close of the Plan Year.

(2)  To commence receiving the payment of monthly retirement benefits provided for in the Plan as though actual retirement had occurred on Normal Retirement Date. At the close of each Plan Year prior to actual Retirement Date, such Participant shall be entitled

14

EXHIBIT 1
25
EXHIBIT 1
29

to a monthly retirement benefit payable each subsequent Plan Year equal to the greater of (i) the Participant's monthly retirement benefit determined at the close of the prior Plan Year, or (ii) the Participant's Accrued Benefit determined at the close of the Plan Year, offset by the actuarial value (determined pursuant to Section 1.3) of the total benefit distributions made by the close of the Plan Year.

If as a result of actuarial increases to the benefit of a Participant who delays commencement of benefits beyond Normal Retirement Age the Accrued Benefit of such Participant would exceed the limitations under Section 6.1 for the Limitation Year, then distribution of the Participant's benefit will commence.

Except with respect to a "five (5) percent owner," a Participant's Accrued Benefit is actuarially increased to take into account the period after age 70 1/2 in which the Participant does not receive any benefits under the Plan. The actuarial increase begins on the April 1 following the calendar year in which the Participant attains age 70 1/2 (January 1, 1997 in the case of a Participant who attained age 70 1/2 prior to 1996), and ends on the date on which benefits commence after retirement in an amount sufficient to satisfy Code Section 401(a)(9).

The amount of actuarial increase payable as of the end of the period for actuarial increases must be no less than the Actuarial Equivalent of the Participant's retirement benefits that would have been payable as of the date the actuarial increase must commence plus the Actuarial Equivalent of additional benefits accrued after that date, reduced by the Actuarial Equivalent of any distributions made after that date. The actuarial increase is generally the same as, and not in addition to, the actuarial increase required for that same period under Code Section 411 to reflect the delay in payments after normal retirement, except that the actuarial increase required under Code Section 401(a)(9)(C) must be provided even during the period during which a Participant is in Act Section 203(a)(3)(B) service.

(e) **Suspension of Benefits.** Notwithstanding anything in the preceding subsection to the contrary, and subject to any required minimum distributions pursuant to Section 5.9, benefits will be suspended for each calendar month during which the Employee completes at least 40 Hours of Service with the Employer in Act Section 203(a)(3)(B) service. Consequently, the amount of benefits which are paid later than Normal Retirement Age will be computed as if the Employee had received any suspended benefits. Late Retirement Benefits shall be administered in the following manner:

(1)  Resumption of payment. If benefit payments have been suspended, payments shall resume no later than the first day of the third calendar month after the calendar month in which the Employee ceases to be employed in Act Section 203(a)(3)(B) service. The initial payment upon resumption shall include the payment scheduled to occur in the calendar month when payments resume and any amounts withheld during the period between the cessation of Act Section 203(a)(3)(B) service and the resumption of payments.

(2)  Notification. No payment shall be withheld by the Plan pursuant to this Section unless the Plan notifies the Employee by personal delivery or first class mail during the first calendar month or payroll period in which the Plan withholds payments that the Participant's benefits are suspended. Such notifications shall contain a description of the specific reasons why benefit payments are being suspended, a description of the Plan provision relating to the suspension of payments, a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in Section 2530.203-3 of the Code of Federal Regulations.

In addition, the notice shall inform the Employee of the Plan's procedures for affording a review of the suspension of benefits. Requests for such reviews may be considered in accordance with the claims procedure pursuant to Section 2.7.

(3)  Amount suspended.

(i)  Life annuity. In the case of benefits payable periodically on a monthly basis for as long as a life (or lives) continues, such as a straight life annuity or a qualified joint and survivor annuity, an amount equal to the portion of a monthly benefit payment derived from Employer contributions.

(ii)  Other benefit forms. In the case of a benefit payable in a form other than the form described in subsection (i) above, an amount of the Employer-provided portion of benefit payments for a calendar month in which the Employee is employed in Act Section 203(a)(3)(B) service, equal to the lesser of:

(A)  The amount of benefits which would be payable to the Employee if the Employee had been receiving monthly benefits under the Plan since actual retirement based on a straight life annuity commencing at actual retirement age; or

(B)  The actual amount paid or scheduled to be paid to the Employee for such month. Payments which are scheduled to be paid less frequently than monthly may be converted to monthly payments for purposes of the above sentence.

(4)  Actuarial Increase. Except with respect to a "five (5) percent owner," a Participant's Accrued Benefit is actuarially increased to take into account the period after age 70 1/2 in which the Participant does not receive any benefits under the Plan. The actuarial increase begins on the April 1 following the calendar year in which the Participant attains age 70 1/2 (January 1, 1997 in the case of a Participant who attained age 70 1/2 prior to 1996), and ends on the date on which benefits commence after retirement in an amount sufficient to satisfy Code Section 401(a)(9).

(i)  The amount of actuarial increase payable as of the end of the period for actuarial increases must be no less than the Actuarial Equivalent of the Participant's retirement benefits that would have been payable as of the date the actuarial increase must commence plus the Actuarial Equivalent of additional benefits accrued after that date, reduced by the

15

EXHIBIT 1
26
EXHIBIT 1
30

Actuarial Equivalent of any distributions made after that date. The actuarial increase is generally the same as, and not in addition to, the actuarial increase required for that same period under Code Section 411 to reflect the delay in payments after normal retirement, except that the actuarial increase required under Code Section 401(a)(9)(C) must be provided even during the period during which a Participant is in Act Section 203(a)(3)(B) service.

(ii)    For purposes of Code Section 411(b)(1)(H), the actuarial increase will be treated as an adjustment attributable to the delay in distribution of benefits after the attainment of Normal Retirement Age. Accordingly, to the extent permitted under Code Section 411(b)(1)(H), the actuarial increase required under Code Section 401(a)(9)(C)(iii) may reduce the benefit accrual otherwise required under Code Section 411(b)(1)(H)(i), except that the rules on the suspension of benefits are not applicable.

(5)    No application to top heavy requirements. This Section does not apply to the minimum benefit to which the Participant is entitled under top-heavy rules of Section 5.2.

(f)    **414(k) account.** If this is an amendment to a Plan that previously permitted a Participant to elect to have the Present Value of Accrued Benefits segregated into a separate Section 414(k) Account, then such account shall remain in existence. Effective as of the date this plan document is adopted, no new Section 414(k) Accounts may be established and any changes to existing Accounts shall be limited to adjustments for earnings, losses, or distributions. The Section 414(k) Account shall be charged or credited as appropriate with the net earnings, gains, losses, and expenses as well as any appreciation or depreciation in market value during each Plan Year attributable to such account. Notwithstanding any provision of this Plan to the contrary, any part of the Participant's interest which is in a Section 414(k) Account will be distributed in a manner satisfying the requirements of Code Section 401(a)(9) and the Regulations thereunder applicable to individual accounts.

5.2    **MINIMUM BENEFIT REQUIREMENT FOR TOP HEAVY PLAN**

(a)    **Minimum benefit.** The minimum Accrued Benefit derived from Employer contributions to be provided under this Section for each Non-Key Employee who is a Participant during a Top Heavy Plan Year shall equal the product of (1) one-twelfth (1/12th) of "415 Compensation" averaged over the five (5) consecutive "limitation years" (or actual number of "limitation years," if less) which produce the highest average, and (2) the lesser of (i) two percent (2%) multiplied by Plan Years of Service; or (ii) twenty percent (20%), expressed as a single life annuity.

(b)    **Participants entitled to top-heavy accrual.** For purposes of providing the minimum benefit under Code Section 416, a Non-Key Employee who is not a Participant solely because (1) such Employee's Compensation is below a stated amount or (2) such Employee declined to make mandatory contributions (if required) to the Plan will be considered to be a Participant. Furthermore, such minimum benefit shall be provided regardless of whether such Non-Key Employee is employed on a specified date.

(c)    **Disregarded service.** For purposes of this Section, Plan Years of Service for any Plan Year beginning before January 1, 1984, or for any Plan Year during which the Plan was not a Top Heavy Plan shall be disregarded.

(d)    **Application of annual compensation limit.** For purposes of this Section, "415 Compensation" for any "limitation year" ending in a Plan Year which began prior to January 1, 1984, subsequent to the last "limitation year" during which the Plan is a Top Heavy Plan, or in which the Participant failed to complete a Plan Year of Service, shall be disregarded.

(e)    **Disregarded service if no Key Employee or frozen plan.** Effective for any Plan Year beginning after December 31, 2001, for purposes of satisfying the minimum benefit requirements of Code Section 416(c)(1) and the Plan, in determining Plan Years of Service with the Employer, any service with the Employer shall be disregarded to the extent that such service occurs during a Plan Year when the Plan benefits (within the meaning of Code Section 410(b)) no Key Employee or former Key Employee. Furthermore, notwithstanding anything in the Plan to the contrary, pursuant to the freezing of benefit accruals under the Plan on June 1, 2009, no additional benefits shall accrue to any Key Employees or former Key Employees after such date.

(f)    **Compensation limit.** For the purposes of this Section, "415 Compensation" of each Participant taken into account in determining the minimum Accrued Benefit of subsection (a) above in any Plan Year beginning after December 31, 2001, shall not exceed $200,000 (or such other amount provided in the Code). Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Years beginning with or within such calendar year. For any short Plan Year, the "415 Compensation" limit shall be an amount equal to the "415 Compensation" limit for the calendar year in which the Plan Year begins multiplied by the ratio obtained by dividing the number of full months in the short Plan Year by twelve (12).

(g)    **Prior compensation limit.** If "415 Compensation" for any prior Plan Year is taken into account in determining a Participant's minimum Accrued Benefit for the current Plan Year, then "415 Compensation" for such Plan Year is subject to the applicable annual Compensation limit in effect for that prior Plan Year. For purposes of determining the minimum Accrued Benefit in a Plan Year beginning after December 31, 2001, "415 Compensation" for any prior Plan Year shall be limited to $150,000 for any Plan Year beginning in 1994, 1995, or 1996; $160,000 for any Plan Year beginning in 1997, 1998, or 1999; and $170,000 for any Plan Year beginning in 2000 or 2001. Furthermore, in determining the minimum Accrued Benefit in Plan Years beginning on or after January 1, 1989 and prior to January 1, 1994, the limit imposed on "415 Compensation" in effect for Plan Years beginning during those years is $200,000 (or such other amount as adjusted for increases in the cost of living in accordance with Code Section 415(d) for Plan Years

46

EXHIBIT 1
27
EXHIBIT 1
31

beginning on or after January 1, 1989. For Plan Years beginning prior to January 1, 1989, the $200,000 Compensation limit imposed on "415 Compensation" shall apply only for Top Heavy Plan Years and shall not be adjusted.

(h)   **Adjustment for normal form of benefit.** If Section 5.1(c) provides for the Normal Retirement Benefit to be paid in a form other than a single life annuity, the Accrued Benefit under this Section shall be the Actuarial Equivalent of the minimum Accrued Benefit under (a) above pursuant to Section 1.3.

(i)   **Adjustment for time of payment.** If payment of the minimum Accrued Benefit commences at a date other than Normal Retirement Date, the minimum Accrued Benefit shall be the Actuarial Equivalent of the minimum Accrued Benefit commencing at Normal Retirement Date pursuant to Section 1.3.

(j)   **Non-Forfeiture.** To the extent required to be nonforfeitable under Section 5.6, the minimum Accrued Benefit under this Section may not be forfeited under Code Section 411(a)(3)(B) or Code Section 411(a)(3)(D).

## 5.3   PAYMENT OF RETIREMENT BENEFITS

When a Participant retires, the Administrator shall immediately take pursuant to the Plan all necessary steps and execute all required documents to cause the payment of the Participant's Accrued Benefit pursuant to the Plan. If a former Participant receiving payment of an Accrued Benefit again becomes an Employee, such renewed employment shall be subject to the suspension of benefit rules specified in Section 5.1(e).

## 5.4   DISABILITY RETIREMENT BENEFITS

(a)   **Disability benefit.** If a Participant becomes Totally and Permanently Disabled pursuant to Section 1.51 prior to retirement or separation from service, and such condition continues for a period of six (6) consecutive months and by reason thereof such Participant's status as an Employee ceases, then said disabled Participant shall be entitled to receive the Actuarial Equivalent of the Participant's Accrued Benefit. In the event of a Participant's Total and Permanent Disability, the Administrator shall direct the Trustee to commence payment of the benefits payable hereunder pursuant to the provisions of Sections 5.7 and 5.10 as though the Participant had retired.

(b)   **Time of determination of benefit.** The benefit payable pursuant to (a) above shall be computed as of the Anniversary Date subsequent to termination of employment.

(c)   **Disability after termination of employment.** In the event of the Terminated Participant's Total and Permanent Disability, the Terminated Participant (or the Terminated Participant's Beneficiary) shall receive the Actuarial Equivalent of such Terminated Participant's Vested Accrued Benefit pursuant to the provisions of Sections 5.7 and 5.10 as though the Terminated Participant had retired.

## 5.5   DEATH BENEFITS

(a)   **Death prior to retirement benefits beginning.** If a Participant dies prior to the Participant's Retirement Date, such Participant's Beneficiary shall receive a death benefit equal to the Actuarial Equivalent of the Accrued Benefit.

(b)   **Payment of other death benefits.** Death benefits payable by reason of the death of a Participant or a Retired Participant shall be paid to such Participant's Beneficiary in accordance with the following provisions:

(1)   Upon the death of a Participant subsequent to the Annuity Starting Date, the Participant's Beneficiary shall be entitled to whatever death benefit may be available under the settlement arrangements pursuant to which the Participant's benefit is made payable.

(2)   In the event of a Terminated Participant's death subsequent to termination of employment, the Participant's Beneficiary shall receive the Actuarial Equivalent of such Participant's Vested Accrued Benefit.

(c)   **Proof of death and beneficiary.** The Administrator may require such proper proof of death and such evidence of the right of any person to receive the death benefit payable as a result of the death of a Participant as the Administrator may deem desirable. The Administrator's determination of death and the right of any person to receive payment shall be conclusive.

(d)   **Beneficiary designation.** Unless otherwise elected in the manner prescribed in Section 5.8, the Beneficiary of the death benefit shall be the Participant's surviving spouse, who shall receive such benefit in the form of a Pre-Retirement Survivor Annuity pursuant to Section 5.8. Except, however, the Participant may designate a Beneficiary other than the spouse if:

(1)   the Participant and the Participant's spouse have validly waived the Pre-Retirement Survivor Annuity in the manner prescribed in Section 5.8, and the spouse has waived the right to be the Participant's Beneficiary, or

(2)   the Participant is legally separated or has been abandoned (within the meaning of local law) and the Participant has a court order to such effect (and there is no qualified domestic relations order which provides otherwise), or

(3)   the Participant has no spouse, or

(4)   the spouse cannot be located.

17

EXHIBIT 1
28
EXHIBIT 1
32

In such event, the designation of a Beneficiary shall be made on a form satisfactory to the Administrator. A Participant may at any time revoke a designation of a Beneficiary or change a Beneficiary by filing written (or in such other form as permitted by the Internal Revenue Service) notice of such revocation or change with the Administrator. However, the Participant's spouse must again consent in writing (or in such other form as permitted by the Internal Revenue Service) to any change in Beneficiary unless the original consent acknowledged that the spouse had the right to limit consent only to a specific Beneficiary and that the spouse voluntarily elected to relinquish such right. In the event no valid designation of Beneficiary exists, or if the Beneficiary is not alive, at the time of the Participant's death, the death benefit shall be payable to the Participant's spouse. Additionally, if the Beneficiary does not predecease the Participant, but dies prior to the distribution of the death benefit, the death benefit will be paid to the Beneficiary's estate.

(e)  **Divorce revokes spousal Beneficiary designation.** Notwithstanding anything in this Section to the contrary, if a Participant has designated the spouse as a Beneficiary, then a divorce decree that relates to such spouse shall revoke the Participant's designation of the spouse as a Beneficiary unless the decree or a "qualified domestic relations order" (within the meaning of Code Section 414(p)) provides otherwise or a subsequent Beneficiary designation is made.

(f)  **Form of payment.** The benefit payable under this Section shall be paid pursuant to the provisions of Sections 5.8 and 5.10.

(g)  **Minimum death benefit.** In no event shall the death benefit payable to a surviving spouse be less than the Actuarial Equivalent of the "minimum spouse's death benefit."

(h)  **Definition of minimum spouse's death benefit.** For the purposes of this Section, the "minimum spouse's death benefit" means a death benefit for a Vested married Participant payable in the form of a Pre-Retirement Survivor Annuity. Such minimum payments shall be equal to the amount which would be payable as a survivor annuity under the qualified joint and survivor annuity provisions of the Plan if:

(1)  in the case of a Participant who dies after the Earliest Retirement Age, such Participant had retired with an immediate joint and survivor annuity on the day before the Participant's date of death; or

(2)  in the case of a Participant who dies on or before the Earliest Retirement Age, such Participant had:

(i)  separated from service on the earlier of the actual time of separation or the date of death,

(ii)  survived to the Earliest Retirement Age,

(iii)  retired with an immediate joint and survivor annuity at the Earliest Retirement Age based on the Participant's Vested Accrued Benefit on date of death, and

(iv)  died on the day after the day on which said Participant would have attained the Earliest Retirement Age.

5.6  TERMINATION OF EMPLOYMENT BEFORE RETIREMENT

(a)  **Latest time for Payment.** Payment to a Participant of the Vested portion of such Participant's Accrued Benefit, unless such Participant otherwise elects, shall begin not later than the 60th day after the close of the Plan Year in which the latest of the following events occurs: (1) the date on which the Participant attains the earlier of age 65 or the Normal Retirement Age specified herein; (2) the 10th anniversary of the year in which the Participant commenced participation in the Plan; or (3) the date the Participant terminates service with the Employer.

(b)  **Earlier payments of benefits.** However, the Administrator shall, at the election of the Participant, direct earlier payment of the Vested portion of the Participant's Accrued Benefit. Any distribution under this paragraph shall be made in a manner which is consistent with and satisfies the provisions of Section 5.7, including, but not limited to, notice and consent requirements of Code Sections 417 and 411(a)(11) and the Regulations thereunder.

(c)  **Usage of Forfeitures.** That portion of a Terminated Participant's Accrued Benefit that is forfeited shall be used only to reduce future costs of the Plan.

(d)  **Timing of Forfeitures.** That portion of a Terminated Participant's Accrued Benefit that is not Vested shall become a forfeiture on the earlier of:

(1)  the distribution of the entire Vested portion of the Accrued Benefit of such Terminated Participant. For purposes of this provision, if a Terminated Participant has a Vested Accrued Benefit of zero (0), then such Terminated Participant shall be deemed to have received a distribution of such Vested Accrued Benefit as of the date that such Terminated Participant terminated employment with the Employer; or

(2)  the last day of the Plan Year in which such Terminated Participant incurs five (5) consecutive 1-Year Breaks in Service.

18

EXHIBIT 1
29
EXHIBIT 1
33

(e)  Vesting Schedule. The Vested portion of any Participant's Accrued Benefit shall be a percentage of the Participant's Accrued Benefit determined on the basis of the Participant's number of Years of Service according to the following schedule:

| Vesting Schedule | |
|---|---|
| Years of Service | Percentage |
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

(f)  Vesting upon this restatement. Notwithstanding the vesting schedule above, the Vested percentage of a Participant's Accrued Benefit shall not be less than the Vested percentage attained as of the later of the effective date or adoption date of this amendment and restatement.

(g)  Vesting upon subsequent amendment. The computation of a Participant's nonforfeitable percentage of such Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Plan. In the event that the Plan is amended to change or modify any vesting schedule, or if the Plan is amended in any way that directly or indirectly affects the computation of the Participant's nonforfeitable percentage, or if the Plan is deemed amended by an automatic change to a top-heavy vesting schedule, then each Participant with an Hour of Service after such change and who has at least three (3) Years of Service as of the expiration date of the election period may elect to have such Participant's nonforfeitable percentage computed under the Plan without regard to such amendment or change. If a Participant fails to make such election, then such Participant shall be subject to the new vesting schedule. The Participant's election period shall commence on the adoption date (or deemed adoption date) of the amendment and shall end sixty (60) days after the latest of:

(1)  the adoption date (or deemed adoption date) of the amendment,

(2)  the effective date of the amendment, or

(3)  the date the Participant receives written notice of the amendment from the Employer or Administrator.

(h)  Service not credited for vesting. In determining Years of Service for purposes of vesting under the Plan, Years of Service prior to the Effective Date of the Plan shall be excluded.

**5.7    DISTRIBUTION OF BENEFITS**

(a)  Qualified joint and survivor annuity.

(1)  Unless otherwise elected as provided below, a Participant who is married on the Annuity Starting Date and who does not die before the Annuity Starting Date shall receive benefits in the form of a joint and survivor annuity. The joint and survivor annuity is an annuity that commences immediately and shall be the Actuarial Equivalent of the Participant's Accrued Benefit. Such joint and survivor benefits following the Participant's death shall continue to the spouse during the spouse's lifetime at a rate equal to 50% of the rate at which such benefits were payable to the Participant. This joint and fifty percent (50%) survivor annuity shall be considered the designated qualified joint and survivor annuity and automatic form of payment for the purposes of this Plan. However, the Participant may, without spousal consent, elect to receive an alternative annuity benefit with continuation of payments to the spouse at a rate of seventy-five percent (75%) (or, sixty-six and two-thirds percent (66 2/3%) if the Insurer used to provide the annuity (if applicable) does not offer a joint and seventy-five percent (75%) annuity) or one hundred percent (100%) of the rate payable to a Participant during the Participant's lifetime, which alternative joint and survivor annuity shall be the Actuarial Equivalent of the designated joint and survivor annuity. An unmarried Participant shall receive the Actuarial Equivalent of such Participant's benefit in the form of a life annuity. Such unmarried Participant, however, may elect in writing to waive the life annuity. The election must comply with the provisions of this Section as if it were an election to waive the joint and survivor annuity by a married Participant, but without the spousal consent requirement.

(2)  Any election to waive the joint and survivor annuity must be made by the Participant in writing (or in such other form as permitted by the Internal Revenue Service) during the election period and be consented to in writing (or in such other form as permitted by the Internal Revenue Service) by the Participant's spouse. If the spouse is legally incompetent to give consent, the spouse's legal guardian, even if such guardian is the Participant, may give consent. Such election shall designate a Beneficiary (or a form of benefits) that may not be changed without spousal consent (unless the consent of the spouse expressly permits designations by the Participant without the requirement of further consent by the spouse). Such spouse's consent shall be irrevocable and must acknowledge the effect of such election and be witnessed by a Plan representative or a notary public. Such consent shall not be required if it is established to the satisfaction of the Administrator that the required consent cannot be obtained because there is no spouse, the spouse cannot be located, or other circumstances that may be prescribed by Regulations. The election made by the Participant and consented to by such Participant's spouse may be revoked by the Participant in writing (or in such other form as permitted by the Internal Revenue Service) without the consent of the spouse at any time during the election period. A revocation of a prior election shall cause the Participant's benefits to be distributed as a joint and survivor annuity. The number of revocations shall not

19

EXHIBIT 1
30
EXHIBIT 1
34

be limited. Any new election must comply with the requirements of this paragraph. A former spouse's waiver shall not be binding on a new spouse.

(3)   The election period to waive the joint and survivor annuity shall be the one hundred eighty (180) day period (ninety (90) day period for Plan Years beginning before January 1, 2007) ending on the Annuity Starting Date.

If benefit payments in any form are suspended pursuant to Section 5.1(e) for an Employee who continues in service without a separation and who does not receive a benefit payment, the recommencement of benefit payments shall be treated as a new Annuity Starting Date.

(4)   For purposes of this Section, spouse or surviving spouse means the spouse or surviving spouse of the Participant, provided that a former spouse will be treated as the spouse or surviving spouse and a current spouse will not be treated as the spouse or surviving spouse to the extent provided under a qualified domestic relations order as described in Code Section 414(p).

(5)   With regard to the election, the Administrator shall provide to the Participant no less than thirty (30) days and no more than one hundred eighty (180) days (ninety (90) days for Plan Years beginning before January 1, 2007) before the Annuity Starting Date a written (or in such other form as permitted by the Internal Revenue Service) explanation of:

(i)    the terms and conditions of the joint and survivor annuity,

(ii)   the Participant's right to make, and the effect of, an election to waive the joint and survivor annuity,

(iii)  the right of the Participant's spouse to consent to any election to waive the joint and survivor annuity, and

(iv)  the right of the Participant to revoke such election, and the effect of such revocation.

(6)   Notwithstanding the above, if the Participant elects (with spousal consent, if applicable) to waive the requirement that the explanation be provided at least thirty (30) days before the Annuity Starting Date, the election period shall be extended to the thirtieth (30th) day after the date on which such explanation is provided to the Participant, unless the thirty (30) day period is waived pursuant to the following provisions.

Any distribution provided for in this Section 5.7 may commence less than thirty (30) days after the notice required by Code Section 417(a)(3) is given provided the following requirements are satisfied:

(i)    the Administrator clearly informs the Participant that the Participant has a right to a period of thirty (30) days after receiving the notice to consider whether to waive the joint and survivor annuity and to elect (with spousal consent) to a form of distribution other than a joint and survivor annuity;

(ii)   the Participant is permitted to revoke an affirmative distribution election at least until the Annuity Starting Date, or, if later, at any time prior to the expiration of the seven (7) day period that begins the day after the explanation of the joint and survivor annuity is provided to the Participant;

(iii)  the Annuity Starting Date is after the date that the explanation of the joint and survivor annuity is provided to the Participant. However, the Annuity Starting Date may be before the date that any affirmative distribution election is made by the Participant and before the date that the distribution is permitted to commence under (iv) below; and

(iv)  distribution in accordance with the affirmative election does not commence before the expiration of the seven (7) day period that begins the day after the explanation of the joint and survivor annuity is provided to the Participant.

(7)   Notwithstanding the above, the provisions of this subsection shall be modified to the extent provided by Section 5.17.

(b)   **Alternative forms of distribution.** In the event a married Participant duly elects pursuant to paragraph (a)(2) above not to receive benefits in the form of a qualified joint and survivor annuity, or if such Participant is not married, in the form of a life annuity, the Administrator, pursuant to the election of the Participant, shall direct the Trustee to distribute to a Participant or such Participant's Beneficiary an amount which is the Actuarial Equivalent of the monthly retirement benefit provided in Section 5.1(c) in one or more of the following methods:

(1)   One lump-sum payment in cash or in property.

(2)   Payments over a period certain in monthly, quarterly, semiannual, or annual cash installments. The period over which such payment is to be made shall not extend beyond the Participant's life expectancy (or the life expectancy of the Participant and the Participant's designated Beneficiary).

(3)   Monthly pension payable over the life of the Participant.

EXHIBIT 1
31
EXHIBIT 1
35

(4)  Monthly pension payable over the life of the Participant, with the provision that, if a Retired Participant dies prior to the completion of sixty (60) monthly payments, such monthly payments shall be continued to the Retired Participant's designated Beneficiary until the monthly payments made to the Retired Participant and to the Beneficiary shall total sixty (60).

(5)  Monthly pension payable over the life of the Participant, with the provision that, if a Retired Participant dies prior to the completion of 120 monthly payments, such monthly payments shall be continued to the Retired Participant's designated Beneficiary until the monthly payments made to the Retired Participant and to the Beneficiary shall total 120.

(6)  Monthly pension payable over the life of the Participant, with the provision that, if a Retired Participant dies prior to the completion of 180 monthly payments, such monthly payments shall be continued to the Retired Participant's designated Beneficiary until the monthly payments made to the Retired Participant and to the Beneficiary shall total 180.

(7)  Monthly pension payable over the life of the Participant, with the provision that, if a Retired Participant dies prior to the completion of 240 monthly payments, such monthly payments shall be continued to the Retired Participant's designated Beneficiary until the monthly payments made to the Retired Participant and to the Beneficiary shall total 240.

(8)  Monthly pension payable over the life of the Participant and the life of the Participant's designated Beneficiary (50% joint and survivor annuity).

(9)  Monthly pension payable over the life of the Participant and the life of the Participant's designated Beneficiary (66 2/3% joint and survivor annuity).

(10)  Monthly pension payable over the life of the Participant and the life of the Participant's designated Beneficiary (75% joint and survivor annuity).

(11)  Monthly pension payable over the life of the Participant and the life of the Participant's designated Beneficiary (100% joint and survivor annuity).

(12)  Monthly pension payable over the life of the Participant, with the provision that, payments made prior to the receipt of Social Security benefits will be larger so that, insofar as practical, a level monthly pension will be available for the Participant.

(c)  **Consent to timing of distribution.** The present value of a Participant's Accrued Benefit derived from Employer and Employee contributions may not be paid without the Participant's written consent (or in such other form as permitted by the Internal Revenue Service) if the value exceeds $1,000, and the benefit is "immediately distributable." In addition, the spouse of a Participant must consent in writing (or in such other form as permitted by the Internal Revenue Service) to a distribution only if the value of the Participant's benefit exceeds $5,000. However, spousal consent is not required if the distribution will be made in the form of a qualified joint and survivor annuity and the benefit is "immediately distributable." A benefit is "immediately distributable" if any part of the benefit could be distributed to the Participant (or surviving spouse) before the Participant attains (or would have attained if not deceased) the later of the Participant's Normal Retirement Age or age 62. Any consent required by this Section 5.7(c) must be obtained not more than one hundred eighty (180) days (ninety (90) days for Plan Years beginning before January 1, 2007) before commencement of the distribution and shall be made in a manner consistent with Section 5.7(a)(2).

(d)  **Form of Payment.** If the value of the Participant's benefit derived from Employer and Employee contributions does not exceed $5,000, then distribution may only be made as an immediate lump-sum payment. This distribution will be made regardless of the Participant's spouse's written consent. However, the Participant must consent to the distribution if the amount exceeds $1,000. No distribution may be made under the preceding sentence after the Annuity Starting Date unless the Participant and the Participant's spouse consent in writing (or in such other form as permitted by the Internal Revenue Service) to such distribution.

(e)  **Consent requirements.** The following rules will apply to the consent requirements set forth above:

(1)  No consent shall be valid unless the Participant has received a general description of the material features and an explanation of the relative values of the optional forms of benefit available under the Plan that would satisfy the notice requirements of Code Section 417.

(2)  The Participant must be informed of the right to defer receipt of the distribution, and for notices provided in Plan Years beginning after December 31, 2006, such notification must also include a description of how much larger benefits will be if the commencement of distributions is deferred. If a Participant fails to consent, it shall be deemed an election to defer the commencement of payment of any benefit. However, any election to defer the receipt of benefits shall not apply with respect to distributions which are required under Section 5.9.

(3)  Notice of the rights specified under this paragraph shall be provided no less than thirty (30) days and no more than one hundred eighty (180) day period (ninety (90) day period for Plan Years beginning before January 1, 2007) before the Annuity Starting Date.

(4)  Written (or such other form as permitted by the Internal Revenue Service) consent of the distribution must not be made before the Participant receives the notice and must not be made more than one hundred eighty (180) days (ninety (90) days for Plan Years beginning before January 1, 2007) before the Annuity Starting Date.

21

EXHIBIT 1
32
EXHIBIT 1
36

(5)   No consent shall be valid if a significant detriment is imposed under the Plan on any Participant who does not consent to the distribution.

Any such distribution may commence less than thirty (30) days, subject to Section 5.7(a)(6), after the notice required under Regulation 1.411(a)-11(c) is given, provided that: (1) the Administrator clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and (2) the Participant, after receiving the notice, affirmatively elects a distribution.

(f)   **Mandatory Distributions.** This Subsection shall be effective with respect to distributions made on and after March 28, 2005. The provisions of this Subsection do not affect the other provisions of the Plan relating to the form or timing of a distribution nor the consent rules that are applicable with respect to individuals other than Participants.

(1)   Effective with respect to distributions made on or after March 28, 2005, the provisions of the Plan that provide for the mandatory distribution of the Participant's Vested Accrued Benefit without the Participant's consent are hereby modified to provide that the mandatory distribution threshold be reduced to $1,000. Accordingly, if the amount payable exceeds $1,000, then Participant consent shall be required before a distribution may be made.

(g)   All annuity Contracts (if any) that are purchased under this Plan shall be non-transferable when distributed. Furthermore, the terms of any annuity Contract purchased and distributed to a Participant or spouse shall comply with all of the requirements of the Plan.

5.8    DISTRIBUTION OF BENEFITS UPON DEATH

(a)   **Qualified Pre-Retirement Survivor Annuity (QPSA).** Unless otherwise elected as provided below, a Vested Participant who dies before the Annuity Starting Date and who has a surviving spouse shall have the death benefit paid to the surviving spouse in the form of a Pre-Retirement Survivor Annuity. The Participant's spouse may direct that payment of the Pre-Retirement Survivor Annuity commence within a reasonable period after the Participant's death (but not later than the month in which the Participant would have attained the Earliest Retirement Age under the Plan if the Participant dies on or before the Earliest Retirement Age). If the spouse does not so direct, payment of such benefit will commence at the time the Participant would have attained the later of Normal Retirement Age or age 62. However, the spouse may elect a later commencement date, subject to the rules specified in Section 5.9.

(b)   **Election to waive QPSA.** Any election to waive the Pre-Retirement Survivor Annuity before the Participant's death must be made by the Participant in writing (or in such other form as permitted by the Internal Revenue Service) during the election period and shall require the spouse's irrevocable consent in the same manner provided for in Section 5.7(a)(2). Further, the spouse's consent must acknowledge the specific nonspouse Beneficiary. Notwithstanding the foregoing, the nonspouse Beneficiary need not be acknowledged, provided the consent of the spouse acknowledges that the spouse has the right to limit consent only to a specific Beneficiary and that the spouse voluntarily elects to relinquish such right.

(c)   **Time to waive QPSA.** The election period to waive the Pre-Retirement Survivor Annuity shall begin on the first day of the Plan Year in which the Participant attains age thirty-five (35) and end on the date of the Participant's death. An earlier waiver (with spousal consent) may be made provided a written (or in such other form as permitted by the Internal Revenue Service) explanation of the Pre-Retirement Survivor Annuity is given to the Participant and such waiver becomes invalid at the beginning of the Plan Year in which the Participant turns age thirty-five (35). In the event a Vested Participant separates from service prior to the beginning of the election period, the election period shall begin on the date of such separation from service.

(d)   **QPSA notice.** With regard to the election, the Administrator shall provide each Participant within the applicable period, with respect to such Participant (and consistent with Regulations), a written (or in such other form as permitted by the Internal Revenue Service) explanation of the Pre-Retirement Survivor Annuity containing comparable information to that required pursuant to Section 5.7(a)(5). For the purposes of this paragraph, the term "applicable period" means, with respect to a Participant, whichever of the following periods ends last:

(1)   The period beginning with the first day of the Plan Year in which the Participant attains age thirty-two (32) and ending with the close of the Plan Year preceding the Plan Year in which the Participant attains age thirty-five (35);

(2)   A reasonable period after the individual becomes a Participant;

(3)   A reasonable period ending after the Plan no longer fully subsidizes the cost of the Pre-Retirement Survivor Annuity with respect to the Participant;

(4)   A reasonable period ending after Code Section 401(a)(11) applies to the Participant; or

(5)   A reasonable period after separation from service in the case of a Participant who separates before attaining age thirty-five (35). For this purpose, the Administrator must provide the explanation beginning one (1) year before the separation from service and ending one (1) year after such separation. If such a Participant thereafter returns to employment with the Employer, the applicable period for such Participant shall be redetermined.

22

EXHIBIT 1
33
EXHIBIT 1
37

For purposes of applying this Section 5.8(d), a reasonable period ending after the enumerated events described in paragraphs (2), (3) and (4) is the end of the two (2) year period beginning one (1) year prior to the date the applicable event occurs, and ending one (1) year after that date.

(e)    **Consent.** If the present value of the Pre-Retirement Survivor Annuity derived from Employer and Employee contributions does not exceed $5,000 at the time of distribution, then the Administrator shall direct the immediate distribution of the present value of the Pre-Retirement Survivor Annuity to the Participant's spouse. No distribution may be made under the preceding sentence after the Annuity Starting Date (unless the spouse consents in writing (or in such other form as permitted by the Internal Revenue Service) to such distribution. If the value exceeds $5,000, then an immediate distribution of the entire amount of the Pre-Retirement Survivor Annuity may be made to the surviving spouse, provided such surviving spouse consents in writing (or in such other form as permitted by the Internal Revenue Service) to such distribution. Any consent required under this paragraph must be obtained not more than one hundred eighty (180) days (ninety (90) days for Plan Years beginning before January 1, 2007) before commencement of the distribution and shall be made in a manner consistent with Section 5.7(a)(2).

The present value in this regard shall be determined as provided in Section 1.41.

(f)    **Alternative forms of distribution.** If the present value of the total death benefit does not exceed $5,000 at the time of distribution, then the Administrator shall direct the immediate distribution of the present value of the death benefit. Otherwise, to the extent the death benefit is not paid in the form of a Pre-Retirement Survivor Annuity, an amount that is the Actuarial Equivalent of the Pre-Retirement Survivor Annuity shall be paid to the Participant's Beneficiary in one of the following methods, as elected by the Participant (or if no election has been made prior to the Participant's death, by the Participant's Beneficiary), subject to the rules specified in Section 5.9:

(1)    One lump-sum payment in cash or in property.

(2)    Payment in monthly, quarterly, semi-annual, or annual cash installments over a period to be determined by the Participant or the Participant's Beneficiary. After periodic installments commence, the Beneficiary shall have the right to direct the Trustee to reduce the period over which such periodic installments shall be made, and the Trustee shall adjust the cash amount of such periodic installments accordingly.

(3)    Monthly pension payable over the life of the Participant's Beneficiary.

(4)    Monthly pension payable over the life of the Participant's designated Beneficiary, with the provision that, if the Participant's designated Beneficiary dies prior to the completion of 60 monthly payments, such monthly payments shall be continued to the Participant's beneficiary until the monthly payments made to the Participant's designated Beneficiary and the Participant's beneficiary shall total 60.

(5)    Monthly pension payable over the life of the Participant's designated Beneficiary, with the provision that, if the Participant's designated Beneficiary dies prior to the completion of 120 monthly payments, such monthly payments shall be continued to the Participant's beneficiary until the monthly payments made to the Participant's designated Beneficiary and the Participant's beneficiary shall total 120.

(6)    Monthly pension payable over the life of the Participant's designated Beneficiary, with the provision that, if the Participant's designated Beneficiary dies prior to the completion of 180 monthly payments, such monthly payments shall be continued to the Participant's beneficiary until the monthly payments made to the Participant's designated Beneficiary and the Participant's beneficiary shall total 180.

(7)    Monthly pension payable over the life of the Participant's designated Beneficiary, with the provision that, if the Participant's designated Beneficiary dies prior to the completion of 240 monthly payments, such monthly payments shall be continued to the Participant's beneficiary until the monthly payments made to the Participant's designated Beneficiary and the Participant's beneficiary shall total 240.

(8)    Monthly pension payable over the life of the Participant's designated Beneficiary, with the provisions that, payments made prior to the receipt of Social Security benefits will be larger so that, insofar as practical, a level monthly pension will be available for the designated Beneficiary.

In the event the death benefit payable pursuant to Section 5.5 is payable in installments, then, upon the death of the Participant, the Administrator may direct the Trustee to segregate the death benefit into a separate account, and the Trustee shall invest such segregated account separately, and the funds accumulated in such account shall be used for the payment of the installments.

Notwithstanding the above, if the death benefit payable pursuant to Section 5.5 is payable in an annuity, payments shall be subject to the rules specified in Section 5.9.

(g)    All annuity Contracts (if any) that are purchased under this Plan shall be non-transferable when distributed. Furthermore, the terms of any annuity Contract purchased and distributed to a spouse shall comply with all of the requirements of the Plan.

EXHIBIT 1
34
EXHIBIT 1
38

5.9    MINIMUM DISTRIBUTION REQUIREMENTS

(a)    General Rules.

(1)    Effective date. The provisions of this Section are effective January 1, 2004; however, except as otherwise provided herein, the provisions of this Section will first apply for purposes of determining required minimum distributions for calendar years beginning on and after January 1, 2006.

(2)    Requirements of Treasury regulations incorporated. All distributions required under this Section shall be determined and made in accordance with Code Section 401(a)(9), including the incidental death benefit requirement in Code Section 401(a)(9)(G), and the Regulations thereunder.

(3)    Precedence. Subject to the qualified joint and survivor annuity requirements of the Plan, the requirements of this Section shall take precedence over any inconsistent provisions of the Plan.

(4)    TEFRA Section 242(b)(2) elections.

(i)    Notwithstanding the other provisions of this Section, other than Section 5.9, distributions may be made on behalf of any Participant, including a five percent (5%) owner, who has made a designation in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (TEFRA) and in accordance with all of the following requirements (regardless of when such distributions commence):

(A)    The distribution by the Plan is one which would not have disqualified such plan under Code Section 401(a)(9) as in effect prior to amendment by the Deficit Reduction Act of 1984.

(B)    The distribution is in accordance with a method of distribution designated by the Participant whose interest in the plan is being distributed or, if the Participant is deceased, by a beneficiary of such Participant.

(C)    Such designation was in writing, was signed by the Participant or beneficiary, and was made before January 1, 1984.

(D)    The Participant had accrued a benefit under the Plan as of December 31, 1983.

(E)    The method of distribution designated by the Participant or the beneficiary specifies the time at which distribution will commence, the period over which distributions will be made, and in the case of any distribution upon the Participant's death, the beneficiaries of the Participant listed in order of priority.

(ii)    A distribution upon death will not be covered by the transitional rule of this Subsection unless the information in the designation contains the required information described above with respect to the distributions to be made upon the death of the Participant.

(iii)    For any distribution which commences before January 1, 1984, but continues after December 31, 1983, the Participant, or the beneficiary, to whom such distribution is being made, will be presumed to have designated the method of distribution under which the distribution is being made if the method of distribution was specified in writing and the distribution satisfies the requirements in (i)(A) and (i)(E) of this Subsection.

(iv)    If a designation is revoked, any subsequent distribution must satisfy the requirements of Code Section 401(a)(9) and the Regulations thereunder. If a designation is revoked subsequent to the date distributions are required to begin, the Plan must distribute by the end of the calendar year following the calendar year in which the revocation occurs the total amount not yet distributed which would have been required to have been distributed to satisfy Code Section 401(a)(9) and the Regulations thereunder, but for the Section 242(b)(2) election. For calendar years beginning after December 31, 1988, such distributions must meet the minimum distribution incidental benefit requirements. Any changes in the designation will be considered to be a revocation of the designation. However, the mere substitution or addition of another beneficiary (one not named in the designation) under the designation will not be considered to be a revocation of the designation, so long as such substitution or addition does not alter the period over which distributions are to be made under the designation, directly or indirectly (for example, by altering the relevant measuring life).

(v)    In the case in which an amount is transferred or rolled over from one plan to another plan, the rules in Regulation Section 1.401(a)(9)-8, Q&A-14 and Q&A-15, shall apply.

(b)    Time and manner of distribution.

(1)    Required beginning date. The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's "Required Beginning Date."

EXHIBIT 1
35
EXHIBIT 1
39

(2) **Death of participant before distributions begin.** If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(i) **Life expectancy rule, spouse is beneficiary.** At the election of the Participant or, if no election is made by the Participant, then at the election of the Participant's "Designated Beneficiary," if the Participant's surviving spouse is the Participant's sole "Designated Beneficiary," then distributions to the surviving spouse will begin by December 31st of the calendar year immediately following the calendar year in which the Participant died, or by December 31st of the calendar year in which the Participant would have attained age 70 1/2, if later.

(ii) **Life expectancy rule, spouse is not beneficiary.** At the election of the Participant or, if no election is made by the Participant, then at the election of the Participant's "Designated Beneficiary," if the Participant's surviving spouse is not the Participant's sole "Designated Beneficiary," then distributions to the "Designated Beneficiary" will begin by December 31st of the calendar year immediately following the calendar year in which the Participant died.

(iii) **5-year rule.** At the election of the Participant or, if no election is made by the Participant, then at the election of the Participant's "Designated Beneficiary," if the Participant dies before distributions begin and there is a "Designated Beneficiary," then the Participant's entire interest will be distributed to the "Designated Beneficiary" by December 31st of the calendar year containing the fifth anniversary of the Participant's death. If the Participant's surviving spouse is the Participant's sole "Designated Beneficiary" and the surviving spouse dies after the Participant but before distributions to either the Participant or the surviving spouse begin, then this Section 5.9(b)(2)(iii) will apply as if the surviving spouse were the Participant.

**Participant or designated beneficiary election.** Participants or beneficiaries may elect on an individual basis whether the 5-year rule in Section 5.9(b)(2)(iii) or the life expectancy rule in Sections 5.9(b)(2)(i) or 5.9(b)(2)(ii), and 5.9(e) applies to distributions after the death of a Participant who has a "Designated Beneficiary". The election must be made no later than the earlier of September 30th of the calendar year in which distribution would be required to begin under Sections 5.9(b)(2)(i) or 5.9(b)(2)(ii), or by September 30th of the calendar year which contains the fifth anniversary of the Participant's (or, if applicable, surviving spouse's) death under Section 5.9(b)(2)(iii). If neither the Participant nor beneficiary makes an election under this paragraph, distributions will be made in accordance with Sections 5.9(b)(2)(i) or 5.9(b)(2)(ii), and 5.9(e).

(iv) **No designated beneficiary, 5-year rule.** If there is no "Designated Beneficiary" as of September 30th of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31st of the calendar year containing the fifth anniversary of the Participant's death.

(v) **Surviving spouse dies before distributions begin.** If the Participant's surviving spouse is the Participant's sole "Designated Beneficiary" and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, then this Section 5.9(b), other than Section 5.9(b)(2)(i), will apply as if the surviving spouse were the Participant.

For purposes of this Section 5.9(b) and Section 5.9(e), distributions are considered to begin on the Participant's "Required Beginning Date" (or, if Section 5.9(b)(2)(i) applies, the date distributions are required to begin to the surviving spouse under Section 5.9(b)(2)(i)). If annuity payments irrevocably commence to the Participant before the Participant's "Required Beginning Date" (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under Section 5.9(b)(2)(i)), the date distributions are considered to begin is the date distributions actually commence.

(3) **Form of distribution.** Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the "Required Beginning Date," as of the first "Distribution Calendar Year" distributions will be made in accordance with Sections 5.9(c), 5.9(d), and 5.9(e). If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Section 401(a)(9) of the Code and the Regulations thereunder.

(c) **Determination of amount to be distributed each year.**

(1) **General annuity requirements.** A Participant who is required to begin payments as a result of attaining his or her "Required Beginning Date," whose interest has not been distributed in the form of an annuity purchased from an insurance company or in a single sum before such date, may receive such payments in the form of annuity payments under the Plan. Payments under such annuity must satisfy the following requirements:

(i) The annuity distributions will be paid in periodic payments made at intervals not longer than one year;

(ii) The distribution period will be over a life (or lives) or over a period certain not longer than the period described in Section 5.9(d) or 5.9(e);

(iii) Once payments have begun over a period certain, the period certain will not be changed even if the period certain is shorter than the maximum permitted.

<div align="center">25</div>

EXHIBIT 1
36
EXHIBIT 1
40

(iv) Payments will either be nonincreasing or increase only to the extent permitted by one of the following conditions:

(A) By an annual percentage increase that does not exceed the annual percentage increase in a cost-of-living index that for a 12-month period ending in the year during which the increase occurs or the prior year;

(B) By a percentage increase that occurs at specified times (e.g., at specified ages) and does not exceed the cumulative total of annual percentage increases in an "Eligible Cost-of-Living Index" since the Annuity Starting Date, or if later, the date of the most recent percentage increase. In cases providing such a cumulative increase, an actuarial increase may not be provided to reflect the fact that increases were not provided in the interim years;

(C) To the extent of the reduction in the amount of the Participant's payments to provide for a survivor benefit upon death, but only if the beneficiary whose life was being used to determine the distribution period described in Section 5.9(d) dies or is no longer the Participant's beneficiary pursuant to a qualified domestic relations order within the meaning of Section 414(p);

(D) To allow a beneficiary to convert the survivor portion of a joint and survivor annuity into a single sum distribution upon the Participant's death;

(E) To pay increased benefits that result from a Plan amendment or other increase in the Participant's Accrued Benefit under the Plan;

(F) By a constant percentage, applied not less frequently than annually, at a rate that is less than five percent (5%) per year;

(G) To provide a final payment upon the death of the Participant that does not exceed the excess of the actuarial present value of the Participant's accrued benefit (within the meaning of Code Section 411(a)(7)) calculated as of the Annuity Starting Date using the applicable interest rate and the applicable mortality table under Code Section 417(e) over the total of payments before the death of the Participant; or

(H) As a result of dividend or other payments that result from "Actuarial Gains," provided:

(i) Actuarial gain is measured not less frequently than annually;

(ii) The resulting dividend or other payments are either paid no later than the year following the year for which the actuarial experience is measured or paid in the same form as the payment of the annuity over the remaining period of the annuity (beginning no later than the year following the year for which the actuarial experience is measured);

(iii) The "Actuarial Gain" taken into account is limited to "Actuarial Gain" from investment experience;

(iv) The assumed interest rate used to calculate such "Actuarial Gains" is not less than three percent (3%); and

(v) The annuity payments are not also being increased by a constant percentage as described in Subsection (F) above.

(2) **Amount required to be distributed by required beginning date.**

(i) In the case of a Participant whose interest in the Plan is being distributed as an annuity pursuant to Subsection (1) above, the amount that must be distributed on or before the Participant's "Required Beginning Date" (or, if the Participant dies before distributions begin, the date distributions are required to begin under Section 5.9(b)(2)(i) or 5.9(b)(2)(ii)) is the payment that is required for one payment interval. The second payment need not be made until the end of the next payment interval even if that payment interval ends in the next calendar year. Payment intervals are the periods for which payments are received, e.g., bi-monthly, monthly, semi-annually, or annually. All of the Participant's benefit accruals as of the last day of the first "Distribution Calendar Year" will be included in the calculation of the amount of the annuity payments for payment intervals ending on or after the Participant's "Required Beginning Date."

(ii) In the case of a single sum distribution of a Participant's entire accrued benefit during a "Distribution Calendar Year," the amount that is the required minimum distribution for the "Distribution Calendar Year" (and thus not eligible for rollover under Code Section 402(c)) is determined under this paragraph. The portion of the single sum distribution that is a required minimum distribution is determined by treating the single sum distribution as a distribution from an individual account Plan and treating the amount of the single sum distribution as the Participant's account balance as of the end of the relevant valuation calendar year. If the single sum distribution is being made in the calendar year containing the "Required Beginning Date" and the required minimum distribution for the Participant's first "Distribution Calendar Year" has not been distributed, the portion of the single sum distribution that represents the required minimum distribution for the Participant's first and second "Distribution Calendar Year" is not eligible for rollover.

26

EXHIBIT 1
37
EXHIBIT 1
41

(3)    **Additional accruals after first distribution calendar year.** Any additional benefits accruing to the Participant in a calendar year after the first "Distribution Calendar Year" will be distributed beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues. Notwithstanding the preceding, the Plan will not fail to satisfy the requirements of this paragraph and Code Section 401(a)(9) merely because there is an administrative delay in the commencement of the distribution of the additional benefits accrued in a calendar year, provided that the actual payment of such amount commences as soon as practicable. However, payment must commence no later than the end of the first calendar year following the calendar year in which the additional benefit accrues, and the total amount paid during such first calendar year must be no less than the total amount that was required to be paid during that year under this paragraph.

(4)    **Death after distributions begin.** If a Participant dies after distribution of the Participant's interest begins in the form of an annuity meeting the requirements of this Section, then the remaining portion of the Participant's interest will continue to be distributed over the remaining period over which distributions commenced.

(d)    Annuity distributions that commence during participant's lifetime.

(1)    **Joint life annuities where the Beneficiary is the Participant's Spouse.** If distributions commence under a distribution option that is in the form of a joint and survivor annuity for the joint lives of the Participant and the Participant's spouse, the minimum distribution incidental benefit requirement will not be satisfied as of the date distributions commence unless, under the distribution option, the periodic annuity payment payable to the survivor does not at any time on or after the Participant's "Required Beginning Date" exceed the annuity payable to the Participant. In the case of an annuity that provides for increasing payments, the requirement of this Paragraph will not be violated merely because benefit payments to the beneficiary increase, provided the increase is determined in the same manner for the Participant and the beneficiary. If the form of distribution combines a joint and survivor annuity for the joint lives of the Participant and the Participant's spouse and a period certain annuity, the preceding requirements will apply to annuity payments to be made to the "Designated Beneficiary" after the expiration of the period certain.

(2)    **Joint life annuities where the Beneficiary is not the Participant's Spouse.** If the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a beneficiary other than the Participant's spouse, the minimum distribution incidental benefit requirement will not be satisfied as of the date distributions commence unless under the distribution option, the annuity payments to be made on and after the Participant's "Required Beginning Date" will satisfy the conditions of this Paragraph. The periodic annuity payment payable to the survivor must not at any time on and after the Participant's "Required Beginning Date" exceed the applicable percentage of the annuity payment payable to the Participant using the table set forth in Q&A-2(c)(2) of Section 1.401(a)(9)-6 of the Regulations. The applicable percentage is based on the adjusted Participant/beneficiary age difference. The adjusted Participant/beneficiary age difference is determined by first calculating the excess of the age of the Participant over the age of the beneficiary based on their ages on their birthdays in a calendar year. If the Participant is younger than age 70, the age difference determined in the previous sentence is reduced by the number of years that the Participant is younger than age 70 on the Participant's birthday in the calendar year that contains the Annuity Starting Date. In the case of an annuity that provides for increasing payments, the requirement of this Paragraph will not be violated merely because benefit payments to the beneficiary increase, provided the increase is determined in the same manner for the Participant and the beneficiary. If the form of distribution combines a joint and survivor annuity for the joint lives of the Participant and a nonspouse beneficiary and a period certain annuity, the preceding requirements will apply to annuity payments to be made to the "Designated Beneficiary" after the expiration of the period certain.

(3)    **Period certain annuities.** Unless the Participant's spouse is the sole "Designated Beneficiary" and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the Uniform Lifetime Table set forth in Regulation Section 1.401(a)(9)-9 for the calendar year that contains the Annuity Starting Date. If the Annuity Starting Date precedes the year in which the Participant reaches age 70, the applicable distribution period for the Participant is the distribution period for age 70 under the Uniform Lifetime Table set forth in Regulation Section 1.401(a)(9)-9 plus the excess of 70 over the age of the Participant as of the Participant's birthday in the year that contains the Annuity Starting Date. If the Participant's spouse is the Participant's sole "Designated Beneficiary" and the form of distribution is a period certain and no life annuity, the period certain may not exceed the longer of the Participant's applicable distribution period, as determined under this Section 5.9(d)(3), or the joint life and last survivor expectancy of the Participant and the Participant's spouse as determined under the Joint and Last Survivor Table set forth in Regulation Section 1.401(a)(9)-9, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the calendar year that contains the Annuity Starting Date.

(e)    Minimum distributions where participant dies before date distributions begin.

(1)    **Participant survived by designated beneficiary and life expectancy rule.** At the election of the Participant or, if no election is made by the Participant, then at the election of the Participant's "Designated Beneficiary," if the Participant dies before the date distribution of his or her interest begins and there is a "Designated Beneficiary," the Participant's entire interest will be distributed, beginning no later than the time described in Section 5.9(b)(2)(i) or 5.9(b)(2)(ii), over the life of the "Designated Beneficiary" or over a period certain not exceeding:

(i)    Unless the Annuity Starting Date is before the first "Distribution Calendar Year," the "Life Expectancy" of the "Designated Beneficiary" determined using the beneficiary's age as of the beneficiary's birthday in the calendar year immediately following the calendar year of the Participant's death; or

<div align="center">27</div>

<div align="center">
EXHIBIT 1

38

EXHIBIT 1

42
</div>

(ii)  If the Annuity Starting Date is before the first Distribution Calendar Year, the "Life Expectancy" of the "Designated Beneficiary" determined using the beneficiary's age as of the beneficiary's birthday in the calendar year that contains the Annuity Starting Date.

(2)  **Participant survived by designated beneficiary and 5-year rule.** At the election of the Participant or, if no election is made by the Participant, then at the election of the Participant's "Designated Beneficiary," if the Participant dies before distributions begin and there is a "Designated Beneficiary," the Participant's entire interest will be distributed to the "Designated Beneficiary" by December 31st of the calendar year containing the fifth anniversary of the Participant's death. This Section 5.9(e)(2) will apply to all distributions.

(3)  **No designated beneficiary.** If the Participant dies before the date distributions begin and there is no "Designated Beneficiary" as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the fifth anniversary of the Participant's death.

(4)  **Death of surviving spouse before distributions to surviving spouse begin.** If the Participant dies before the date distribution of his or her interest begins, the Participant's surviving spouse is the "Designated Beneficiary," and the surviving spouse dies before distributions to the surviving spouse begin, this Section 5.9(e) will apply as if the surviving spouse were the Participant, except that the time by which distributions must begin will be determined without regard to Section 5.9(b)(2)(i).

(f)  **Definitions.**

(1)  **Actuarial Gain.** "Actuarial Gain" means the difference between an amount determined using the actuarial assumptions (i.e., investment return, mortality, expense, and other similar assumptions) used to calculate the initial payments before adjustment for any increases and the amount determined under the actual experience with respect to those factors. Actuarial Gain also includes differences between the amount determined using actuarial assumptions when an annuity was purchased or commenced and such amount determined using actuarial assumptions used in calculating payments at the time the Actuarial Gain is determined.

(2)  **Designated Beneficiary.** "Designated Beneficiary" means the individual who is designated as the beneficiary under Section 5.5 of the Plan and is the designated beneficiary under Code Section 401(a)(9) and Regulation Section 1.401(a)(9)-4.

(3)  **Distribution Calendar Year.** "Distribution Calendar Year" means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Participant's "Required Beginning Date." For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin pursuant to Section 5.9(b).

(4)  **Eligible cost-of-living index.** An "Eligible Cost-of-Living Index" means an index described below:

(i)  A consumer price index that is based on prices of all items (or all items excluding food and energy) and issued by the Bureau of Labor Statistics, including an index for a specific population (such as urban consumers or urban wage earners and clerical workers) and an index for a geographic area or areas (such as a given metropolitan area or state); or

(ii)  A percentage adjustment based on a cost-of-living index described in Subsection (i) above, or a fixed percentage, if less. In any year when the cost-of-living index is lower than the fixed percentage, the fixed percentage may be treated as an increase in an Eligible Cost-of-Living Index, provided it does not exceed the sum of:

(A)  The cost-of-living index for that year; and

(B)  The accumulated excess of the annual cost-of-living index from each prior year over the fixed annual percentage used in that year (reduced by any amount previously utilized under this Subsection (ii)).

(5)  **Life expectancy.** "Life Expectancy" means the life expectancy as computed by use of the Single Life Table in Regulation Section 1.401(a)(9)-9, Q&A-1.

(6)  **Required beginning date.** "Required Beginning Date" means the April 1st of the calendar year following the later of (1) the calendar year in which the Participant attains age 70 1/2, or (2) if the Participant is not a "five (5) percent owner" at any time during the Plan Year ending with or within the calendar year in which the Participant attains age 70 1/2, then the calendar year in which the Participant retires. "5-percent owner" means a Participant who is a 5-percent owner as defined in Code Section 416(i)(1)(B)(i) at any time during the Plan Year ending with or within the calendar year in which such owner attains age 70 1/2.

(g)  **Effective date of application of regulations, and transitional rules.**

(1)  Except as provided below, the provisions of this Section will apply with respect to distributions under the Plan made for calendar years beginning on or after January 1, 2006.

EXHIBIT 1
39
EXHIBIT 1
43

**5.10    TIME OF SEGREGATION OR DISTRIBUTION**

Except as limited by Sections 5.7 and 5.8, whenever the Trustee is to make a distribution or to commence a series of payments the distribution or series of payments may be made on such date or as soon thereafter as is practicable. However, unless a Participant elects in writing to defer the receipt of benefits (such election may not result in a death benefit that is more than incidental), the payment of benefits shall begin not later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs: (a) the date on which the Participant attains the earlier of age 65 or the Normal Retirement Age specified herein; (b) the tenth (10th) anniversary of the year in which the Participant commenced participation in the Plan; or (c) the date the Participant terminates service with the Employer.

Notwithstanding the foregoing, the failure of a Participant and, if applicable, the Participant's spouse, to consent to a distribution that is "immediately distributable" (within the meaning of Section 5.7), shall be deemed to be an election to defer commencement of payment of any benefit sufficient to satisfy this Section.

**5.11    DISTRIBUTION FOR MINOR OR INCOMPETENT BENEFICIARY**

In the event a distribution is to be made to a minor or incompetent individual, then the Administrator may direct that such distribution be paid to the court-appointed legal guardian or any other person authorized under state law to receive such distribution, or if none, then in the case of a minor Beneficiary, to a parent of such Beneficiary, or to the custodian for such Beneficiary under the Uniform Gift to Minors Act or Gift to Minors Act, if such is permitted by the laws of the state in which said Beneficiary resides. Such a payment to the guardian, custodian or parent of a minor or incompetent individual shall fully discharge the Trustee, Employer, and Plan from further liability on account thereof.

**5.12    LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN**

In the event that all, or any portion, of the distribution payable to a Participant or Beneficiary hereunder shall, at the later of the Participant's attainment of age 62 or Normal Retirement Age, remain unpaid solely by reason of the inability of the Administrator, after sending a registered letter, return receipt requested, to the last known address, and after further diligent effort, to ascertain the whereabouts of such Participant or Beneficiary, the amount so distributable shall be forfeited and shall be used to reduce the cost of the Plan. Notwithstanding the foregoing, if the value of a Participant's Vested benefit derived from Employer and Employee contributions does not exceed $1,000, then the amount distributable may, in the sole discretion of the Administrator, either be treated as a forfeiture, or be paid directly to an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) at the time it is determined that the whereabouts of the Participant or the Participant's Beneficiary cannot be ascertained. In the event a Participant or Beneficiary is located subsequent to the benefit being forfeited, such benefit shall be restored unadjusted for earnings or losses. However, regardless of the preceding, a benefit which is lost by reason of escheat under applicable state law is not treated as a forfeiture for purposes of this Section nor as an impermissible forfeiture under the Code.

**5.13    EFFECT OF SOCIAL SECURITY ACT**

Benefits being paid to a Participant or Beneficiary under the terms of the Plan may not be decreased by reason of any post-separation Social Security benefit increases or by the increase of the Social Security wage base under Title II of the Social Security Act. Benefits to which a Participant has a Vested interest may not be decreased by reason of an increase in a benefit level or wage base under Title II of the Social Security Act.

**5.14    QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION**

All rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any alternate payee under a qualified domestic relations order. Furthermore, a distribution to an alternate payee shall be permitted if such distribution is authorized by a qualified domestic relations order, even if the affected Participant has not separated from service and has not reached the Earliest Retirement Age. For the purposes of this Section, "alternate payee" and "qualified domestic relations order" shall have the meaning set forth under Code Section 414(p).

**5.15    LIMITATION OF BENEFITS ON TERMINATION**

(a)    **Restrictions applicable to restricted employee.** Benefits distributed to a "restricted employee" are restricted such that the monthly payments are no greater than an amount equal to the monthly payment that would be made on behalf of such individual under a straight life annuity that is the Actuarial Equivalent of the sum of the individual's Accrued Benefit, the individual's other benefits under the Plan (other than a social security supplement within the meaning of Regulation Section 1.411(a)-7(c)(4)(ii)), and the amount the individual is entitled to receive under a social security supplement. However, the limitation of this Section 5.15 shall not apply if:

(1)    after payment of the benefit to an individual described above, the value of Plan assets equals or exceeds one-hundred-ten percent (110%) of the value of current liabilities;

(2)    the value of the benefits for an individual described above is less than 1 percent of the value of current liabilities before distribution; or

(3)    the value of the benefits payable under the Plan to an individual described above does not exceed $5,000.

29

EXHIBIT 1
40
EXHIBIT 1
44

(b)  **Benefit.** For purposes of this Section, benefit includes any periodic income, any withdrawal values payable to a living Participant, and any death benefits not provided for by insurance on the individual's life.

(c)  **Payment permitted if security provided.** An individual's otherwise restricted benefit may be distributed in full to the affected individual if, prior to receipt of the restricted amount, the individual enters into a written agreement with the Administrator to secure repayment to the Plan of the restricted amount. The restricted amount is the excess of the amounts distributed to the individual (accumulated with reasonable interest) over the amounts that could have been distributed to the individual under the straight life annuity described above (accumulated with reasonable interest). The individual may secure repayment of the restricted amount upon distribution by:

(1)  entering into an agreement for promptly depositing in escrow with an acceptable depositary, property having a fair market value equal to at least one-hundred-twenty-five percent (125%) of the restricted amount;

(2)  providing a bank letter of credit in an amount equal to at least one-hundred percent (100%) of the restricted amount; or

(3)  posting a bond equal to at least one-hundred percent (100%) of the restricted amount. The bond must be furnished by an insurance company, bonding company or other surety for federal bonds.

(d)  **Escrow.** The escrow arrangement described in (c)(1) above may permit an individual to withdraw from escrow amounts in excess of one-hundred-twenty-five percent (125%) of the restricted amount. If the market value of the property in an escrow account falls below one-hundred-ten percent (110%) of the remaining restricted amount, the individual must deposit additional property to bring the value of the property held by the depositary up to one-hundred-twenty-five percent (125%) of the restricted amount. The escrow arrangement may provide that the individual has the right to receive any income from the property placed in escrow, subject to the individual's obligation to deposit additional property, as set forth in the preceding sentence.

(e)  **Limitation on bond or letter of credit.** A surety or bank may release any liability on a bond or letter of credit in excess of one-hundred percent (100%) of the restricted amount.

(f)  **Restrictions no longer apply.** If the Administrator certifies to the depositary, surety or bank that the individual (or the individual's estate) is no longer obligated to repay any restricted amount, a depositary may deliver to the individual any property held under an escrow arrangement, and a surety or bank may release any liability on an individual's bond or letter of credit.

(g)  **Definition of Restricted Employee.** For purposes of this Section, "Restricted Employee" means any Highly Compensated Employee or former Highly Compensated Employee. However, a Highly Compensated Employee or former Highly Compensated Employee need not be treated as a "Restricted Employee" in the current year if the Highly Compensated Employee or former Highly Compensated Employee is not one of the twenty-five (25) (or larger number chosen by the Employer) nonexcludable Employees and former Employees of the Employer with the largest amount of compensation in the current or any prior year.

5.16  **DIRECT ROLLOVER**

(a)  **Right to direct rollover.** Notwithstanding any provision of the Plan to the contrary that would otherwise limit a "distributee's" election under this Section, a distributee may elect, at the time and in the manner prescribed by the Administrator, to have any eligible rollover distribution, or any portion of an eligible rollover distribution that is equal to at least $500, paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)  **Definitions.** For purposes of this Section the following definitions shall apply:

(1)  An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's Designated Beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any other distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); any hardship distribution; and any other distribution that is reasonably expected to total less than $200 during a year.

Notwithstanding the above, a portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax voluntary Employee contributions which are not includible in gross income. However, such portion may be transferred only to (1) an individual retirement account or annuity described in Code Section 408(a) or (b), or (2) for taxable years beginning after December 31, 2001 and before January 1, 2007, to a qualified trust that is part of a defined contribution plan that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible, or (3) for taxable years beginning after December 31, 2006, to a qualified trust or to an annuity contract described in 403(b), if such trust or contract agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(2)  With respect to distributions made after December 31, 2001, an eligible retirement plan is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b), (other than an endowment

<div align="center">30</div>

EXHIBIT 1
41
EXHIBIT 1
45

contract), a qualified defined contribution plan described in Code Section 401(a) that accepts the distributee's rollover distribution, an annuity plan described in Code Section 403(a), an eligible deferred compensation plan described in Code Section 457(b) which is maintained by an eligible employer described in Code Section 457(e)(1)(A), and an annuity contract described in Code Section 403(b), that accepts the distributee's eligible rollover distribution. The definition of "eligible retirement plan" shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Code Section 414(p). In the case of "distributee" who is a nonspouse designated beneficiary, (1) the direct rollover may be made only to an individual retirement account described in Code Section 408(a) or annuity described in Code Section 408(b) ("IRA") that is established on behalf of the designated beneficiary and that will be treated as an inherited IRA pursuant to the provisions of Code Section 402(c)(11), and (2) the determination of any required minimum distribution required under Code Section 401(a)(9) that is ineligible for rollover shall be made in accordance with Notice 2007-7, Q&A 17 and 18.

(3)   A "distributee" includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are distributees with regard to the interest of the spouse or former spouse. A distributee also includes the Participant's nonspouse designated beneficiary under Section 5.5 of the Plan.

(4)   A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

(c)   **Participant notice.** A Participant entitled to an eligible rollover distribution must receive a written explanation of the right to a direct rollover, the tax consequences of not making a direct rollover, and, if applicable, any available special income tax elections. The notice must be provided within the same 30 – 180 day timeframe applicable to the Participant consent notice. The direct rollover notice must be provided to all Participants, unless the total amount the Participant will receive as a distribution during the calendar year is expected to be less than $200.

## 5.17   RETROACTIVE ANNUITY STARTING DATES

Notwithstanding anything in the Plan to the contrary, effective as of January 1, 2012, the Plan permits "retroactive annuity starting dates" in accordance with the following provisions.

(a)   **Definition of retroactive annuity starting date.** For purposes of this Section, a "retroactive annuity starting date" is an Annuity Starting Date affirmatively elected by a Participant that occurs on or before the date the written explanation required by Code Section 417(a)(3) is provided to the Participant. If a Participant elects a retroactive annuity starting date, then future periodic payments with respect to the Participant must be the same as the future periodic payments, if any, that would have been paid with respect to the Participant had payments actually commenced on the retroactive annuity starting date. The Participant must receive a make-up payment to reflect any missed payment or payments for the period from the retroactive annuity starting date to the date of the actual make-up payment (with an appropriate adjustment for interest from the date the missed payment or payments would have been made to the date of the actual make-up payment). Thus, the benefit determined as of the retroactive annuity starting date must satisfy the requirements of Code Section 417(e)(3), if applicable, and Code Section 415 with the applicable interest rate and applicable mortality table determined as of that date. Similarly, a Participant is not permitted to elect a retroactive annuity starting date that precedes the date upon which the Participant could have otherwise started receiving benefits (e.g., in the case of an ongoing plan, the earlier of the Participant's termination of employment or the Participant's Normal Retirement Age) under the terms of the Plan in effect as of the retroactive annuity starting date. The Plan does not fail to treat a Participant as having elected a retroactive annuity starting date as described in this paragraph merely because the distributions are adjusted to the extent necessary to satisfy the requirements of paragraphs (c)(2) or (c)(3) of this Section relating to Code Sections 415 and 417(e)(3).

(1)   If the Participant's spouse as of the retroactive annuity starting date would not be the Participant's spouse determined as if the date distributions commence was the Participant's Annuity Starting Date, consent of that former spouse is not needed to waive the qualified joint and survivor annuity (QJSA) with respect to the retroactive annuity starting date, unless otherwise provided under a qualified domestic relations order (as defined in Code Section 414(p)).

(2)   A distribution payable pursuant to a retroactive annuity starting date election is treated as excepted from the present value requirements of Regulation Section 1.417(e)-1(d) under paragraph (d)(6) of such Regulation Section 1.417(e)-1(d)(6) if the distribution form would have been described in paragraph (d)(6) of such Regulation Section 1.417(e)-1(d)(6) had the distribution actually commenced on the retroactive annuity starting date. Similarly, annuity payments that otherwise satisfy the requirements of a QJSA under Code Section 417(b) will not fail to be treated as a QJSA for purposes of Code Section 415(b)(2)(B) merely because a retroactive annuity starting date is elected and a make-up payment is made. Also, for purposes of Code Section 72(t)(2)(A)(iv), a distribution that would otherwise be one of a series of substantially equal periodic payments will be treated as one of a series of substantially equal periodic payments notwithstanding the distribution of a make-up payment provided for in paragraph (a) of this Section.

(b)   **Requirements applicable to retroactive annuity starting dates.** A distribution is permitted to have a retroactive annuity starting date with respect to a Participant's benefit only if the following requirements are met:

(1)   The Participant's spouse (including an alternate payee who is treated as the spouse under a qualified domestic relations order (QDRO), as defined in Code Section 414(p)), determined as if the date distributions commence were the Participant's Annuity Starting Date, consents to the distribution in a manner that would satisfy the requirements of Code Section 417(a)(2). The spousal

51

EXHIBIT 1
42
EXHIBIT 1
46

consent requirement of this paragraph is satisfied if such spouse consents to the distribution under Regulation Section 1.417(e)-1(b)(2)(i). The spousal consent requirement of this paragraph does not apply if the amount of such spouse's survivor annuity payments under the retroactive annuity starting date election is no less than the amount that the survivor payments to such spouse would have been under an optional form of benefit that would satisfy the requirements to be a QJSA under Code Section 417(b) and that has an Annuity Starting Date after the date that the explanation was provided.

(2)    The distribution (including appropriate interest adjustments) provided based on the retroactive annuity starting date would satisfy the requirements of Code Section 415 if the date the distribution commences is substituted for the Annuity Starting Date for all purposes, including for purposes of determining the applicable interest rate and the applicable mortality table. However, in the case of a form of benefit that would have been excepted from the present value requirements of Regulation Section 1.417(e)-1(d) under such Regulation Section 1.417(e)-1(d)(6) if the distribution had actually commenced on the retroactive annuity starting date, the requirement to apply Code Section 415 as of the date distribution commences set forth in this paragraph does not apply if the date distribution commences is twelve months or less from the retroactive annuity starting date.

(3)    In the case of a form of benefit that would have been subject to Code Section 417(e)(3) and Regulation Section 1.417(e)-1(d) if distributions had commenced as of the retroactive annuity starting date, the distribution is no less than the benefit produced by applying the applicable interest rate and the applicable mortality table determined as of the date the distribution commences to the annuity form that corresponds to the annuity form that was used to determine the benefit amount as of the retroactive annuity starting date. Thus, for example, if a distribution paid pursuant to an election of a retroactive annuity starting date is a single-sum distribution that is based on the present value of the straight life annuity payable at Normal Retirement Age, then the amount of the distribution must be no less than the present value of the annuity payable at Normal Retirement Age, determined as of the distribution date using the applicable mortality table and applicable interest rate that apply as of the distribution date. Likewise, if a distribution paid pursuant to an election of a retroactive annuity starting date is a single-sum distribution that is based on the present value of the early retirement annuity payable as of the retroactive annuity starting date, then the amount of the distribution must be no less than the present value of the early retirement annuity payable as of the distribution date, determined as of the distribution date using the applicable mortality table and applicable interest rate that apply as of the distribution date.

(c)    **Timing of notice and consent requirements in the case of retroactive annuity starting dates.** In the case of a retroactive annuity starting date, the date of the first actual payment of benefits based on the retroactive annuity starting date is substituted for the Annuity Starting Date for purposes of satisfying the timing requirements for giving consent and providing an explanation of the QJSA provided in Regulation Section 1.417(e)-1(b)(3)(i) and (ii), except that the substitution does not apply for purposes of Regulation Section 1.417(e)-1(b)(3)(iii). Thus, the written explanation required by Code Section 417(a)(3)(A) must generally be provided no less than 30 days and no more than 180 days before the date of the first payment of benefits and the election to receive the distribution must be made after the written explanation is provided and on or before the date of the first payment. Similarly, the written explanation may also be provided less than 30 days prior to the first payment of benefits if the requirements of Regulation Section 1.417(e)-1(b)(3)(ii) would be satisfied if the date of the first payment is substituted for the Annuity Starting Date.

(d)    **Administrative delay.** A plan will not fail to satisfy the 180-day timing requirements of Regulation Section 1.417(e)-1(b)(3)(iii) and (vi) merely because, due solely to administrative delay, a distribution commences more than 180 days after the written explanation of the QJSA is provided to the Participant.

### ARTICLE VI
### CODE SECTION 415 LIMITATIONS

6.1    **ANNUAL BENEFIT**

(a)    **Annual Benefit.** For purposes of this Article, "annual benefit" means a benefit that is payable annually in the form of a straight life annuity. Except as provided below, where a benefit is payable in a form other than a straight life annuity, the benefit shall be adjusted to an actuarially equivalent straight life annuity that begins at the same time as such other form of benefit and is payable on the first day of each month, before applying the limitations of this Article. For a Participant who has or will have distributions commencing at more than one Annuity Starting Date, the "Annual Benefit" shall be determined as of each such Annuity Starting Date (and shall satisfy the limitations of this article as of each such date), actuarially adjusting for past and future distributions of benefits commencing at the other Annuity Starting Dates. For this purpose, the determination of whether a new Annuity Starting Date has occurred shall be made without regard to Regulations Section 1.401(a)-20, Q&A 10(d), and with regard to Regulations Section 1.415(b)(1)(b)(1)(iii)(B) and (C). No actuarial adjustment to the benefit shall be made for (a) survivor benefits payable to a surviving spouse under a qualified joint and survivor annuity to the extent such benefits would not be payable if the Participant's benefit were paid in another form; (b) benefits that are not directly related to retirement benefits (such as a qualified disability benefit, preretirement incidental death benefits, and postretirement medical benefits); or (c) the inclusion in the form of benefit of an automatic benefit increase feature, provided the form of benefit is not subject to Code Section 417(e)(3) and would otherwise satisfy the limitations of this Article, and the Plan provides that the amount payable under the form of benefit in any "limitation year" shall not exceed the limits of this Article applicable at the Annuity Starting Date, as increased in subsequent years pursuant to Code Section 415(d). For this purpose, an automatic benefit increase feature is included in a form of benefit if the form of benefit provides for automatic, periodic increases to the benefits paid in that form.

32

EXHIBIT 1
43
EXHIBIT 1
47

The determination of the "Annual Benefit" shall take into account social security supplements described in Code Section 411(a)(9) and benefits transferred from another defined benefit plan, other than transfers of distributable benefits pursuant Regulations Section 1.41.1(d)-4, Q&A-2(c), but shall disregard benefits attributable to Employee contributions or rollover contributions.

The "Annual Benefit" otherwise payable to a Participant under the Plan at any time shall not exceed the "Maximum Permissible Benefit" described by Section 6.2. If the benefit the Participant would otherwise accrue in a "limitation year" would produce an "Annual Benefit" in excess of the "Maximum Permissible Benefit," then the benefit shall be limited (or the rate of accrual reduced) to a benefit that does not exceed the "Maximum Permissible Benefit."

(b)    **Grandfather provision.** The application of the provisions of this Section shall not cause the maximum permissible benefit for any Participant to be less than the Participant's accrued benefit under all the defined benefit plans of the Employer or a predecessor employer as of the end of the last "limitation year" beginning before July 1, 2007 under provisions of the plans that were both adopted and in effect before April 5, 2007. The preceding sentence applies only if the provisions of such defined benefit plans that were both adopted and in effect before April 5, 2007 satisfied the applicable requirements of statutory provisions, Regulations, and other published guidance relating to Code Section 415 in effect as of the end of the last "limitation year" beginning before July 1, 2007, as described in Regulation Section 1.415(a)-1(g)(4).

(c)    **High three-year average compensation.** For purposes of the Plan's provisions reflecting Code Section 415(b)(3) (i.e., limiting the annual benefit payable to no more than 100% of the Participant's average annual compensation), a Participant's average compensation shall be the average compensation for the three (3) consecutive years of service with the Employer that produces the highest average, except that a Participant's compensation for a year of service shall not include Compensation in excess of the limitation under Code Section 401(a)(17) that is in effect for the calendar year in which such year of service begins. If the Participant has less than three consecutive years of service, compensation shall be averaged over the Participant's longest consecutive period of service, including fractions of years, but not less than one year. In the case of a Participant who is rehired by the Employer after a severance of employment, the Participant's high three-year average compensation shall be calculated by excluding all years for which the Participant performs no services for and receives no compensation from the Employer (the "break period"), and by treating the years immediately preceding and following the break period as consecutive.

6.2    MAXIMUM ANNUAL BENEFIT

(a)    **Maximum benefit.** Notwithstanding the foregoing and subject to the exceptions and adjustments below, effective for "limitation years" ending after December 31, 2001, the maximum "annual benefit" payable to a Participant under this Plan in any "limitation year" shall equal the lesser of:

(1)    **Defined Benefit Dollar Limitation.** $160,000, as adjusted, effective January 1 of each year, under Code Section 415(d) in such manner as the Secretary shall prescribe, and payable in the form of a straight life annuity. Such dollar limitation as adjusted under Code Section 415(d) will apply to "limitation years" ending with or within the calendar year for which the adjustment applies; or

Post-Severance Adjustment to Dollar Limit. In the case of a Participant who has had a severance from employment with the Employer, the defined benefit dollar limitation applicable to the Participant in any "limitation year" beginning after the date of severance shall not be automatically adjusted under Code Section 415(d).

(2)    **Defined Benefit Compensation Limitation.** One hundred percent (100%) of the Participant's "415 Compensation" averaged over the three consecutive "limitation years" (or actual number of "limitation years" for Employees who have been employed for less than three consecutive "limitation years") during which the Employee had the greatest aggregate "415 Compensation" from the Employer.

Post-Severance Adjustment to Compensation Limit. In the case of a Participant who has had a severance from employment with the Employer, the defined benefit compensation limitation applicable to the Participant in any "limitation year" beginning after the date of severance shall be automatically adjusted under Code Section 415(d).

(b)    **Limitation year.** For purposes of applying the limitations of Code Section 415, the "limitation year" shall be the Plan Year. All qualified plans maintained by the Employer must use the same "limitation year." If the "limitation year" is amended to a different twelve (12) consecutive month period, the new "limitation year" must begin on a date within the "limitation year" in which the amendment is made.

(c)    **Effect of EGTRRA Increase in Code Section 415(b) Limitations.** Effective for "limitation years" ending after December 31, 2001, benefit increases resulting from the increase in the limitations of Code Section 415(b) on account of the Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA) will be provided to all Employees participating in the Plan who have one Hour of Service on or after the first day of the first "limitation year" ending after December 31, 2001.

6.3    ADJUSTMENTS TO ANNUAL BENEFIT AND LIMITATIONS

(a)    **Adjustment for Early Payment (Limitation Years beginning on or after July 1, 2007).** If the Annuity Starting Date for the Participant's benefit is prior to age 62 and occurs in a Limitation Year beginning on or after July 1, 2007, and the Plan does not have an immediately commencing straight life annuity payable at both age 62 and the age of benefit commencement, the "Defined Benefit

33

EXHIBIT 1
44
EXHIBIT 1
48

Dollar Limitation" for the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a straight life annuity commencing at the Participant's Annuity Starting Date that is the actuarial equivalent of the "Defined Benefit Dollar Limitation" (adjusted under Plan Section 6.3(f) for years of participation less than ten (10), if required) with actuarial equivalence computed using a 5 percent interest rate assumption and the applicable mortality table for the Annuity Starting Date (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date). However, if the Plan has an immediately commencing straight life annuity payable at both age 62 and the age of benefit commencement, the "Defined Benefit Dollar Limitation" for the Participant's Annuity Starting Date is the lesser of the limitation determined under the preceding sentence and the "Defined Benefit Dollar Limitation" (adjusted under Plan Section 6.3(f) for years of participation less than ten (10), if required) multiplied by the ratio of the annual amount of the immediately commencing straight life annuity under the Plan at the Participant's Annuity Starting Date to the annual amount of the immediately commencing straight life annuity under the Plan at age 62, both determined without applying the limitations of this Section and without applying the provisions of Section 6.3(e).

(b)    Adjustment for Early Payment (Limitation Years beginning prior to July 1, 2007). If the "annual benefit" of a Participant begins prior to age 62, then for Limitation Years beginning before July 1, 2007, the Defined Benefit Dollar Limitation of Section 6.2(a)(1) applicable to the Participant at the earlier age is the actuarial equivalent of the dollar limitation under Code Section 415(b)(1)(A) (as adjusted under Code Section 415(d)), with actuarial equivalence computed using whichever of the following produces the smaller annual amount: (1) the interest rate and mortality table or other tabular factor specified in the Plan for determining Actuarial Equivalence for early retirement purposes, or (2) a five percent (5%) interest rate assumption and the "applicable mortality table."

(c)    Adjustment for Late Payment (Limitation Years beginning on or after July 1, 2007). If the Annuity Starting Date for the Participant's benefit is after age 65 and occurs in a Limitation Year beginning on or after July 1, 2007, and the Plan does not have an immediately commencing straight life annuity payable at both age 65 and the age of benefit commencement, the "Defined Benefit Dollar Limitation" at the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a straight life annuity commencing at the Participant's Annuity Starting Date that is the actuarial equivalent of the "Defined Benefit Dollar Limitation" (adjusted under Plan Section 6.3(f) for years of participation less than ten (10), if required) with actuarial equivalence computed using a 5 percent interest rate assumption and the applicable mortality table for that Annuity Starting Date as defined in Plan Section 1.3 (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date). However, if the plan has an immediately commencing straight life annuity payable at both age 65 and the age of benefit commencement, the "Defined Benefit Dollar Limitation" at the Participant's Annuity Starting Date is the lesser of the limitation determined under the preceding sentence and the "Defined Benefit Dollar Limitation" (adjusted under Plan Section 6.3(f) for years of participation less than ten (10), if required) multiplied by the ratio of the annual amount of the adjusted immediately commencing straight life annuity under the plan at the Participant's Annuity Starting Date to the annual amount of the adjusted immediately commencing straight life annuity under the Plan at age 65, both determined without applying the limitations of this Article and without applying the provisions of Section 6.3(e). For this purpose, the adjusted immediately commencing straight life annuity under the Plan at the Participant's Annuity Starting Date is the annual amount of such annuity payable to the Participant, computed disregarding the Participant's accruals after age 65 but including actuarial adjustments even if those actuarial adjustments are used to offset accruals; and the adjusted immediately commencing straight life annuity under the Plan at age 65 is the annual amount of such annuity that would be payable under the Plan to a hypothetical Participant who is age 65 and has the same accrued benefit as the Participant.

(d)    Adjustment for Late Payment (Limitation Years beginning before July 1, 2007). If the "annual benefit" of a Participant begins after age 65, then for Limitation Years beginning before July 1, 2007, the Defined Benefit Dollar Limitation of Section 6.2(a)(1) applicable to the Participant at the earlier age is the actuarial equivalent of the dollar limitation under Code Section 415(b)(1)(A) (as adjusted under Code Section 415(d)), with actuarial equivalence computed using whichever of the following produces the smaller annual amount: (1) the interest rate and mortality table or other tabular factor specified in the Plan for determining Actuarial Equivalence for early retirement purposes, or (2) a five percent (5%) interest rate assumption and the "applicable mortality table."

(e)    No Mortality Adjustment for Certain Payments. Except as provided in Section 6.3(a) and Section 6.3(c), no adjustment shall be made to the "Defined Benefit Dollar Limitation" to reflect the probability of a Participant's death between the Annuity Starting Date and age 62, or between age 65 and the Annuity Starting Date, as applicable, if benefits are not forfeited upon the death of the Participant prior to the Annuity Starting Date. To the extent benefits are forfeited upon death before the Annuity Starting Date, such an adjustment shall be made. For this purpose, no forfeiture shall be treated as occurring upon the Participant's death if the Plan does not charge Participants for providing a qualified preretirement survivor annuity, as defined in Code Section 417(c) upon the Participant's death.

(f)    Adjustment for Less Than 10 Years of Participation or Service. Effective for "limitation years" ending after December 31, 2001, if a Participant has fewer than 10 years of participation in the Plan, then the Defined Benefit Dollar Limitation of Section 6.2(a)(1) shall be multiplied by a fraction, the numerator of which is the number of years (or part thereof) of participation in the Plan, and the denominator of which is 10. However, in no event shall such fraction be less than 1/10th.

Furthermore, effective for "limitation years" ending after December 31, 2001, if a Participant has fewer than 10 years of service with the Employer, then the Defined Benefit Compensation Limitation of Section 6.2(a)(2) shall be multiplier by a fraction, the numerator of which is the number of years (or part thereof) of service with the Employer, and the denominator of which is 10. However, in no event shall such fraction be less than 1/10th.

34

EXHIBIT 1
45
EXHIBIT 1
49

For purposes of this Subsection, "year of participation" means each accrual computation period for which the following conditions are met: (1) the Participant is credited with at least the number of Hours of Service for benefit accrual purposes, required under the terms of the Plan in order to accrue a benefit for the accrual computation period, and (2) the Participant is included as a Participant under the eligibility provisions of the Plan for at least one day of the accrual computation period. If these two conditions are met, the portion of a year of participation credited to the Participant shall equal the amount of benefit accrual service credited to the Participant for such accrual computation period. A Participant who is permanently and totally disabled within the meaning of Code Section 415(c)(3)(C)(i) for an accrual computation period shall receive a year of participation with respect to the period. In addition, for a Participant to receive a year of participation (or part thereof) for an accrual computation period, the Plan must be established no later than the last day of such accrual computation period. In no event will more than one year of participation be credited for any 12-month period.

(g)    **Actuarial Equivalence.** For purposes of adjusting the "annual benefit" to a straight life annuity, the equivalent "annual benefit" shall be (i) for Limitation Years beginning on or after July 1, 2007, the greater of the annual amount of the straight life annuity commencing at the same Annuity Starting Date, and the annual amount of a straight life annuity commencing at the same Annuity starting date that has the same actuarial present value as the Participant's form of benefit computed using five percent (5%) interest rate assumption and the "Applicable Mortality Table", and (ii) for Limitation Years beginning before July 1, 2007, the annual amount of a straight life annuity commencing at the same Annuity Starting Date that has the same Annuity Starting Date as the Participant's form of benefit computed using whichever of the following produces the greater annual amount: (1) the interest rate and mortality table or other tabular factor specified in the plan for adjusting benefits in the same form; and (2) a five percent (5%) interest rate assumption and the "Applicable Mortality Table." If the "annual benefit" is paid in a form other than a nondecreasing life annuity payable for a period not less than the life of a Participant or, in the case of a Pre-Retirement Survivor Annuity, the life of the surviving spouse, the "Applicable Interest Rate" shall be substituted for five percent (5%) in the preceding sentence. With respect to Plan Years beginning after December 31, 2003 but not after December 31, 2005, for purposes of adjusting the "annual benefit" to a straight life annuity, if the "annual benefit" is paid in any form other than a nondecreasing life annuity payable for a period not less than the life of a Participant or, in the case of a Pre-Retirement Survivor Annuity, the life of the surviving spouse, then the equivalent "annual benefit" shall be the greater of (1) the equivalent "annual benefit" computed using the Plan interest rate and Plan mortality table (or other tabular factor), or (2) the equivalent "annual benefit" computed using five and one-half percent (5.5%) and the "applicable mortality table." With respect to Plan Years beginning after December 31, 2005, for purposes of adjusting the "annual benefit" to a straight life annuity, if the "annual benefit" is paid in any form other than a nondecreasing life annuity payable for a period not less than the life of a Participant or, in the case of a Pre-Retirement Survivor Annuity, the life of the surviving spouse, then the equivalent "annual benefit" shall be the greatest of (1) the equivalent "annual benefit" computed using the Plan interest rate and Plan mortality table (or other tabular factor), or (2) the equivalent "annual benefit" computed using five and one-half percent (5.5%) and the "applicable mortality table," or (3) 100/105 of the equivalent "annual benefit" computed using the "applicable interest rate" and the "applicable mortality table."

(h)    **Time of Adjustment.** For purposes of Sections 6.1, 6.3(a) and 6.3(c), no adjustments under Code Section 415(d) shall be taken into account before the "limitation year" for which such adjustment first takes effect.

(i)    **Benefits not Subject to Adjustment.** For purposes of Section 6.1, no actuarial adjustment to the benefit is required for (1) the value of a qualified joint and survivor annuity, (2) benefits that are not directly related to retirement benefits (such as a qualified disability benefit, pre-retirement death benefits, and post-retirement medical benefits), and (3) the value of post-retirement cost-of-living increases made in accordance with Code Section 415(d) and Regulation 1.415-3(c)(2)(iii). The "annual benefit" does not include any benefits attributable to after-tax voluntary Employee contributions or rollover contributions, or the assets transferred from a qualified plan that was not maintained by the Employer.

6.4    ANNUAL BENEFIT NOT IN EXCESS OF $10,000

This Plan may pay an "annual benefit" to any Participant in excess of the Participant's maximum "annual benefit" if the "annual benefit" derived from Employer contributions under this Plan and all other defined benefit plans maintained by the Employer does not in the aggregate exceed $10,000 for the "limitation year" or for any prior "limitation year" and the Employer has not at any time maintained a defined contribution plan, a welfare benefit fund under which amounts attributable to post-retirement medical benefits are allocated to separate accounts of key employees (as defined in Code Section 419A(d)(3)), or an individual medical account in which the Participant participated. For purposes of this paragraph, if this Plan provides for voluntary or mandatory Employee contributions, such contributions will not be considered a separate defined contribution plan maintained by the Employer.

However, if a Participant has fewer than 10 years of service with the Employer, then the $10,000 threshold of the previous paragraph shall be multiplied by a fraction, the numerator of which is the number of years (or part thereof) of service with the Employer, and the denominator of which is 10. However, in no event shall such fraction be less than 1/10th.

6.5    OTHER RULES

(a)    **Benefits under terminated plans.** If a defined benefit plan maintained by the Employer has terminated with sufficient assets for the payment of benefit liabilities of all plan Participants and a Participant in the plan has not yet commenced benefits under the plan, the benefits provided pursuant to the annuities purchased to provide the Participant's benefits under the terminated plan at each possible Annuity Starting Date shall be taken into account in applying the limitations of this Article. If there are not sufficient assets for the payment of all Participants' benefit liabilities, the benefits taken into account shall be the benefits that are actually provided to the Participant under the terminated plan.

35

EXHIBIT 1
46
EXHIBIT 1
50

(b)    **Benefits transferred from the Plan.** If a Participant's benefits under a defined benefit plan maintained by the employer are transferred to another defined benefit plan maintained by the employer and the transfer is not a transfer of distributable benefits pursuant Regulations Section 1.411(d)-4, Q&A-3(c), the transferred benefits are not treated as being provided under the transferor plan (but are taken into account as benefits provided under the transferee plan). If a Participant's benefits under a defined benefit plan maintained by the Employer are transferred to another defined benefit plan that is not maintained by the Employer and the transfer is not a transfer of distributable benefits pursuant to Regulations Section 1.411(d)-4, Q&A-3(c), then the transferred benefits are treated by the Employer's Plan as if such benefits were provided under annuities purchased to provide benefits under a plan maintained by the Employer that terminated immediately prior to the transfer with sufficient assets to pay all Participants' benefit liabilities under the Plan. If a Participant's benefits under a defined benefit plan maintained by the Employer are transferred to another defined benefit plan in a transfer of distributable benefits pursuant to Regulations Section 1.411(d)-4, Q&A-3(c), the amount transferred is treated as a benefit paid from the transferor plan.

(c)    **Formerly affiliated plans of the Employer.** A formerly affiliated plan of an Employer shall be treated as a plan maintained by the Employer, but the formerly affiliated plan shall be treated as if it had terminated immediately prior to the cessation of affiliation with sufficient assets to pay Participants' benefit liabilities under the Plan and had purchased annuities to provide benefits. A formerly affiliated plan of an Employer shall be treated as a plan maintained by the Employer, but the formerly affiliated plan shall be treated as if it had terminated immediately prior to the cessation of affiliation with sufficient assets to pay Participants' benefit liabilities under the Plan and had purchased annuities to provide benefits. A formerly affiliated plan of the Employer means a plan that, immediately prior to the cessation of affiliation, was actually maintained by the Employer and, immediately after the cessation of affiliation, is not actually maintained by the Employer. For this purpose, cessation of affiliation means the event that causes an entity to no longer be considered the Employer, such as the sale of a member controlled group of corporations, as defined in Code Section 414(b), as modified by Code Section 415(h), to an unrelated corporation, or that causes a plan to not actually be maintained by the Employer, such as transfer of plan sponsorship outside a controlled group.

(d)    **Plans of a "Predecessor Employer".** If the Employer maintains a defined benefit plan that provides benefits accrued by a Participant while performing services for a "Predecessor Employer," then the Participant's benefits under a plan maintained by the "Predecessor Employer" shall be treated as provided under a plan maintained by the Employer. However, for this purpose, the plan of the "Predecessor Employer" shall be treated as if it had terminated immediately prior to the event giving rise to the "Predecessor Employer" relationship with sufficient assets to pay participants' benefit liabilities under the plan, and had purchased annuities to provide benefits; the Employer and the "Predecessor Employer" shall be treated as if they were a single employer immediately prior to such event and as unrelated employers immediately after the event; and if the event giving rise to the predecessor relationship is a benefit transfer, the transferred benefits shall be excluded in determining the benefits provided under the plan of the "Predecessor Employer". A former entity that antedates the Employer is also a "Predecessor Employer" with respect to a Participant if, under the facts and circumstances, the Employer constitutes a continuation of all or a portion of the trade or business of the former entity.

(e)    **Employer.** "Employer" means, for purposes of this Article, the Employer that adopts this plan, and all members of a controlled group of corporations, as defined in Code Section 414(b), as modified by Code Section 415(h)), all commonly controlled trades or businesses (as defined in Code Section 414(c), as modified, except in the case of a brother-sister group of trades or businesses under common control, or Code Section 415(h)), or affiliated service groups (as defined in Code Section 414(m)) of which the adopting Employer is a part, and any other entity required to be aggregated with the employer pursuant to Code Section 414(o).

(f)    **Adjustment if in two defined benefit plans.** If the Participant is, or has ever been, a participant in another qualified defined benefit plan (without regard to whether the plan has been terminated) maintained by the Employer or a "Predecessor Employer", the sum of the Participant's "Annual Benefits" from all such plans may not exceed the "Maximum Permissible Benefit." Where the Participant's employer-provided benefits under all such defined benefit plans (determined as of the same age) would exceed the "Maximum Permissible Benefit" applicable at that age, the Employer shall select in the Adoption Agreement the method by which the plans will limit a Participant's benefit accrual.

(g)    **Special rules.** The limitations of this Article shall be determined and applied taking into account the rules in Regulations Section 1.415(f)-1(d), (e) and (h).

<div align="center">

**ARTICLE VII**
**PLAN AMENDMENT**

</div>

7.1    AMENDMENT

(a)    **General rule on Employer amendment.** The Employer shall have the right at any time to amend this Plan, subject to the limitations of this Section. However, any amendment which affects the rights, duties or responsibilities of the Trustee or Administrator may only be made with the Trustee's or Administrator's written consent. Any such amendment shall become effective as provided therein upon its execution, and unless otherwise provided in the amendment, shall only apply to those Participants who have an Hour of Service after the effective date of the amendment. The Trustee shall not be required to execute any such amendment unless the amendment affects the duties of the Trustee hereunder.

(b)    **Permissible amendments without affecting reliance.** The Employer may make the modifications described below without affecting reliance on the terms of the Plan. An Employer that amends the Plan for any other reason may not rely on the advisory letter that the terms of the Plan meet the qualification requirements of the Code. Permitted changes include: adding options permitted by the Plan; adding or

<div align="center">

36

</div>

<div align="center">

**EXHIBIT 1**
47
**EXHIBIT 1**
51

</div>

deleting provisions that are optional under the volume submitter specimen plan; changing effective dates within the parameters of the volume submitter specimen plan; correcting obvious and unambiguous typographical errors; correcting cross-references that do not in any way change the original intended meaning of the provisions; adding a list of benefits that must be preserved as protected benefits within the meaning of Code Section 411(d)(6) and the regulations thereunder; amending provisions dealing with the administration of the Trust; a change to the name of the Plan, Employer, Trustee, custodian, Plan Administrator or any other fiduciary, the Plan Year; and any sample or model amendment published by the IRS (or other required good-faith amendments) which specifically provide that their adoption will not cause the plan to be treated as an individually designed plan.

(c)    Sponsoring practitioner amendments. Effective March 31, 2010, the Employer (and every Participating Employer) expressly delegates authority to the sponsoring organization of this Volume Submitter Plan the right to amend the Plan by submitting a copy of the amendment to each Employer (and Participating Employer) who has adopted this Volume Submitter Plan, after first having received a ruling or favorable determination from the Internal Revenue Service that the Volume Submitter Plan as amended qualifies under Code Section 401(a) (unless a ruling or determination is not required by the IRS). The sponsoring organization will amend the Plan on behalf of all adopting Employers, including those Employers who have adopted the plan prior to the effective date of this provision, for changes in the Code, regulations, revenue rulings, and other statements published by the Internal Revenue Service, including model, sample or other required good faith amendments, but only if their adoption will not cause such plan to be individually designed, and for corrections of prior approved plans. The sponsoring organization will no longer have the authority to amend the Plan on behalf of an adopting Employer as of either: (1) the date the Internal Revenue Service requires the Employer to file Form 5300 as an individually designed plan as a result of an Employer amendment to the Plan to incorporate a type of Plan not allowable in the volume submitter program, as described in Revenue Procedure 2005-16, or (2) as of the date the Plan is otherwise considered an individually designed plan due to the nature and extent of the amendments. If the Employer is required to obtain a determination letter for any reason in order to maintain reliance on the advisory letter issued to the sponsoring organization's specimen plan, the sponsoring organization's authority to amend the Plan on behalf of the adopting Employer is conditioned on the Plan receiving a favorable determination letter. The volume submitter practitioner will maintain a record of the Employers that have adopted the Plan, and the practitioner will make reasonable and diligent efforts to ensure that adopting Employers adopt new documents when necessary. This subsection supersedes other provisions of the Plan to the extent those other provisions are inconsistent with this subsection.

(d)    Impermissible amendments. No amendment to the Plan shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to any purpose other than for the exclusive benefit of the Participants or their Beneficiaries or estates; or causes or permits any portion of the Trust Fund to revert to or become property of the Employer.

(e)    Anti-cutback restrictions. Except as permitted by Regulations, no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective to the extent it eliminates or reduces any Section 411(d)(6) protected benefit or adds or modifies conditions relating to Section 411(d)(6) protected benefits which results in a further restriction on such benefit unless such Section 411(d)(6) protected benefits are preserved with respect to benefits accrued as of the later of the adoption date or effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Code Section 411(d)(6)(A), early retirement benefits and retirement-type subsidies, and optional forms of benefit. Notwithstanding the preceding, a Participant's Accrued Benefit, early retirement benefit, retirement-type subsidy, or optional form of benefit may be reduced to the extent permitted under Code Section 412(c)(8) (for Plan Years beginning on or before December 31, 2007) or Code Section 412(d)(2) (for Plan Years beginning after December 31, 2007), or to the extent permitted under Regulations Sections 1.411(d)-3 and 1.411(d)-4.

(f)    Increase in current liability. For Plan Years beginning on or before December 31, 2007, if this Plan is amended and an effect of such amendment is to increase current liability (as defined in Code Section 401(a)(29)(E) (as then in effect)) under the Plan for a Plan Year, and the funded current liability percentage of the Plan for the Plan Year in which the amendment takes effect is less than sixty percent (60%), including the amount of the unfunded current liability under the Plan attributable to the amendment, the amendment shall not take effect until the Employer (or any member of a controlled group which includes the Employer) provides security to the Plan. The form and amount of such security shall satisfy the requirements of Code Section 401(a)(29)(B) and (C) (as then in effect). Such security may be released provided the requirements of Code Section 401(a)(29)(D) (as then in effect) are satisfied.

(g)    No age-related curtailment. No amendment shall be effective to the extent that it reduces or eliminates benefit accruals because of the attainment of any age.

<div align="center">

**ARTICLE VIII**
**PLAN TERMINATION**

</div>

**8.1    TERMINATION OF PLAN WHILE COVERED BY PBGC**

(a)    Termination of Plan. If the Plan is subject to the Title IV of the Act, the Employer shall have the right to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. However, any termination (other than a partial termination or an involuntary termination pursuant to Act Section 4042) must satisfy the requirements and follow the procedures outlined herein and in Act Section 4041 for a Standard Termination or a Distress Termination. Upon any termination (full or partial), all amounts shall be allocated in accordance with the provisions hereof and the Accrued Benefit, to the extent funded as of such date, of each affected Participant shall become fully Vested and shall not thereafter be subject to forfeiture. However, Participants who were not fully Vested at the time they received a complete distribution of their Vested benefits prior to the date of termination, shall not

<div align="center">

37

</div>

<div align="center">

**EXHIBIT 1**
48
**EXHIBIT 1**
52

</div>

become entitled to any additional Vested benefits on account of Plan termination. The preceding sentence does not apply to Participants affected by a partial termination by operation of law.

(b)   **Standard Termination Procedure for Plans covered by PBGC**

(1)   The Administrator shall first notify all "affected parties" (as defined in Act Section 4001(a)(21)) of the Employer's intention to terminate the Plan and the proposed date of termination. Such termination notice must be provided at least sixty (60) days prior to the proposed termination date. However, in the case of a standard termination, it shall not be necessary to provide such notice to the Pension Benefit Guaranty Corporation (PBGC). As soon as practicable after the termination notice is given, the Administrator shall provide a follow-up notice to the PBGC setting forth the following:

(i)   a certification of an enrolled actuary of the projected amount of the assets of the Plan as of the proposed date of final distribution of assets, the actuarial present value of the "benefit liabilities" (as defined in Act Section 4001(a)(16)) under the Plan as of the proposed termination date, and confirmation that the Plan is projected to be sufficient for such "benefit liabilities" as of the proposed date of final distribution;

(ii)   a certification by the Administrator that the information provided to the PBGC and upon which the enrolled actuary based the certification is accurate and complete; and

(iii)   such other information as the PBGC may prescribe by regulation.

The certification of the enrolled actuary and of the Administrator shall not be applicable in the case of a plan funded exclusively by individual insurance contracts.

(2)   No later than the date on which the follow-up notice is sent to the PBGC, the Administrator shall provide all Participants and Beneficiaries under the Plan with an explanatory statement specifying each such person's "benefit liabilities", the benefit form on the basis of which such amount is determined, and any additional information used in determining "benefit liabilities" that may be required pursuant to regulations promulgated by the PBGC.

(3)   A standard termination may only take place if at the time the final distribution of assets occurs, the Plan is sufficient to meet all "benefit liabilities" determined as of the termination date.

(c)   **Distress Termination Procedure for Plans covered by the PBGC**

(1)   The Administrator shall first notify all "affected parties" of the Employer's intention to terminate the Plan and the proposed date of termination. Such termination notice must be provided at least sixty (60) days prior to the proposed termination date. As soon as practicable after the termination notice is given, the Administrator shall also provide a follow-up notice to the PBGC setting forth the following:

(i)   a certification of an enrolled actuary of the amount, as of the proposed termination date, of the current value of the assets of the Plan, the actuarial present value (as of such date) of the "benefit liabilities" under the Plan, whether the Plan is sufficient for "benefit liabilities" as of such date, the actuarial present value (as of such date) of benefits under the Plan guaranteed under Act Section 4022, and whether the Plan is sufficient for guaranteed benefits as of such date;

(ii)   in any case in which the Plan is not sufficient for "benefit liabilities" as of such date, the name and address of each Participant and Beneficiary under the Plan as of such date;

(iii)   a certification by the Administrator that the information provided to the PBGC and upon which the enrolled actuary based the certification is accurate and complete; and

(iv)   such other information as the PBGC may prescribe by regulation.

The certification of the enrolled actuary and of the Administrator shall not be applicable in the case of a plan funded exclusively by individual insurance contracts.

(2)   A distress termination may only take place if:

(i)   the Employer demonstrates to the PBGC that such termination is necessary to enable the Employer to pay its debts while staying in business, or to avoid unreasonably burdensome pension costs caused by a decline in the Employer's work force;

(ii)   the Employer is the subject of a petition seeking liquidation in a bankruptcy or insolvency proceeding which has not been dismissed as of the proposed termination date; or

(iii)   the Employer is the subject of a petition seeking reorganization in a bankruptcy or insolvency proceeding which has not been dismissed as of the proposed termination date, and the bankruptcy court (or such other appropriate court) approves the

EXHIBIT 1
49
EXHIBIT 1
53

termination and determines that the Employer will be unable to continue in business outside a Chapter 11 reorganization process and that such termination is necessary to enable the Employer to pay its debts pursuant to a plan of reorganization.

(d)   **Priority and Payment of Benefits for Plans covered by the PBGC**: In the case of a distress termination, upon approval by the PBGC that the Plan is sufficient for "benefit liabilities" or for "guaranteed benefits," or in the case of a standard termination, a letter of non-compliance has not been issued within the sixty (60) day period (as extended) following the receipt by the PBGC of the follow-up notice, the Administrator shall allocate the assets of the Plan among Participants and Beneficiaries pursuant to Act Section 4044(a). As soon as practicable thereafter, the assets of the Trust shall be distributed to the Participants and Beneficiaries, in cash, in property or through the purchase of irrevocable commitments from an insurer, in a manner consistent with Section 5.7. However, if all liabilities with respect to Participants and Beneficiaries under the Plan have been satisfied and there remains a balance in the Trust due to erroneous actuarial computation, such balance, if any, shall be reallocated to the Participants in a nondiscriminatory manner. In the case of a distress termination in which the PBGC is unable to determine that the Plan is sufficient for guaranteed benefits, the assets of the Plan shall only be distributed in accordance with proceedings instituted by the PBGC.

(e)   **Other PBGC requirements**. The termination of the Plan shall comply with such other requirements and rules as may be promulgated by the PBGC under authority of Title IV of the Act, including any rules relating to time periods or deadlines for providing notice or for making a necessary filing.

8.2   TERMINATION OF PLAN IF NOT COVERED BY PBGC

(a)   **Plan termination**. The Employer shall have the right to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination (full or partial), all amounts shall be allocated in accordance with the provisions hereof and the Accrued Benefit, to the extent funded as of such date, of each affected Participant shall become fully Vested and shall not thereafter be subject to forfeiture. However, Participants who were not fully Vested at the time they received a complete distribution of their Vested benefits prior to the date of termination, shall not become entitled to any additional Vested benefits on account of Plan termination. The preceding sentence does not apply to Participants affected by a partial termination by operation of law. Upon full termination of the Plan, the Employer shall direct the distribution of the assets in the Trust Fund to the Participants in a manner which is consistent with Section 5.7. In such case, the Trustee shall distribute the assets to the remaining Participants in the Plan and to retired Participants in cash, in property or through the purchase of irrevocable deferred commitments from an insurer, subject to provision for expenses of administration or liquidation. Such distributions shall be allocated in the following order to the extent of the sufficiency of such assets, basing such allocation on the Accrued Benefit for each such Participant at the date of termination of the Plan:

(1)   to provide pensions to retired Participants who have retired under the Plan prior to its termination without reference to the order of retirement;

(2)   to provide Normal Retirement Benefits to Participants who have reached their Normal Retirement Dates but have not retired on the date of termination, without reference to the order in which they shall have reached their Normal Retirement Date;

(3)   to provide Normal Retirement Benefits to Participants who have not yet reached their Normal Retirement Date on the date of termination, without reference to the order in which they will reach their Normal Retirement Date. Such benefits will be based upon Accrued Benefits as of the date of termination. The balance, if any, of the assets due to erroneous actuarial computation held by the Trust Fund after such allocation shall be reallocated to the Participants in a nondiscriminatory manner.

(b)   If the Employer, in accordance with DOL guidance, abandons the Plan, then the Trustee (or Insurer) or other party permitted to take action as a qualified terminal administrator (QTA), may terminate the Plan in accordance with applicable DOL and IRS regulations and other guidance.

8.3   LIMITATION OF BENEFITS ON PLAN TERMINATION

In the event of Plan termination, the benefit of any Highly Compensated Participant or any highly compensated former Employee shall be limited to a benefit that is nondiscriminatory under Code Section 401(a)(4) (see Section 5.15).

ARTICLE IX
MERGER, CONSOLIDATION OR TRANSFER OF ASSETS

9.1   MERGER, CONSOLIDATION, AND TRANSFER REQUIREMENTS

Before this Plan can be merged or consolidated with any other qualified plan, or its assets or liabilities transferred to any other qualified plan, the Administrator must secure (and file with the Secretary of Treasury at least thirty (30) days beforehand) a certification from a government-enrolled actuary that the benefits which would be received by a Participant of this Plan, in the event of a termination of the Plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation, and such transfer, merger or consolidation does not otherwise result in the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 7.1.

39

EXHIBIT 1
50
EXHIBIT 1
54

<div align="center">

ARTICLE X
TOP-HEAVY

</div>

**10.1    TOP HEAVY PLAN REQUIREMENTS**

For any Top Heavy Plan Year, the Plan shall provide the special vesting requirements of Code Section 416(b) pursuant to Section 5.6 of the Plan and the special minimum benefit requirements of Code Section 416(c) pursuant to Section 5.2 of the Plan.

**10.2    DETERMINATION OF TOP HEAVY STATUS**

(a)    This Plan shall be a Top Heavy Plan for any Plan Year in which, as of the "determination date," (1) the Present Value of Accrued Benefits of Key Employees under all the Employer's defined benefit plans, and (2) if the Employer has maintained any defined contribution plan (including any simplified employee pension, as defined in Code Section 408(k)) which has or had account balance within the 5-year period ending on the determination date, the sum of the Aggregate Accounts of Key Employees under this Plan and all plans of an Aggregation Group, exceeds sixty percent (60%) of the Present Value of Accrued Benefits (and the Aggregate Accounts, if applicable) of all Key and Non-Key Employees under this Plan and all plans of an Aggregation Group.

If any Participant is a Non-Key Employee for any Plan Year, but such Participant was a Key Employee for any prior Plan Year, such Participant's Present Value of Accrued Benefit and/or Aggregate Account balance shall not be taken into account for purposes of determining whether this Plan is a Top Heavy Plan (or whether any Aggregation Group which includes this Plan is a Top Heavy Group). In addition, effective for any Plan Year beginning after December 31, 2001, if a Participant has not performed any services for any Employer maintaining the Plan at any time during the one year period ending on the "determination date," any accrued benefit for such Participant shall not be taken into account for the purposes of determining whether this Plan is a Top Heavy Plan.

(b)    Aggregate Account: A Participant's Aggregate Account as of the "determination date" shall be determined under applicable provisions of the defined contribution plan used in determining Top Heavy Plan status.

(c)    "Aggregation Group" means either a Required Aggregation Group or a Permissive Aggregation Group as hereinafter determined.

(1)    Required Aggregation Group: In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a participant in the Plan Year containing the "determination date" or any of the four preceding Plan Years (regardless of whether the plan has terminated), and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Sections 401(a)(4) or 410, will be required to be aggregated. Such group shall be known as a Required Aggregation Group.

In the case of a Required Aggregation Group, each plan in the group will be considered a Top Heavy Plan if the Required Aggregation Group is a Top Heavy Group. No plan in the Required Aggregation Group will be considered a Top Heavy Plan if the Required Aggregation Group is not a Top Heavy Group.

(2)    Permissive Aggregation Group: The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is a Top Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is not a Top Heavy Group.

(3)    Only those plans of the Employer in which the "determination dates" fall within the same calendar year shall be aggregated in order to determine whether such plans are Top Heavy Plans.

(4)    Effective for any Plan Year beginning after December 31, 2001, an Aggregation Group shall include any terminated plan of the Employer if it was maintained during the one (1) year period ending on the "determination date."

(d)    "Determination date" means (a) the last day of the preceding Plan Year, or (b) in the case of the first Plan Year, the last day of such Plan Year.

(e)    Present Value of Accrued Benefit: In the case of a defined benefit plan, a Participant's Present Value of Accrued Benefit shall be determined:

(1)    in the case of a Participant other than a Key Employee, using the single accrual method used for all plans of the Employer and Affiliated Employers, or if no such single method exists, using a method which results in benefits accruing not more rapidly than the slowest accrual rate permitted under Code Section 411(b)(1)(C).

(2)    as of the most recent "actuarial valuation date," which is the most recent valuation date within a twelve (12) month period ending on the "determination date."

<div align="center">

40

EXHIBIT 1
51
EXHIBIT 1
55

</div>

(3)  for the first Plan Year, as if (a) the Participant terminated service as of the "determination date"; or (b) the Participant terminated service as of the actuarial valuation date, but taking into account the estimated Accrued Benefits as of the "determination date."

(4)  for the second Plan Year, the Accrued Benefit taken into account for a current Participant must not be less than the Accrued Benefit taken into account for the first Plan Year unless the difference is attributable to using an estimate of the Accrued Benefit as of the "determination date for the first Plan Year and using the actual Accrued Benefit for the second Plan Year.

(5)  for any other Plan Year, as if the Participant terminated service as of the actuarial valuation date.

(6)  the actuarial valuation date must be the same date used for computing the defined benefit plan minimum funding costs, regardless of whether a valuation is performed that Plan Year.

(7)  by not taking into account proportional subsidies.

(8)  by taking into account nonproportional subsidies.

(f)  The calculation of a Participant's Present Value of Accrued Benefit as of a "determination date" shall be the sum of:

(1)  the Present Value of Accrued Benefit using the actuarial assumptions of Section 1.3, which assumptions shall be identical for all defined benefit plans being tested for Top Heavy Plan status.

(2)  Effective for any Plan Year beginning after December 31, 2001, any distributions during the 1-year period ending on the "determination date." The Present Value of Accrued Benefits of an Employee as of the "determination date" shall be increased by the distributions made with respect to the Employee under the Plan during the 1-year period ending on the "determination date." The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been required to be included in an Aggregation Group. In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

(3)  any Employee contributions, whether voluntary or mandatory. However, amounts attributable to tax deductible Qualified Voluntary Employee Contributions shall not be considered to be a part of the Participant's Present Value of Accrued Benefit.

(4)  with respect to unrelated rollovers and plan-to-plan transfers (ones which are both initiated by the Employee and made from a plan maintained by one employer to a plan maintained by another employer), if this Plan provides the rollovers or plan-to-plan transfers, it shall always consider such rollovers or plan-to-plan transfers as a distribution for the purposes of this Section. If this Plan is the plan accepting such rollovers or plan-to-plan transfers, it shall not consider such rollovers or plan-to-plan transfers accepted after December 31, 1983, as part of the Participant's Present Value of Accrued Benefit.

(5)  with respect to related rollovers and plan-to-plan transfers (ones either not initiated by the Employee or made to a plan maintained by the same employer), if this Plan provides the rollovers or plan-to-plan transfers, it shall not be counted as a distribution for purposes of this Section. If this Plan is the plan accepting such rollovers or plan-to-plan transfers, it shall consider such rollovers or plan-to-plan transfers as part of the Participant's Present Value of Accrued Benefit, irrespective of the date on which such rollovers or plan-to-plan transfers are accepted.

(6)  for the purposes of determining whether two employers are to be treated as the same employer in (4) and (5) above, all employers aggregated under Code Section 414(b), (c), (m) or (o) are treated as the same employer.

(g)  "Top Heavy Group" means an Aggregation Group in which, as of the "determination date," the sum of:

(1)  the Present Value of Accrued Benefits of Key Employees under all defined benefit plans included in the group, and

(2)  the Aggregate Accounts of Key Employees under all defined contribution plans included in the group,

exceeds sixty percent (60%) of a similar sum determined for all Participants.

**ARTICLE XI**
**MISCELLANEOUS**

**11.1   PARTICIPANT'S RIGHTS**

This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon the Employee as a Participant of this Plan.

41

EXHIBIT 1
52
EXHIBIT 1
56

**11.2    ALIENATION**

(a)    **General rule.** Subject to the exceptions provided below, and as otherwise permitted by the Code and the Act, no benefit which shall be payable out of the Trust Fund to any person (including a Participant or the Participant's Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

(b)    **Exception for QDROs.** Subsection (a) shall not apply to a "qualified domestic relations order" defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Administrator under the provisions of the Retirement Equity Act of 1984. The Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Further, to the extent provided under a "qualified domestic relations order," a former spouse of a Participant shall be treated as the spouse or surviving spouse for all purposes under the Plan.

(c)    **Exception for certain debts to Plan.** Subsection (a) shall not apply to an offset to a Participant's accrued benefit against an amount that the Participant is ordered or required to pay the Plan with respect to a judgment, order, or decree issued, or a settlement entered into in accordance with Code Sections 401(a)(13)(C) and (D).

**11.3    CONSTRUCTION OF PLAN**

(a)    **Applicable state laws.** This Plan shall be construed and enforced according to the Code, the Act and the laws of the State of California, other than its laws respecting choice of law, to the extent not pre-empted by the Act.

(b)    **Single subsections.** This Plan may contain single subsections. The existence of such single subsections shall not constitute scrivener's errors.

**11.4    GENDER AND NUMBER**

(a)    **Masculine and feminine.** Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they would so apply.

(b)    **Singular and plural.** Whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

**11.5    LEGAL ACTION**

In the event any claim, suit, or proceeding is brought regarding the Trust and/or Plan established hereunder to which the Trustee, the Employer or the Administrator may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the Employer or the Administrator, they shall be entitled to be reimbursed from the Trust Fund for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable.

**11.6    PROHIBITION AGAINST DIVERSION OF FUNDS**

(a)    **General rule.** Except as provided below and otherwise specifically permitted by law, it shall be impossible by operation of the Plan or of the Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any Trust Fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants or their Beneficiaries.

(b)    **Mistake of fact.** In the event the Employer shall make an excessive contribution under a mistake of fact pursuant to Act Section 403(c)(2)(A), the Employer may demand repayment of such excessive contribution at any time within one (1) year following the time of payment and the Trustees shall return such amount to the Employer within the one (1) year period. Earnings of the Plan attributable to the contributions may not be returned to the Employer but any losses attributable thereto must reduce the amount so returned.

(c)    Except as specifically stated in the Plan, any contribution made by the Employer to the Plan (if the Employer is not tax-exempt) is conditioned upon the deductibility of the contribution by the Employer under the Code and, to the extent any such deduction is disallowed, the Employer may, within one (1) year following the final determination of the disallowance, whether by agreement with the Internal Revenue Service or by final decision of a competent jurisdiction, demand repayment of such disallowed contribution and such contribution shall be returned to the Employer within one (1) year following the disallowance. Earnings of the Plan attributable to the contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

42

EXHIBIT 1
53

EXHIBIT 1
57

**11.7   EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE**

The Employer, Administrator and Trustee, and their successors, shall not be responsible for the validity of any Contract issued hereunder or for the failure on the part of the insurer to make payments provided by any such Contract, or for the action of any person which may delay payment or render a Contract null and void or unenforceable in whole or in part.

**11.8   INSURER'S PROTECTIVE CLAUSE**

Except as otherwise agreed upon in writing between the Employer and the insurer, an insurer which issues any Contracts hereunder shall not have any responsibility for the validity of this Plan or for the tax or legal aspects of this Plan. The insurer shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee. Regardless of any provision of this Plan, the insurer shall not be required to take or permit any action or allow any benefit or privilege contrary to the terms of any Contract which it issues hereunder, or the rules of the insurer.

**11.9   RECEIPT AND RELEASE FOR PAYMENTS**

Any payment to any Participant, the Participant's legal representative, Beneficiary, or to any guardian or committee appointed for such Participant or Beneficiary in accordance with the provisions of the Plan, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee and the Employer, either of whom may require such Participant, legal representative, Beneficiary, guardian or committee, as a condition precedent to such payment, to execute a receipt and release thereof in such form as shall be determined by the Trustee or Employer.

**11.10   ACTION BY THE EMPLOYER**

Whenever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its legally constituted authority.

**11.11   NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY**

The "named Fiduciaries" of this Plan are (1) the Employer, (2) the Administrator, (3) the Trustee, and (4) any Investment Manager appointed hereunder. The named Fiduciaries shall have only those specific powers, duties, responsibilities, and obligations as are specifically given them under the Plan, including, but not limited to, any agreement allocating or delegating their responsibilities, the terms of which are incorporated herein by reference. In general, the Employer shall have the sole responsibility for making the contributions provided for under Section 4.1; and shall have the authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method"; and to amend or terminate, in whole or in part, the Plan. The Administrator shall have the sole responsibility for the administration of the Plan, including, but not limited to, the items specified at Article II of the Plan, as the same may be allocated or delegated thereunder. The Trustee shall have the sole responsibility of management of the assets held under the Trust, except to the extent directed pursuant to Article II or with respect to those assets, the management of which has been assigned to an Investment Manager, who shall be solely responsible for the management of the assets assigned to it, all as specifically provided in the Plan. Each named Fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of the Plan, authorizing or providing for such direction, information or action. Furthermore, each named Fiduciary may rely upon any such direction, information or action of another named Fiduciary as being proper under the Plan, and is not required under the Plan to inquire into the propriety of any such direction, information or action. It is intended under the Plan that each named Fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under the Plan as specified or allocated herein. No named Fiduciary shall guarantee the Trust Fund in any manner against investment loss or depreciation in asset value. Any person or group may serve in more than one Fiduciary capacity.

**11.12   HEADINGS**

The headings and subheadings of this Plan have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

**11.13   APPROVAL BY INTERNAL REVENUE SERVICE**

Notwithstanding anything herein to the contrary, if, pursuant to an application for qualification filed by or on behalf of the Plan by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted, or such later date that the Secretary of the Treasury may prescribe, the Commissioner of Internal Revenue Service or the Commissioner's delegate should determine that the Plan does not initially qualify as a tax-exempt plan under Code Sections 401 and 501, and such determination is not contested, or if contested, is finally upheld, then if the Plan is a new plan, it shall be void ab initio and all amounts contributed to the Plan by the Employer, less expenses paid, shall be returned within one (1) year after the date the initial qualification is denied, and the Plan shall terminate, and the Trustee shall be discharged from all further obligations. If the disqualification relates to an amended plan, then the Plan shall operate as if it had not been amended.

43

EXHIBIT 1
54
EXHIBIT 1
58

**11.14  UNIFORMITY**

All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner. In the event of any conflict between the terms of this Plan and any Contract purchased hereunder, the Plan provisions shall control.

**11.15  INTERPRETATION OF AGREEMENT WHEN PLAN FROZEN**

(a)   The Employer established this Plan effective January 1, 2003. The Employer froze the benefits under the Plan as of June 1, 2009, and directed that the Trust created by this Agreement be continued and that distribution of benefits to Participants be made at such time and in such manner as though the Plan had not frozen benefit accruals.

(b)   The Plan is being amended and restated as of January 1, 2012 in order to maintain its qualified status under the Code and the Act.

(c)   All provisions of the Plan shall be construed and interpreted in a manner consistent with the freezing of benefit accruals under the Plan as of June 1, 2009.

**11.16  ELECTRONIC MEDIA**

The Administrator may use telephonic or electronic media to satisfy any notice requirements required by this Plan, to the extent permissible under regulations (or other generally applicable guidance). In addition, a Participant's consent to an immediate distribution may be provided through telephonic or electronic means, to the extent permissible under regulations (or other generally applicable guidance). The Administrator also may use telephonic or electronic media to conduct plan transactions such as enrolling Participants, electing (and changing) investment allocations, applying for Plan loans, and other transactions, to the extent permissible under regulations (or other generally applicable guidance).

**11.17  PLAN CORRECTION**

The Administrator in conjunction with the Employer may undertake such correction of Plan errors as the Administrator deems necessary, including correction to preserve tax qualification of the Plan under Code Section 401(a) or to correct a fiduciary breach under the Act. Without limiting the Administrator's authority under the prior sentence, the Administrator, as it determines to be reasonable and appropriate, may undertake correction of Plan document, operational, demographic and employer eligibility failures under a method described in the Plan or under the IRS Employee Plans Compliance Resolution System ("EPCRS") or any successor program to EPCRS. The Administrator, as it determines to be reasonable and appropriate, also may undertake or assist the appropriate Fiduciary or Plan official in undertaking correction of a fiduciary breach, including correction under the DOL Voluntary Fiduciary Correction Program ("VFC") or any successor program to VFC.

### ARTICLE XII
### PARTICIPATING EMPLOYERS

**12.1  ADOPTION BY OTHER EMPLOYERS**

Notwithstanding anything herein to the contrary, with the consent of the Employer and Trustee, any other corporation or entity, whether an Affiliated Employer or not, may adopt this Plan and all of the provisions hereof, and participate herein and be known as a Participating Employer, by a properly executed document evidencing said intent and will of such Participating Employer.

**12.2  REQUIREMENTS OF PARTICIPATING EMPLOYERS**

(a)   Each such Participating Employer shall be required to use the same Trustee as provided in this Plan.

(b)   The Trustee may, but shall not be required to, commingle, hold and invest as one Trust Fund all contributions made by Participating Employers, as well as all increments thereof.

(c)   On the basis of information furnished by the Administrator, the Trustee shall keep separate books and records concerning the affairs of each Participating Employer hereunder and as to the Accrued Benefits of the Participants of each Participating Employer. The Trustee may, but need not, register Contracts so as to evidence that a particular Participating Employer is the interested Employer hereunder, but in any event of Employee transfer from one Participating Employer to another, the employing Employer shall immediately notify the Trustee thereof.

(d)   In the event of termination of employment of any transferred Employee, any portion of the Accrued Benefit of such Employee which has not been Vested under the provisions of this Plan shall be allocated by the Trustee at the direction of the Administrator to the respective equities of the Participating Employers for whom such Employee has rendered service in the proportion that each Participating Employer has contributed toward the benefits of such Employee. The amount so allocated shall be retained by the Trustee and shall be used to reduce the contribution by the respective Participating Employer, for the next succeeding year or years.

(e)   Any expenses of the Plan which are to be paid by the Employer or borne by the Trust Fund shall be paid by each Participating Employer in the same proportion that the total amount standing to the credit of all Participants employed by such Employer bears to the total standing to the credit of all Participants.

44

EXHIBIT 1
55
EXHIBIT 1
59

**12.3   DESIGNATION OF AGENT**

Each Participating Employer shall be deemed to be a party to this Plan; provided, however, that with respect to all of its relations with the Trustee and Administrator for the purpose of this Plan, each Participating Employer shall be deemed to have designated irrevocably the Employer as its agent. Unless the context of the Plan clearly indicates the contrary, the word "Employer" shall be deemed to include each Participating Employer as related to its adoption of the Plan.

**12.4   EMPLOYEE TRANSFERS**

In the event an Employee is transferred between Participating Employers, accumulated service and eligibility shall be carried with the Employee involved. No such transfer shall effect a termination of employment hereunder, and the Participating Employer to which the Employee is transferred shall thereupon become obligated hereunder with respect to such Employee in the same manner as was the Participating Employer from whom the Employee was transferred.

**12.5   AMENDMENT**

Any Participating Employer that is an Affiliated Employer hereby authorizes the Employer to make amendments on its behalf, unless otherwise agreed among all affected parties. If a Participating Employer is not an Affiliated Employer, then amendment of this Plan by the Employer at any time when there shall be a Participating Employer hereunder shall only be by the written action of each and every Participating Employer and with the consent of the Trustee where such consent is necessary in accordance with the terms of this Plan.

**12.6   DISCONTINUANCE OF PARTICIPATION**

Any Participating Employer shall be permitted to discontinue or revoke its participation in the Plan at any time. At the time of any such discontinuance or revocation, satisfactory evidence thereof and of any applicable conditions imposed shall be delivered to the Trustee. The Employer shall have the right to discontinue or revoke the participation in the Plan of any Participating Employer by providing 45 days notice to such Participating Employer. The Trustee shall thereafter transfer, deliver and assign Contracts and other Trust Fund assets allocable to the Participants of such Participating Employer to such new Trustee as shall have been designated by such Participating Employer, in the event that it has established a separate qualified retirement plan for its employees provided, however, that no such transfer shall be made if the result is the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 7.1(e). If a separate plan has not been established, at the time of such continuance or revocation for whatever reason, the assets and liabilities, Contracts and other Trust Fund assets allocable to such Participating Employer's participation in this Plan shall be spun off pursuant to Code Section 414(l) and such spun off assets shall constitute a retirement plan of the Participating Employer with such Participating Employer becoming sponsor and the individual who has signed the Supplemental Participation Agreement on behalf of the Participating Employer becoming Trustee for this purpose. Such individual shall agree to this appointment by virtue of signing the Supplemental Participation Agreement. If such individual is no longer an Employee of the Participating Employer, then the Participating Employer shall appoint a Trustee. If no successor is designated, the Trustee shall retain such assets for the Employees of said Participating Employer pursuant to the provisions of the Trust. In no such event shall any part of the corpus or income of the Trust as it relates to such Participating Employer be used for or diverted for purposes other than for the exclusive benefit of the Employees of such Participating Employer.

**12.7   PROVISIONS APPLIED SEPARATELY (OR JOINTLY) FOR PARTICIPATING NON-AFFILIATED EMPLOYERS**

(a)   **Separate status.** The Plan Administrator will apply the definition of Compensation and perform the tests listed in this Section, separately for each Participating Employer other than an Affiliated Employer of such Participating Employer. For this purpose, the Employees of each Participating Employer (and its Affiliated Employers), and their benefits, shall be treated as though they were in separate plan. Any correction action, such as additional contributions or corrective distributions, shall only affect the Employees of the Participating Employer (and its Affiliated Employers, if any). The tests subject to this separate treatment are:

(1)   Nondiscrimination testing as described in Code Section 401(a)(4) and the applicable Regulations.

(2)   Coverage testing as described in Code Section 410(b) and the Regulations.

(3)   Status as a Highly Compensated Employee.

(b)   **Joint status.** The following tests shall be performed for the plan as whole, without regard to employment by a particular Participating Employer:

(1)   Applying the Code Section 415 limitations, including the related Compensation definition.

**12.8   TOP-HEAVY APPLIED SEPARATELY FOR PARTICIPATING NON-AFFILIATED EMPLOYERS**

The Plan will apply the Top-Heavy Plan provisions separately to each Participating Employer other than an Affiliated Employer of such Participating Employer. For purposes of applying this Article to a Participating Employer, the Participating Employer and any entity which is an Affiliated Employer to that Participating Employer shall be the "Employer" for purposes of Section 10.1, and the terms "Key Employee" and "Non-Key Employee" shall refer only to the Employees of that Participating Employer and/or its Affiliated Employers.

EXHIBIT 1
56
EXHIBIT 1
60

12.9  SERVICE

An Employee's service includes all Hours of Service and Years of Service with any and all Participating Employers and their Affiliated Employers. An Employee who terminates employment with one Participating Employer and immediately commences employment with another Participating Employer has not separated from service and has not had a severance from employment.

12.10  REQUIRED BEGINNING DATE

If a Participant is a 5-percent owner (under Section 1.26(b)) of any Participating Employer for which the Participant is an Employee in the Plan Year the Participant attains age 70-1/2, then the Participant's required beginning date under Section 5.9(f)(6) shall be the April 1 of the calendar year following the close of the calendar year in which the Participant attains age 70-1/2.

12.11  ADMINISTRATOR'S AUTHORITY

The Administrator shall have authority to make any and all necessary rules or regulations, binding upon all Participating Employers and all Participants, to effectuate the purpose of this Article.

46

EXHIBIT 1
57
EXHIBIT 1
61

IN WITNESS WHEREOF, this Plan has been executed the day and year first above written.

St. Joseph's Investments, Inc.

EMPLOYER

47

EXHIBIT 1
58
EXHIBIT 1
62

SUNGARD VOLUME SUBMITTER MODIFICATIONS

St. Joseph's Investments, Inc.
Defined Benefit Pension Plan

The enclosed Plan is being submitted for expedited review as a Volume Submitter Plan.

Certain modifications from the approved specimen plan have been made to this Plan. In accordance with Rev. Proc. 2012-6 submission requirements, the location, nature and effect of these changes are listed below.

To facilitate your review of these changes, we have extracted from the Plan document the entire paragraph in which a change occurred. We have indicated the page number or the Section of the Plan document where the modified paragraph appears. The effect the change has on the Plan is listed below the paragraph.

THE FOLLOWING PARAGRAPH HAS BEEN MODIFIED:

THIS PLAN, hereby adopted this 27th day of April 2012, by St. Joseph's Investments, Inc. (herein referred to as the "Employer").

EXHIBIT 1
59
EXHIBIT 1
63

# EXHIBIT 2

EXHIBIT 1

64

# EXHIBIT 2

**Transfers from Carlo Bondanelli to St. Joseph's Investments, Inc. Defined Benefit Pension Plan**

| Amount | Date | Checking Account Number and Check Number |
|---:|---:|:---:|
| $14,925.00 | 02-25-2013 | Account 8000802505, Ck. No. 1294 |
| $5,000.00 | 05-31-2013 | Account 8000802505, Ck. No. 1359 |
| $138,446.03 | 10-15-2013 | Account 8000802505, Ck. No. 1395 |
| $25,512.09 | 10-15-2013 | Account 187687133, Ck. No. 141 |

EXHIBIT 2
60
EXHIBIT 1
65

**CARLO BONDANELLI**
6350 WILSHIRE BLVD., STE. 1208
LOS ANGELES, CA 90048
PH# 323-655-9465

1294

90-3757/1211
574

2-25-2013

Pay to the Order of St. Joseph's Invo Defined Benefit Plan    $ 14,925.00

Fourteen Thousand Nine Hundred Twenty Five — DOLLARS

Comerica Bank
www.comerica.com

Re: Payment of note BRANCH    Carlo Bondanelli

⑈121137522⑈ 8000902505⑈ 1294

50574100 9754. CMA:CA.02/26/2013 >121137522<

FOR DEPOSIT ONLY
St. JOSEPH'S INVESTMENTS INC.
DEFINED BENEFIT PLAN
Acct # 1893 086 535

```
Posted      : 02/26/2013
Bank        : 00000048
Account     : 8000902505
R/T         : 12113752
Check       : 1294
Amount      : 14925.00
DIN         : 480001073
```

EXHIBIT 2
61
EXHIBIT 1
66



Posted     : 05/31/2013
Bank       : 00000048
Account    : 8000902505
R/T        : 12113752
Check      : 1359
Amount     : 5000.00
DIN        : 480021707

EXHIBIT 2
63

EXHIBIT 1
68

CARLO BONDANELLI
323-655-0465
8380 WILSHIRE BLVD., STE. 120B
LOS ANGELES, CA 90048-5031

90-7162 9111B        141
3221

DATE 10-14-2013

PAY TO THE ORDER OF _St Joseph's Inv. Defined Benefit Plan_    $25,572 00

Twenty Five Thousand Five Hundred Twelve + 00/100    DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

Reimbursement

⑈322271627⑈    ⑆8766713⑈0141

50574105951: CMA*CA 10/15/2013 >121137522<

ENDORSE HERE
FOR DEPOSIT ONLY
ST. JOSEPHS INVESTMENTS, INC.
DEFINED BENEFIT PLAN
ACCT # 1893 086 585

Posted        : 10/15/2013
Bank          : 00000068
R/T           : 32227162
Account       : 18766713
Check         : 141
Amount        : 25512.09
DIN           : 480025272

EXHIBIT 2
64

EXHIBIT 1
69

Case 2:17-ap-01547-WB    Doc 3    Filed 11/22/17    Entered 11/22/17 17:05:20    Desc
Main Document    Page 72 of 89

Case 2:14-bk-27656-WB    Doc 161-3    Filed 11/21/17    Entered 11/21/17 18:35:32    Desc
Adversary Proceeding Cover Sheet Summons and Notice of Status Conference    Page 1 of 5

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

**PLAINTIFFS**

Peter J. Mastan, Chapter 7 Trustee

**DEFENDANTS**

CARLO BONDANELLI, in his individual capacity and as the trustee of ST. JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN; ST. JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN, a pension plan; ST. JOSEPH'S INVESTMENTS, INC. in its capacity as plan sponsor; and DOES 1-10, Inclusive

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
LANDAU GOTTFRIED & BERGER LLP

1801 Century Park East, Suite 700, Los Angeles, California 90067

Telephone: (310) 557-0050

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
- ☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor        ☐ Other
- ■ Trustee

**PARTY** (Check One Box Only)
- ☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor        ■ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

The Trustee seeks to recover actually fraudulent transfers made to or for the benefit of the defendants, under 11 U.S.C. §§ 548(a)(1)(A) and 550(a).

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ■ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 183,883.12 |
| Other Relief Sought | |

EXHIBIT 1
70

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Carlo Bondanelli | BANKRUPTCY CASE NO.<br>2:14-bk-27656-WB | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Julia W. Brand |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

| DATE<br>11/21/17 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Aleksandra Zimonjic |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

EXHIBIT 1
71

Case 2:17-ap-01547-WB    Doc 3    Filed 11/22/17    Entered 11/22/17 17:05:20    Desc
Main Document      Page 74 of 89

Case 2:14-bk-27656-WB    Doc 161-3    Filed 11/21/17    Entered 11/21/17 18:35:32    Desc
Adversary Proceeding Cover Sheet Summons and Notice of Status Conference    Page 3 of 5

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| JOHN P. REITMAN (State Bar No. 80579)<br>jreitman@lgbfirm.com<br>ALEKSANDRA ZIMONJIC (State Bar No. 210252)<br>azimonjic@lgbfirm.com<br>LANDAU GOTTFRIED & BERGER LLP<br>1801 Century Park East, Suite 700<br>Los Angeles, California 90067<br>Telephone: (310) 557-0050<br>Facsimile: (310) 557-0056<br><br>*Attorney for Plaintiff* | |

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| In re:<br><br>CARLO BONDANELLI<br><br><br><br><br>Debtor(s). | CASE NO.: 2:14-bk-27656-WB<br><br>CHAPTER: 7<br><br>ADVERSARY NO.: |
|---|---|
| PETER J. MASTAN, Chapter 7 Trustee,<br><br><br><br><br><br>Plaintiff(s)<br>Versus<br>CARLO BONDANELLI, in his individual capacity and as the trustee of ST. JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN; ST. JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN, a pension plan; ST. JOSEPH'S INVESTMENTS, INC. in its capacity as plan sponsor; and DOES 1-10, Inclusive,<br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| Hearing Date: _____<br>Time: _____<br>Courtroom: _____ | Address:<br>☐ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |
|---|---|

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

Case 2:17-ap-01547-WB    Doc 3    Filed 11/22/17    Entered 11/22/17 17:05:20    Desc
Main Document        Page 75 of 89

Case 2:14-bk-27656-WB    Doc 161-3    Filed 11/21/17    Entered 11/21/17 18:35:32    Desc
Adversary Proceeding Cover Sheet Summons and Notice of Status Conference    Page 4 of 5

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL**
**CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
                    Deputy Clerk

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

EXHIBIT 1
73

Case 2:14-bk-27656-WB    Doc 161-3    Filed 11/21/17    Entered 11/21/17 18:35:32    Desc
Adversary Proceeding Cover Sheet Summons and Notice of Status Conference    Page 5 of 5

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

_____

_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *(date)* _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On *(date)* _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *(date)* _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____  _____   _____
*Date*                    *Printed Name*                *Signature*

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                          Page 3                          **F 7004-1.SUMMONS.ADV.PROC**

EXHIBIT 1
74

# EXHIBIT 2

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| John P Reitman<br>Landau Gottfried & Berger LLP<br>1801 Century Park East Ste 700<br>Los Angeles, CA 90067<br><br>310-557-0050<br><br><br><br><br>*Plaintiff or Attorney for Plaintiff* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES**

</div>

| In re:<br><br>Carlo Bondanelli<br><br><div align="right">Debtor(s).</div> | CASE NO.:  2:14-bk-27656-WB<br><br>CHAPTER:  7<br><hr>ADVERSARY NUMBER: 2:17-ap-01547-WB |
|---|---|
| Peter J Mastan<br><br><div align="right">Plaintiff(s)</div><div align="center">Versus</div>Carlo Bondanelli<br><br>**(See Attachment A for names of additional defendants)**<div align="right">Defendant(s).</div> | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT(S): A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is **12/22/2017.** If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| Date: | **January 30, 2018** |
| Time: | **02:00 PM** |
| Hearing Judge: | **Julia W. Brand** |
| Location: | **255 E Temple St., Crtrm 1375, Los Angeles, CA 90012** |

---

<div align="center">This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.</div>

| *December 2016* | Page 1 | **F 7004-1.SUMMONS.ADV.PROC** |
|---|---|---|

<div align="center">

EXHIBIT 2
75

</div>

Case 2:17-ap-01547-WB    Doc 2    Filed 11/22/17    Entered 11/22/17 08:56:16    Desc
AP-Summons    Page 2 of 4

**You must comply □ith LBR 701□-1, □hich re□uires you to file a □oint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court−approved joint status report form is available on the court□s website (LBR form F 7016−1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016−1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying re□uired declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**


                                        **KATHLEEN J. CAMPBELL**
                                        **CLERK OF COURT**


Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: <u>November 22, 2017</u>


                          By: <u>    □s□William C. □aaumoana Jr.    </u>
                                   Deputy Clerk



This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                Page 2            **F 7004−1.SUMMONS.ADV.PROC**

EXHIBIT 2
76

## ATTACHMENT A
### Names of plaintiffs and defendants

| Plaintiff(s): | Defendant(s): |
|---|---|
| Peter J Mastan | Carlo Bondanelli<br>Carlo Bondanelli, as trustee of St. Joseph's Investments, Inc. Defined Benefit Pension Plan<br>St. Joseph's Investments, Inc. Defined Benefit Pension Plan, a Pension Plan<br>St. Joseph's Investments, Inc. in its capacity as plan sponsor<br>Does 1–10, Inclusive |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

## ATTACHMENT A

EXHIBIT 2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 1☐ and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

will be served or was served **(a)** on the judge in chambers in the form and manner re☐uired by LBR 5005-2(d)☐and **(☐)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling ☐eneral Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (☐☐e) ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐, I checked the CM☐ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:** On (☐☐e) ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐, I served the following persons and☐or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and☐or controlling LBR, on (☐☐e) ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐, I served the following persons and☐or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and☐or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐     ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

*D☐e*                    ☐r☐☐e☐ ☐☐me                    ☐☐☐☐☐☐re

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                              **F 7004-1.SUMMONS.ADV.PROC**

EXHIBIT 2
78

# EXHIBIT 3

1   JOHN P. REITMAN, SBN 80579
    jreitman@lgbfirm.com
2   ALEKSANDRA ZIMONJIC, SBN 210252
    azimonjic@lgbfirm.com
3   LANDAU GOTTFRIED & BERGER LLP
    1801 Century Park East, Suite 700
4   Los Angeles, CA 90067
    Telephone: (310) 557-0050
5   Facsimile: (310) 557-0056

6   Attorneys for Plaintiff Peter J. Mastan,
    Chapter 7 Trustee

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 LOS ANGELES DIVISION

11  | In re | Case No. 2:14-bk-27656-WB |

12  | CARLO BONDANELLI, | Chapter 7 |

13  |                  Debtor. | Adv. No. 2:17-ap-01547-WB |

14  | | **PLAINTIFF'S NOTICE OF REQUIRED** |

15  | | **COMPLIANCE WITH FRBP 7026 AND LBR 7026-1** |

16  | PETER J. MASTAN, Chapter 7 Trustee, | |

17  |                  Plaintiff, | **Status Conference Date and Time:** |

18  |          v. | Date: January 30, 2018
Time: 2:00 p.m. |

19  | | Place: Courtroom 1375 |

20  | CARLO BONDANELLI, in his individual capacity and as the trustee of ST. | 255 E. Temple St.
Los Angeles, CA 90012 |

21  | JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN; | |

22  | ST. JOSEPH'S INVESTMENTS, INC. DEFINED BENEFIT PENSION PLAN, a | |

23  | pension plan; ST. JOSEPH'S INVESTMENTS, INC. in its capacity as | |

24  | plan sponsor; and DOES 1-10, Inclusive, | |

25  | | |

26  |                  Defendants. | |

27

28

*(vertical text, left margin)* LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

EXHIBIT 3
79

1    **TO ALL DEFENDANTS:**

2    **PLEASE TAKE NOTICE** that Peter J. Mastan, Chapter 7 Trustee and the plaintiff in the

3    above-captioned adversary proceeding hereby gives notice that compliance with the requirements

4    under Rule 7026 of the Federal Rules of Bankruptcy Procedure as well as Local Bankruptcy Rule

5    ("LBR") 7026-1 is required.  A copy of LBR 7026-1 is attached hereto as **Exhibit "A."**

6

7

8    Dated: November 22, 2017           LANDAU GOTTFRIED & BERGER LLP

9

10            By _____

11                 Aleksandra Zimonjic

12           Attorneys for Plaintiff Peter J. Mastan, Chapter 7
             Trustee

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

EXHIBIT 3
81

LBR 7026-1

(2)   <u>Other Parties.</u>  Any party other than plaintiff who has not received plaintiff's proposed pretrial stipulation within the time limits set forth in subsection (c) of this rule must prepare, file, and serve at least 14 days prior to the trial or pretrial conference, if one is ordered, a declaration attesting to plaintiff's failure to prepare and serve a proposed pretrial stipulation in a timely manner.

**(f)**   **Sanctions for Failure to Comply with Rule.**  In addition to the sanctions authorized by F.R.Civ.P. 16(f), if a status conference statement or a joint proposed pretrial stipulation is not filed or lodged within the times set forth in subsections (a), (b), or (e), respectively, of this rule, the court may order one or more of the following:

(1)   A continuance of the trial date, if no prejudice is involved to the party who is not at fault;

(2)   Entry of a pretrial order based conforming party's proposed description of the facts and law;

(3)   An award of monetary sanctions including attorneys' fees against the party at fault and/or counsel, payable to the party not at fault; and/or

(4)   An award of non-monetary sanctions against the party at fault including entry of judgment of dismissal or the entry of an order striking the answer and entering a default.

**(g)**   **Failure to Appear at Hearing or Prepare for Trial.**  The failure of a party's counsel (or the party, if not represented by counsel) to appear before the court at the status conference or pretrial conference, or to complete the necessary preparations therefor, or to appear at or to be prepared for trial may be considered an abandonment or failure to prosecute or defend diligently, and judgment may be entered against the defaulting party either with respect to a specific issue or as to the entire proceeding, or the proceeding may be dismissed.

## LBR 7026-1. DISCOVERY

**(a)**   **General.**  Compliance with FRBP 7026 and this rule is required in all adversary proceedings.

(1)   <u>Notice.</u>  The plaintiff must serve with the summons and complaint a notice that compliance with FRBP 7026 and this rule is required.

(2)   <u>Proof of Service.</u>  The plaintiff must file a proof of service of this notice together with the proof of service of the summons and complaint.

**(b)**   **Discovery Conference and Disclosures.**

(1)   <u>Conference of Parties.</u>  Unless all defendants default, the parties must conduct the meeting and exchange the information required by FRBP 7026 within the time limits set forth therein.

LBR 7026-1

(2)  Joint Status Report. Within 7 days after such meeting, the parties must prepare a joint status report containing the information set forth in LBR 7016-1(a)(2). The joint status report will serve as the written report of the meeting required by FRBP 7026.

(c)  **Failure to Make Disclosures or Cooperate in Discovery.**

(1)  General. Unless excused from complying with this rule by order of the court for good cause shown, a party must seek to resolve any dispute arising under FRBP 7026-7037 or FRBP 2004 in accordance with this rule.

(2)  Meeting of Counsel. Prior to the filing of any motion relating to discovery, counsel for the parties must meet in person or by telephone in a good faith effort to resolve a discovery dispute. It is the responsibility of counsel for the moving party to arrange the conference. Unless altered by agreement of the parties or by order of the court for cause shown, counsel for the opposing party must meet with counsel for the moving party within 7 days of service upon counsel of a letter requesting such meeting and specifying the terms of the discovery order to be sought.

(3)  Moving Papers. If counsel are unable to resolve the dispute, the party seeking discovery must file and serve a notice of motion together with a written stipulation by the parties.

(A)  The stipulation must be contained in 1 document and must identify, separately and with particularity, each disputed issue that remains to be determined at the hearing and the contentions and points and authorities of each party as to each issue.

(B)  The stipulation must not simply refer the court to the document containing the discovery request forming the basis of the dispute. For example, if the sufficiency of an answer to an interrogatory is in issue, the stipulation must contain, verbatim, both the interrogatory and the allegedly insufficient answer, followed by each party's contentions, separately stated.

(C)  In the absence of such stipulation or a declaration of counsel of noncooperation by the opposing party, the court will not consider the discovery motion.

(4)  Cooperation of Counsel; Sanctions. The failure of any counsel either to cooperate in this procedure, to attend the meeting of counsel, or to provide the moving party the information necessary to prepare the stipulation required by this rule within 7 days of the meeting of counsel will result in the imposition of sanctions, including the sanctions authorized by FRBP 7037 and LBR 9011-3.

(5)  Contempt. LBR 9020-1 governing contempt proceedings applies to a discovery motion to compel a non-party to comply with a deposition subpoena for testimony and/or documents under FRBP 7030 and 7034.

1/16

EXHIBIT 3
83

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**LANDAU GOTTFRIED & BERGER LLP, 1801 Century Park East, Suite 700, Los Angeles, CA 90067.**

A true and correct copy of the foregoing documents entitled:
***1) Chapter 7 Trustee's Complaint to Set Aside and Recover Fraudulent Transfers;***
***2) Summons and Notice of Status Conference in Adversary Proceeding [LBR 7004–1]; and***
***3) Plaintiff's Notice of Required Compliance with FRBP 7026 and LBR 7026-1***
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (date) **November 22, 2017** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| St. Joseph's Investments, Inc. Defined Benefit Pension Plan<br>Carlo Bondanelli, Trustee<br>320 N. Palm Drive, Suite 201<br>Beverly Hills, CA 90210 | Carlo Bondanelli<br>320 N. Palm Drive, Suite 201<br>Beverly Hills, CA 90210 | St. Joseph's Investments, Inc.<br>Alessandra Pisani, registered agent for service of process<br>320 N. Palm Drive, Suite 201<br>Beverly Hills, CA 90210 |
| St. Joseph's Investments, Inc.<br>6380 Wilshire Blvd., Suite 1208<br>Los Angeles, CA 90048 | | |

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 22, 2017 | Erik Meza | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012

EXHIBIT 3
84

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**LANDAU GOTTFRIED & BERGER LLP, 1801 Century Park East, Suite 700, Los Angeles, CA 90067.**

A true and correct copy of the foregoing document entitled:
*Summons Service Executed re Service of:*
*1) Complaint;*
*2) Summons and Notice of Status Conference in Adversary Proceeding [LBR 7004-1]; and*
*3) Plaintiff's Notice of Required Compliance with FRBP 7026 and LBR 7026-1*
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **November 22, 2017,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

   - Peter J Mastan (TR)    pmastan@gumportlaw.com, pmastan@ecf.epiqsystems.com
   - John P Reitman    jreitman@lgbfirm.com, srichmond@lgbfirm.com;emeza@lgbfirm.com;njanbay@lgbfirm.com
   - United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
   - Aleksandra Zimonjic    azimonjic@lgbfirm.com, emeza@lgbfirm.com

   ☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) **November 22, 2017** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Julia W. Brand
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1382 / Courtroom 1375
Los Angeles, CA 90012

**United States Trustee (LA)**
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017
(213) 894-6811

   ☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

   ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 22, 2017 | Erik Meza | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California